1  STEPHEN M. HAYES (SBN 83583)
   shayes@hayesscott.com
2  RYAN Z. KELLER (SBN 249193)
   rkeller@hayesscott.com
3  HAYES SCOTT BONINO ELLINGSON & GUSLANI LLP
4  333 Twin Dolphin Road, Suite 230
   Redwood City, California 94065
5  Telephone:  650.637.9100

6
   Attorneys for Plaintiffs
7  HANOVER  AMERICAN  INSURANCE  COMPANY  and
   CITIZENS INSURANCE COMPANY OF AMERICA
8

9

10             UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13 HANOVER AMERICAN            CASE NO. 2:23-cv-10047-MRA-MAA
   INSURANCE COMPANY and
14                            REQUEST FOR JUDICIAL NOTICE IN
   CITIZENS INSURANCE COMPANY SUPPORT OF PLAINTIFFS HANOVER
15 OF AMERICA,               AMERICAN INSURANCE COMPANY
                             and CITIZENS INSURANCE
16          Plaintiffs,      COMPANY OF AMERICA'S REPLY
                             IN SUPPORT OF MOTION FOR
17     vs.                   JUDGMENT ON THE PLEADINGS
18 FRANCINI, INC.; and DOES 1
19 through 100, Inclusive,       Date:      July 18, 2024
                                 Time:      1:30 p.m.
20          Defendants.          Dept.:     10B
21

22

23                              Assigned for all Purposes to:
                                Judge Mónica Ramírez Almadani
24

25                              Complaint Filed:  November 29, 2023
                                Trial Date:       Not Yet Set
26

27

28

Plaintiffs, Hanover American Insurance Company and Citizens Insurance Company of America ("Plaintiffs") hereby respectfully request that this Court take judicial notice of the following documents pursuant to Federal Rules of Evidence Rule 201 in support of its Motion for Judgement on the Pleadings.

1.    A true and correct copy of the Complaint filed in the matter entitled *Melendez-Murillo, et al., v. AKG Trading USA, Inc. et al.*, Los Angeles County Superior Court Case No. 23STCV08596, filed on April 18, 2023, which is attached hereto as **Exhibit "A"**.  Judicial notice of this exhibit is proper because it is a record of a court of this state, and it is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

2.    In footnote 1 of the defendants opposition they noted that the wrong complaint was attached as **Exhibit 8**. It is hereby attached as **Exhibit "A"** and was available to defendants through the court docket and having been served with it.

Dated:  July 3, 2024                              HAYES SCOTT BONINO
                                                 ELLINGSON & GUSLANI LLP


                                                 By: _/S/ Ryan Z Keller_____
                                                     STEPHEN M. HAYES
                                                     RYAN Z. KELLER
                                                     Attorneys for Plaintiffs
                                                     HANOVER AMERICAN INSURANCE
                                                     COMPANY and CITIZENS INSURANCE
                                                     COMPANY OF AMERICA

1

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT FOR MOTION FOR JUDGMENT ON THE PLEADINGS – CASE NO. 2:23-cv-10047-MRA-MAA**

# Exhibit A

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
RAPHAEL METZGER, ESQ., SBN 116020
rmetzger@toxictorts.com
SCOTT P. BRUST, ESQ., SBN 215951
sbrust@toxictortslcom
555 E. OCEAN BLVD., SUITE 800
LONG BEACH, CA 90802
TELEPHONE: (562) 437-4499
TELECOPIER: (562) 436-1561

Attorneys for Plaintiffs
MARTIN MELENDEZ-MURILLO
and RUFINA BARAJAS

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/18/2023 10:30 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Jackson Aubry, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

MARTIN MELENDEZ-MURILLO and RUFINA BARAJAS,

        Plaintiffs,

vs.

AKG TRADING (USA), INC., a California corporation; ALEXANDER STONE INC., a Maryland corporation; AMERICAN MARBLE & GRANITE CO., a California corporation; ANTOLINI LUIGI & CSPA, an Italian corporation; ARCHITECTURAL SURFACES, INC., a Texas corporation; ARIZONA TILE, L.L.C., an Arizona limited liability company; ARRIAGA USA, INC., a California corporation; ARTISAN STONE, a California business entity; AZZARI APPLIANCES, PLUMBING, FLOORING, CABINETS LLC, a California limited liability company; BELLA STONE & TILE, a California business entity; BEST CHEER STONE, INC., a California corporation; BRETON SPA, in Italian corporation; C & C NORTH AMERICA, INC., a Delaware corporation; CAESARSTONE USA, INC., a California corporation; CAMBRIA COMPANY LLC, a Minnesota corporation; CI STONE, a business entity; CLASSIC MARBLE RESTORATION, a business entity; CLASSIC STONE LLC, a California limited liability company; COLOR MARBLE INC., a California corporation; COMPAC USA, INC., a Florida corporation; CONTINENTAL STONE, a business entity; CORNERSTONE MARBLE & GRANITE, a business entity; COSENTINO GROUP, a Spanish corporation; D C S INC., a California corporation; DAL-TILE DISTRIBUTION, INC., a Delaware corporation; DELTA STONE PRODUCTS, INC., a Utah corporation; DENTE TRADING CO., INC., a

CASE NO. 23STCV08596

**COMPLAINT FOR TOXIC INJURIES ASSERTING CAUSES OF ACTION FOR:**

(1) **NEGLIGENCE;**
(2) **STRICT LIABILITY - WARNING DEFECT;**
(3) **STRICT LIABILITY - DESIGN DEFECT;**
(4) **FRAUDULENT CONCEALMENT;**
(5) **BREACH OF IMPLIED WARRANTIES**
(6) **LOSS OF CONSORTIUM**

**DEMAND FOR JURY TRIAL [MADE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §§ 600 ET SEQ. AND PURSUANT TO RULE 38 OF THE FEDERAL RULES OF CIVIL PROCEDURE SHOULD THIS CASE EVER BE REMOVED TO FEDERAL COURT]**

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

New Jersey corporation; DMD MARBLE & GRANITE, INC., a California corporation; DOUBLE BAY COMPANY, INC., a Hawaii corporation; DRAGOS MARBLE INC., a Delaware corporation; DURANGO MARBLE, a business entity; E. I. DUPONT DE NEMOURS AND COMPANY a Delaware corporation; ELITE STONE, a busienss entity; EMPIRE MARBLE AND GRANITE, INC., a California corporation; EURO STONE AMERICA INTERNATIONAL, INC., a California corporation; EUROPEAN MARBLE & GRANITE, a business entity; EUROPEAN SURFACES, LLC, a California limited liability company; FORTE-STONE, LLC, a California limited liability company; FORUM QUARTZ, a business entity; FRANCINI, INC., a California corporation; G&G MARBLE & QUARTZ, INC., a California corporation; GEM INTERNATIONAL, INC., a California corporation; GLOBAL STONE TRADING, INC., a California corporation; GMG STONE, a California corporation; GUIDONI USA, a Georgia corporation; HIRSCH GLASS CORP., a New Jersey corporation; IMPERIAL MARBLE & GRANITE, a business entity; LILLY INDUSTRIES, a California corporation; LX HAUSYS AMERICA, INC., a New Jersey corporation; M S INTERNATIONAL, INC., a Delaware corporation; MAJESTIC STONE, a Texas business entity; MODERN STONE INC., a California corporation; MONT GRANITE, a business entity; MULTI STONE, a business entity; NATURAL STONE RESOURCES, INC., a California corporation; NEW MARBLE UNLIMITED, INC., a California corporation; OLLIN INTERNATIONAL, INC., a California corporation; OLYMPIA MARBLE & GRANITE, a California business entity; OLYMPUS MARBLE INC., a California corporation; OMEGA NATURAL STONE, a business entity; PACIFIC SHORE STONES LLC, a California limited liability company; PACIFIC STONE TILE & MARBLE, a business entity; PACIFICA TILE & STONE, a business entity; PARAGON INDUSTRIES, INC., a California corporation; PARSODA U.S.A., INC., a California corporation; PENTAL GRANITE AND MARBLE, LLC, a Washington limited liability company; PLANET STONE, INC., a California corporation; POLARSTONE US, a California corporation; QORTSTONE, a California business entity; QUANTUM QUARTZ, a business entity; RELIANZ GRANITE AND MARBLE, a business entity; RIO MARBLE & TILE, INC., a Nevada corporation; RIO STONES, INC., a California corporation;

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  SAN FERNANDO MARBLE & GRANITE INC., a California corporation; SANTA
2  MARGHERITA USA, INC., a Florida corporation; SEIEFFE CORPORATION; a
3  California corporation; SOUTHLAND STONE U.S.A., INC., a California corporation; STONE
4  DESIGN, a business entity; STONE ITALIANA, an Italian corporation; STONE
5  MART, a California corporation; STONEVILLE USA, INC., a California
6  corporation; STRICTLY STONES, a California business entity; STYLENQUAZA
7  LLC, a Texas limited liability company; SUBURBAN MARBLE & GRANITE, LLC, a
8  Pennsylvania limited liability company; TERRAZZO & MARBLE SUPPLY CO. OF
9  ILLINOIS, an Illinois corporation; TRI-STONE & TILE, INC., a California
10  corporation; UNITED MARBLE & TILE, INC., a California corporation; VADARA
11  QUARTZ SURFACES, a California business entity, VERONA QUARTZ, INC., a California
12  corporation; WALKER ZANGER, INC., a New York corporation; WEST COAST
13  MARBLE & GRANITE, INC., a California corporation; WILSONART LLC, a Delaware
   corporation; and Doe Defendants 1 - 100,
14  inclusive,

15          Defendants.

16  _____

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

3

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Plaintiffs, MARTIN MELENDEZ-MURILLO and RUFINA BARAJAS, hereby allege:

### THE PARTIES

**Plaintiffs**

1.    At all material times hereto, Plaintiffs, MARTIN MELENDEZ-MURILLO and RUFINA BARAJAS, have been residing in the State of California.

**Defendants**

2.    Plaintiff is informed and believes and thereon alleges that Defendant, AKG TRADING (USA), INC., is a California corporation, which at all material times hereto, was doing business as Cimstone USA in the County of Los Angeles, State of California.

3.    Plaintiff is informed and believes and thereon alleges that Defendant, ALEXANDER STONE, INC., is a Maryland corporation, which at all material times hereto, was doing business as MMG Marble and MMG Tile & Stone in the County of Los Angeles, State of California.

4.    Plaintiff is informed and believes and thereon alleges that Defendant, AMERICAN MARBLE & GRANITE CO., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

5.    Plaintiff is informed and believes and thereon alleges that Defendant, ANTOLINI LUIGI & CSPA, is an Italian corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

6.    Plaintiff is informed and believes and alleges that Defendant, ARCHITECTURAL SURFACES, INC., is a Texas corporation, which, at all times hereto, was doing business in the County of Los Angeles, California, formerly as Modul Marble and Pacifica Wholesale Tile & Stone.

7.    Plaintiff is informed and believes and thereon alleges that Defendant, ARIZONA TILE, L.L.C., is an Arizona limited liability company, which at all material times hereto, was doing

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

business in the County of Los Angeles, State of California.

8. Plaintiff is informed and believes and thereon alleges that Defendant, ARRIAGA USA, INC., is a California corporation, which at all material times hereto, was doing business as Stoneland USA in the County of Los Angeles, State of California.

9. Plaintiff is informed and believes and thereon alleges that Defendant, ARTISAN STONE, is a California business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

10. Plaintiff is informed and believes and thereon alleges that Defendant, AZZARI APPLIANCES, PLUMBING, FLOORING, CABINETS LLC, is a California limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

11. Plaintiff is informed and believes and thereon alleges that Defendant, BELLA STONE & TILE, is a California business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California, and had its principal place of business at 14533 Keswick Street #5, Van Nuys, CA 91405.

12. Plaintiff is informed and believes and thereon alleges that Defendant, BEST CHEER STONE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

13. Plaintiff is informed and believes and thereon alleges that Defendant, BRETON SPA, is an Italian corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

14. Plaintiff is informed and believes and thereon alleges that Defendant, C & C NORTH AMERICA, INC., is a Delaware corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California, at times as SMDS West Coast.

15. Plaintiff is informed and believes and thereon alleges that Defendant, CAESARSTONE USA, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

16. Plaintiff is informed and believes and thereon alleges that Defendant, CAMBRIA

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

COMPANY LLC, is a Minnesota corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

17.    Plaintiff is informed and believes and thereon alleges that Defendant, CI STONE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

18.    Plaintiff is informed and believes and thereon alleges that Defendant, CLASSIC MARBLE RESTORATION, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

19.    Plaintiff is informed and believes and thereon alleges that Defendant, CLASSIC STONE LLC, is a California limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

20.    Plaintiff is informed and believes and thereon alleges that Defendant, COLOR MARBLE INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

21.    Plaintiff is informed and believes and thereon alleges that Defendant, COMPAC USA, INC., is a Florida corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

22.    Plaintiff is informed and believes and thereon alleges that Defendant, CONTINENTAL STONE is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

23.    Plaintiff is informed and believes and thereon alleges that Defendant, CORNERSTONE MARBLE & GRANITE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

24.    Plaintiff is informed and believes and thereon alleges that Defendant, COSENTINO GROUP, is a Spanish corporation, whose headquarters for the Americas is located in Coral Gables, Florida, and which was doing business at 12822 Rangoon Street, Arleta, California, 91331-4321.

25.    Plaintiff is informed and believes and thereon alleges that Defendant, D C S INC. is a California corporation, which at all material times hereto, was doing business as Pacific Stone

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

in the County of Los Angeles, State of California.

26.     Plaintiff is informed and believes and thereon alleges that Defendant, DAL-TILE DISTRIBUTION, INC., is a Delaware corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

27.     Plaintiff is informed and believes and thereon alleges that Defendant, DELTA STONE PRODUCTS, INC., is a Utah corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

28.     Plaintiff is informed and believes and thereon alleges that Defendant, DENTE TRADING CO., INC., is a New Jersey corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

29.     Plaintiff is informed and believes and thereon alleges that Defendant, DMD MARBLE & GRANITE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

30.     Plaintiff is informed and believes and thereon alleges that Defendant, DOUBLE BAY COMPANY, INC., is a Hawaii corporation, which at all material times hereto, was doing business as Carmel Stone in the County of Los Angeles, State of California.

31.     Plaintiff is informed and believes and thereon alleges that Defendant, DRAGOS MARBLE INC., is a Delaware corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

32.     Plaintiff is informed and believes and thereon alleges that Defendant, DURANGO MARBLE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

33.     Plaintiff is informed and believes and thereon alleges that Defendant, E. I. DUPONT DE NEMOURS AND COMPANY is a Delaware corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

34.     Plaintiff is informed and believes and thereon alleges that Defendant, ELITE STONE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

35.     Plaintiff is informed and believes and thereon alleges that Defendant, EMPIRE MARBLE AND GRANITE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

36.     Plaintiff is informed and believes and thereon alleges that Defendant, EURO STONE AMERICA INTERNATIONAL, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

37.     Plaintiff is informed and believes and thereon alleges that Defendant, EUROPEAN MARBLE & GRANITE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

38.     Plaintiff is informed and believes and thereon alleges that Defendant, EUROPEAN SURFACES, LLC, is a California limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

39.     Plaintiff is informed and believes and thereon alleges that Defendant, FORTE-STONE, LLC, is a California limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

40.     Plaintiff is informed and believes and thereon alleges that Defendant, FORUM QUARTZ, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

41.     Plaintiff is informed and believes and thereon alleges that Defendant, FRANCINI, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

42.     Plaintiff is informed and believes and thereon alleges that Defendant, G&G MARBLE & QUARTZ, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

43.     Plaintiff is informed and believes and thereon alleges that Defendant, GEM INTERNATIONAL, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

44.     Plaintiff is informed and believes and thereon alleges that Defendant, GLOBAL

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

STONE TRADING, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

business in the County of Los Angeles, State of California.

45.     Plaintiff is informed and believes and thereon alleges that Defendant, GMG STONE, is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

46.     Plaintiff is informed and believes and thereon alleges that Defendant, GUIDONI USA, is a Georgia corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

47.     Plaintiff is informed and believes and thereon alleges that Defendant, HIRSCH GLASS CORP., is a New Jersey corporation, which at all material times hereto, was doing business as Spectrum Quartz in the County of Los Angeles, State of California.

48.     Plaintiff is informed and believes and thereon alleges that Defendant, IMPERIAL MARBLE & GRANITE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

49.     Plaintiff is informed and believes and thereon alleges that Defendant, LILLY INDUSTRIES, is a California corporation, which at all material times hereto, was doing business as The Slab Studio in the County of Los Angeles, State of California.

50.     Plaintiff is informed and believes and thereon alleges that Defendant, LX HAUSYS AMERICA, INC., is a New Jersey corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

51.     Plaintiff is informed and believes and thereon alleges that Defendant, M S INTERNATIONAL, INC., is a Delaware corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

52.     Plaintiff is informed and believes and thereon alleges that Defendant, MAJESTIC STONE, is a Texas business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

53.     Plaintiff is informed and believes and thereon alleges that Defendant, MODERN

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

STONE INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

54.    Plaintiff is informed and believes and thereon alleges that Defendant, MONT GRANITE, is a business entity, which at all material times hereto, was doing business as Mont Surfaces in the County of Los Angeles, State of California.

55.    Plaintiff is informed and believes and thereon alleges that Defendant, MULTI STONE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

56.    Plaintiff is informed and believes and thereon alleges that Defendant, NATURAL STONE RESOURCES, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

57.    Plaintiff is informed and believes and thereon alleges that Defendant, NEW MARBLE UNLIMITED, INC., is a California corporation, which at all material times hereto, was doing business as Marble Unlimited in the County of Los Angeles, State of California.

58.    Plaintiff is informed and believes and thereon alleges that Defendant, OLLIN INTERNATIONAL, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

59.    Plaintiff is informed and believes and thereon alleges that Defendant, OLYMPIA MARBLE & GRANITE, is a California business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California at 14533 Kewsick Street, Suite 5, Van Nuys, California 91405-1241.

60.    Plaintiff is informed and believes and thereon alleges that Defendant, OLYMPUS MARBLE INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

61.    Plaintiff is informed and believes and thereon alleges that Defendant, OMEGA NATURAL STONE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

62.    Plaintiff is informed and believes and thereon alleges that Defendant, PACIFIC

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

SHORE STONES LLC, is a California limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

63.     Plaintiff is informed and believes and thereon alleges that Defendant, PACIFIC STONE TILE & MARBLE, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

64.     Plaintiff is informed and believes and thereon alleges that Defendant, PACIFICA TILE & STONE, INC., is a corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

65.     Plaintiff is informed and believes and thereon alleges that Defendant, PARAGON INDUSTRIES, INC., is a California corporation, which at all material times hereto, was doing business as Bedrossians Tile & Stone in the County of Los Angeles, State of California.

66.     Plaintiff is informed and believes and thereon alleges that Defendant, PARSODA U.S.A., INC., is a California corporation, which at all material times hereto, was doing business as Pacifica Wholesale Tile & Stone in the County of Los Angeles, State of California.

67.     Plaintiff is informed and believes and thereon alleges that Defendant, PENTAL GRANITE AND MARBLE, LLC is a Washington limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

68.     Plaintiff is informed and believes and thereon alleges that Defendant, PLANET STONE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

69.     Plaintiff is informed and believes and thereon alleges that Defendant, POLARSTONE US, is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

70.     Plaintiff is informed and believes and thereon alleges that Defendant, QORTSTONE, is a California business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California at 7733 Lemona Avenue, Los Angeles, California 91405.

71.     Plaintiff is informed and believes and thereon alleges that Defendant, QUANTUM QUARTZ, is a business entity, which at all material times hereto, was doing business in the County

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

of Los Angeles, State of California.

72.    Plaintiff is informed and believes and thereon alleges that Defendant, RELIANZ GRANITE AND MARBLE is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

73.    Plaintiff is informed and believes and thereon alleges that Defendant, RIO MARBLE & TILE, INC., is a Nevada corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

74.    Plaintiff is informed and believes and thereon alleges that Defendant, RIO STONES, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

75.    Plaintiff is informed and believes and thereon alleges that Defendant, SAN FERNANDO MARBLE & GRANITE INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

76.    Plaintiff is informed and believes and thereon alleges that Defendant, SANTA MARGHERITA USA, INC., is a Florida California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

77.    Plaintiff is informed and believes and thereon alleges that Defendant, SEIEFFE CORPORATION, is a California corporation, which at all material times hereto, was doing business as Marble Express in the County of Los Angeles, State of California.

78.    Plaintiff is informed and believes and thereon alleges that Defendant, SOUTHLAND STONE U.S.A., INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

79.    Plaintiff is informed and believes and thereon alleges that Defendant, STONE DESIGN, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

80.    Plaintiff is informed and believes and thereon alleges that Defendant, STONE ITALIANA, an Italian corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

81.     Plaintiff is informed and believes and thereon alleges that Defendant, STONE MART, is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

82.     Plaintiff is informed and believes and thereon alleges that Defendant, STONEVILLE USA, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

83.     Plaintiff is informed and believes and thereon alleges that Defendant, STRICTLY STONES, is a business entity, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

84.    Plaintiff is informed and believes and thereon alleges that Defendant, STYLENQUAZA LLC is a Texas limited liability company doing business as Vicostone US and which at all material times hereto, was doing business in the County of Los Angeles, State of California.

85.     Plaintiff is informed and believes and thereon alleges that Defendant, SUBURBAN MARBLE & GRANITE, LLC, is a Pennsylvania limited liability company, which at all material times hereto, was doing business as Suburban Marble & Granite in the County of Los Angeles, State of California.

86.    Plaintiff is informed and believes and thereon alleges that Defendant, TERRAZZO & MARBLE SUPPLY CO. OF ILLINOIS, is an Illinois corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

87.    Plaintiff is informed and believes and thereon alleges that Defendant, TRI-STONE & TILE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

88.    Plaintiff is informed and believes and thereon alleges that Defendant, UNITED MARBLE & TILE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

89.     Plaintiff is informed and believes and thereon alleges that Defendant, VADARA QUARTZ SURFACES is a California business entity, which at all material times hereto, was doing business at 8969 Bradley Avenue, Sun Valley, California, 91352 in the County of Los Angeles.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

13

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

90.     Plaintiff is informed and believes and thereon alleges that Defendant, VERONA QUARTZ, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

91.     Plaintiff is informed and believes and thereon alleges that Defendant, WALKER ZANGER, INC., is a New York corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

92.     Plaintiff is informed and believes and thereon alleges that Defendant, WEST COAST MARBLE & GRANITE, INC., is a California corporation, which at all material times hereto, was doing business in the County of Los Angeles, State of California.

93.     Plaintiff is informed and believes and thereon alleges that Defendant, WILSONART LLC, is a Delaware limited liability company, which at all material times hereto, was doing business in the County of Los Angeles, State of California, at times as Technistone, which is the name of a company based in Hradec Kralove in the Czech Republic, that was acquired by Wilsonart in 2019.

94.     The true names and capacities of Defendants Does 1 through 100 are unknown to plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff will amend this complaint to state the true names and capacities of said fictitious defendants when they have been ascertained.  Plaintiff is informed and believes and thereon alleges that Defendants Does 1 through 100 are in some manner responsible for the occurrences herein alleged, and that plaintiff's damages as herein alleged were proximately caused by their conduct.

95.     Plaintiff is informed and believes and based thereon alleges that, at all times material hereto, each of the Defendants, including the fictitiously named Defendants, was acting in an individual, corporate, partnership, associate, conspiratorial or other capacity or as the agent, employee, co-conspirator, and/or alter ego of its co-defendants, and in doing the acts herein alleged, was acting within the course and scope of its authority as such partner, associate, agent, employee, co-conspirator, or alter ego, and with the permission, consent, knowledge, authorization, ratification and direction of its co-defendants, including all fictitiously named defendants.

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

14

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**DEFENDANTS' PRODUCTS**

96.     Defendants' stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed by inhaling dust from cutting, grinding, drilling, and polishing Defendants' products, were all mineral products that contained crystalline silica, the majority of which were artificial stone (also known as agglomerate, agglomerated stone, conglomerate, engineered stone, manufactured stone, quartz, reconstituted stone and synthetic stone), although some of which were natural stone products, including granite, limestone, marble, onyx, porcelain, quartzite, sandstone, serpentine and travertine.

97.     Plaintiff is informed and believes and thereon alleges that in addition to having an extremely high crystalline silica content, Defendants' artificial stone products also contained resins, pigments, and other additives to which Plaintiff, MARTIN MELENDEZ-MURILLO, was also exposed by inhaling dust from cutting, grinding, drilling, and polishing Defendants' products, which also caused damage to his lungs and exacerbated and accelerated his fibrotic lung disease.

98.     Following is a list of the named Defendants' products and their ingredients (as identified by Defendants), which Plaintiff, MARTIN MELENDEZ-MURILLO fabricated and/or installed and to which he was injuriously exposed in his work as a fabricator and installer:


AKG TRADING (USA), INC. dba Cimstone USA


Cimstone Quartz


and other stone products to be identified during the course of discovery


ALEXANDER STONE, INC., dba MMG Marble & Granite and MMG Tile & Stone


Granite

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

15

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Travertine

and other stone products to be identified during the course of discovery

AMERICAN MARBLE & GRANITE CO.

Granite

Marble

Quartz

and other stone products to be identified during the course of discovery

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

ANTOLINI LUIGI & CSPA

Quartz

Granite

Limestone

Marble

Onyx

Porcelain

Quartzite

Serpentine

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

//

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

17

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1   ARCHITECTURAL SURFACES, INC.

2

3       Metroquartz

4           Crystalline Silica (> 90%)

5           "Resins and Trace Minerals" (balance)

6

7       Vicostone, also known as Pentalquartz

8           Crystalline Silica (~ 90%)

9           "Polymeric Resin" (7-12%)

10          "Pigment and Trace Minerals" (~ 2%)

11

12      And other stone products to be identified during the course of discovery

13

14  ARIZONA TILE, LLC

15

16      Basalt

17

18      Della Terra Quartz

19

20      Dolomite

21

22      Granite

23

24      Limestone

25

26      Marble

27

28      Onyx

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1    Porcelain

2

3    Quartzite

4

5    Soapstone

6

7    Terrazzo

8

9    Travertine

10

11    And other stone products to be identified during the course of discovery

12

13    ARRIAGA USA, INC. dba Stoneland USA

14

15    Basalt

16

17    Granite

18

19    Limestone

20

21    Marble

22

23    Onyx

24

25    Porcelain

26

27    Quartz

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

19

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

1    Quartzite

2

3    Soapstone

4

5    Travertine

6

7    and other stone products to be identified during the course of discovery

8

9    ARTISAN STONE

10

11    Granite

12

13    Limestone

14

15    Marble

16

17    Onyx

18

19    Porcelain

20

21    Quartz

22

23    Quartzite

24

25    Travertine

26

27    and other stone products to be identified during the course of discovery

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

20

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic tort & environmental litigation occupational & environmental lung disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1    AZZARI APPLIANCES, PLUMBING, FLOORING, CABINETS, LLC

2

3        Arizona Tile

4

5        Caesarstone

6

7        Cim Stone

8

9        Dekton

10

11       Marble

12

13       M S International

14

15       Neolith

16

17       Pental Quartz

18

19       Qortstone

20

21       Quartz

22

23       Quartzmaster

24

25       Silestone

26

27       Vadara

28       And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

BELLA STONE & TILE

Basalt

Dolomite

Granite

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Sandstone

Soapstone

Travertine

and other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

BEST CHEER STONE, INC.

    BCS Quartz

    Granite

    Koville Quartz

    Marble

    Quarella

    Quartz

    Quartzite

and other stone products to be identified during the course of discovery

BRETON SPA

    Granite

    Marble

    Quartz

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  C & C NORTH AMERICA, INC.

2

3        Silestone (Cosentino)

4

5        Dekton (Cosentino)

6

7        And other stone products to be identified during the course of discovery

8

9  CAESARSTONE USA, INC.

10

11        Caesarstone Classico

12

13        Caesarstone Concetto

14

15        Caesarstone Metropolitan

16

17        Caesarstone Motivo

18

19        Caesarstone Supernatural

20

21        And other stone products to be identified during the course of discovery

22

23  CAMBRIA COMPANY LLC

24

25        Cambria Quartz Surfaces

26

27        And other stone products to be identified during the course of discovery

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

CI STONE

    Granite

    Limestone

    Marble

    Natural Stone

    Porcelain

    Quartz

    Sandstone

    And other stone products to be identified during the course of discovery

CLASSIC MARBLE RESTORATION

    Granite

    Marble

    Natural Stone

    And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

---

*Left margin (top):*
TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

*Left margin (middle):*
METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

*Left margin (bottom):*
Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

CLASSIC STONE LLC

  Cambria

  Granite

  Marble

  Quartz

  Quartzite

  Soapstone

  And other stone products to be identified during the course of discovery

COLOR MARBLE INC.

  Granite

  Limestone

  Marble

  Onyx

  Porcelain

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1    Quartz

2

3    Quartzite

4

5    Serpentine

6

7    Travertine

8

9    And other stone products to be identified during the course of discovery

10

11    COMPAC USA, INC.

12

13    Granite

14

15    Limestone

16

17    Marble

18

19    Onyx

20

21    Porcelain

22

23    Quartz

24

25    Quartzite

26

27    Serpentine

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

27

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

Soapstone

Technological Quartz

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

CONTINENTAL STONE

Granite

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Serpentine

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

1

Soapstone

2

3

Technological Quartz

4

5

Terrazzo

6

7

Travertine

8

9

And other stone products to be identified during the course of discovery

10

11

CORNERSTONE MARBLE & GRANITE

12

13

Granite

14

15

Marble

16

17

Quartz

18

19

Quartzite

20

21

And other stone products to be identified during the course of discovery

22

23

COSENTINO GROUP

24

25

Silestone

26

27

Dekton (by Cosentino)

28

And other stone products to be identified during the course of discovery

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd



TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1    D C S, INC., dba Pacific Stone

2

3        Granite

4

5        Limestone

6

7        Marble

8

9        Onyx

10

11        Porcelain

12

13        Quartz

14

15        Quartzite

16

17        Serpentine

18

19        Soapstone

20

21        Terrazzo

22

23        Travertine

24

25        And other stone products to be identified during the course of discovery

26

27    //

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

30

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1  DAL-TILE DISTRIBUTION, INC.

2

3          Granite

4

5          Limestone

6

7          Marble

8

9          Natural Stone

10

11          One Quartz

12

13          Porcelain

14

15          Quartz

16

17          Quartzite

18

19          Soapstone

20

21          Travertine

22

23          And other stone products to be identified during the course of discovery

24

25  //

26  //

27  //

28  //

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd



DELTA STONE PRODUCTS, INC.

Basalt

Granite

Limestone

Marble

Quartz

Quartzite

Sandstone

And other stone products to be identified during the course of discovery

DENTE TRADING CO., INC.

Granite

Limestone

Marble

Onyx

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

Quartz

Quartzite

Soapstone

Travertine

And other stone products to be identified during the course of discovery

DMD MARBLE & GRANITE, INC.

Arizona Tile

Bedrosians

Caesarstone

Cambria

Dekton

Daltile

MS International

Silestone

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

33

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1  DOUBLE BAY COMPANY, INC. dba Carmel Stone

2

3         Aurea Stone

4

5         Caesarstone

6

7         Cambria

8

9         Granite

10

11        Limestone

12

13        Marble

14

15        Neolith

16

17        Onyx

18

19        Porcelain

20

21        Quartz

22

23        Quartzite

24

25        Travertine

26

27        And other stone products to be identified during the course of discovery

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

34

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

DRAGOS MARBLE INC.

    Granite

    Limestone

    Marble

    Onyx

    Porcelain

    Quartz

    Quartzite

    Sandstone

    Soapstone

    Terrazzo

    Travertine

And other stone products to be identified during the course of discovery

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

DURANGO MARBLE

    Cambria

    Della Terra

    Granite

    Limestone

    Marble

    Natural Stone

    Pental Quartz

    Porcelain

    Quartz

    Quartzite

    Silestone

    Soapstone

    Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic tort & environmental litigation occupational & environmental lung disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

E. I. DUPONT DE NEMOURS AND COMPANY

ZODIAQ Quartz Surfaces

Corian Quartz Surfaces

And other stone products to be identified during the course of discovery

ELITE STONE

Porcelain

Quartz

And other stone products to be identified during the course of discovery

EMPIRE MARBLE AND GRANITE, INC.

Granite

Limestone

Marble

Onyx

Quartz

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

1 | Quartzite

2

3 | Travertine

4

5 | And other stone products to be identified during the course of discovery

6

7 | EURO STONE AMERICA INTERNATIONAL, INC.

8

9 | Granite

10

11 | Limestone

12

13 | Marble

14

15 | Onyx

16

17 | Quartz

18

19 | Porcelain

20

21 | Quartzite

22

23 | Soapstone

24

25 | Terrazzo

26

27 | Travertine

28 | And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

EUROPEAN MARBLE & GRANITE

Basalt

Dolomite

Granite

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Sandstone

Soapstone

Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  EUROPEAN SURFACES, LLC dba Euro Stone

2

3          Quartz

4

5          And other stone products to be identified during the course of discovery

6

7  FORTE STONE, LLC

8

9          Copa Quartz

10

11         Granite

12

13         Limestone

14

15         Marble

16

17         Quartz

18

19         Quartzite

20

21         Soapstone

22

23         And other stone products to be identified during the course of discovery

24

25  FORUM QUARTZ

26

27         Forum Quartz

28         And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

FRANCINI, INC.

Granite

Limestone

Lucastone Quartz by Francini

Marble

Onyx

Porcelain

Quartz

Quartzite

Soapstone

Serpentine

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

41

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  G&G MARBLE & QUARTZ

3      Dekton

5      Granite

7      Marble

9      Quartz

11     And other stone products to be identified during the course of discovery

13  GEM INTERNATIONAL, INC.

15     Granite

17     Limestone

19     Marble

21     Onyx

23     Quartz

25     Quartzite

27     Travertine

28     And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1   GLOBAL STONE TRADING, INC.

2

3        Caesarstone

4

5        Color Quartz

6

7        Granite

8

9        Limestone

10

11       LZ Hausys Viatera

12

13       Marble

14

15       Onyx

16

17       Porcelain

18

19       Quartz

20

21       Quartzite

22

23       Silestone

24

25       Travertine

26

27       And other stone products to be identified during the course of discovery

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd



GMG STONE

    Granite

    Limestone

    Marble

    Natural Stone

    Porcelain

    Quartz

    Quartzite

    Soapstone

    Travertine

    And other stone products to be identified during the course of discovery

GUIDONI USA dba Top Z Stone

    Granite

    Marble

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

1    Quartzite

2

3    Topzstone Quartz

4

5    And other stone products to be identified during the course of discovery

6

7  HIRSCH GLASS CORP.

8

9    Spectrum Quartz

10

11    And other stone products to be identified during the course of discovery

12

13  IMPERIAL MARBLE & GRANITE

14

15    Granite

16

17    Limestone

18

19    Marble

20

21    Quartz

22

23    Quartzite

24

25    Soapstone

26

27    Travertine

28    And other stone products to be identified during the course of discovery

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  LILLY INDUSTRIES, INC. dba The Slab Studio

2

3          Aurea Stone

4

5          Enigma

6

7          Granite

8

9          Itaka

10

11          Limestone

12

13          Marble

14

15          Onyx

16

17          Porcelain

18

19          Quartz

20

21          Quartzite

22

23          Soapstone

24

25          Travertine

26

27          And other stone products to be identified during the course of discovery

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  LX HAUSYS AMERICA, INC.

2

3      HIMACS

4

5      Quartz

6

7      Viatera (Engineered Stone)

8

9      And other stone products to be identified during the course of discovery

10

11  M S INTERNATIONAL, INC.

12

13      Basalt

14

15      Dolomite

16

17      Granite

18

19      Marble

20

21      Onyx

22

23      Porcelain

24

25      Quartz

26

27      Quartzite

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Q Quartz (Premium Natural Quartz)

Sandstone

Soapstone

Travertine

And other stone products to be identified during the course of discovery

MAJESTIC STONE

Granite

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Sandstone

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1   Soapstone

2

3   Serpentine

4

5   Terrazzo

6

7   Travertine

8

9   And other stone products to be identified during the course of discovery

10

11  MODERN STONE INC.

12

13      Granite

14

15      Limestone

16

17      Marble

18

19      Natural Stone

20

21      Onyx

22

23      Porcelain

24

25      Quartz

26

27      Quartzite

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1    Serpentine

2

3    Soapstone

4

5    Terrazzo

6

7    Travertine

8

9    And other stone products to be identified during the course of discovery

10

11    MONT GRANITE, dba Mont Surfaces

12

13    Basalt

14

15    Dolomite

16

17    Engineered Quartz

18

19    Granite

20

21    Limestone

22

23    Marble

24

25    Onyx

26

27    Porcelain

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1   Quartz

2

3   Quartzite

4

5   Sandstone

6

7   Soapstone

8

9   And other stone products to be identified during the course of discovery

10

11  MULTI STONE

12

13      Granite

14

15      Limestone

16

17      Marble

18

19      Porcelain

20

21      Quartz

22

23      Quartzite

24

25      Sandstone

26

27      Soapstone

28  And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1    NATURAL STONE RESOURCES

2

3        Basalt

4

5        Granite

6

7        Limestone

8

9        Marble

10

11       Onyx

12

13       Quartz

14

15       Quartzite

16

17       Porcelain

18

19       Sandstone

20

21       Slate

22

23       Travertine

24

25       And other stone products to be identified during the course of discovery

26

27   //

28   //

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1   NEW MARBLE UNLIMITED, INC. dba Marble Unlimited

2

3        Basalt

4

5        Cristallo

6

7        Granite

8

9        Limestone

10

11       Marble

12

13       Onyx

14

15       Porcelain

16

17       Quartz

18

19       Quartzite

20

21       Sandstone

22

23       Travertine

24

25       And other stone products to be identified during the course of discovery

26

27   //

28   //

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

OLLIN INTERNATIONAL, INC.

Basalt

Granite

Limestone

Marble

Neolith

Onyx

Porcelain

Quartz

Quartzite

Sandstone

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

OLYMPIA MARBLE & GRANITE

    Granite

    Limestone

    Marble

    Porcelain

    Quartz

    Quartzite

    Sandstone

    Soapstone

    And other stone products to be identified during the course of discovery

OLYMPUS MARBLE, INC.

    Granite

    Limestone

    Marble

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

55

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd



Natural Stone

Onyx

Porcelain

Quartz

Quartzite

Serpentine

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

OMEGA NATURAL STONE

Granite

Limestone

Marble

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

56

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1   Porcelain

2

3   Quartz

4

5   Quartzite

6

7   And other stone products to be identified during the course of discovery

8

9   PACIFIC SHORE STONES LLC

10

11   Antolini

12

13   Cambria

14

15   Caesarstone

16

17   Compac

18

19   Dekton

20

21   Dolomite

22

23   Granite

24

25   HanStone Quartz

26

27   Limestone

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

LX Viatera

Marble

Maxfine

Neolith

PacShore Tech Porcelain

Quartz

Silestone

Onyx

Porcelain

Quartzite

Serpentine

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

PACIFIC STONE, TILE & MARBLE

Granite

Marble

Porcelain

Quartz

Quartzite

Travertine

And other stone products to be identified during the course of discovery

PACIFICA TILE & STONE INC.

Basalt

Dolomite

Granite

Limestone

Marble

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

59

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Onyx

Porcelain

Quartz

Quartzite

Serpentine

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

//
//
//
//
//
//
//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

PARAGON INDUSTRIES, INC. dba Bedrosians Tile & Stone

Granite

Limestone

Marble

Onyx

Porcelain

Quartz

Quartzite

Sequel Quartz

Serpentine

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

PARSODA U.S.A., INC.

     Metroquartz

     Vicostone, also known as Pentalquartz

     And other stone products to be identified during the course of discovery

PENTAL GRANITE AND MARBLE, LLC

     Metroquartz

     Vicostone, also known as Pentalquartz

     And other stone products to be identified during the course of discovery

PLANET STONE, INC.

     Caesarstone

     Cambria

     Eurostone

     Granite

     Limestone

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Marble

Onyx

Porcelain

Qortstone

Quartz

Quartzite

Silestone

Soapstone

Terrazzo

Travertine

Vadara

Verona

And other stone products to be identified during the course of discovery

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

POLARSTONE US

      Polarstone Quartz

      And other stone products to be identified during the course of discovery

QORTSTONE

      Qortstone

      And other stone products to be identified during the course of discovery

QUANTUM QUARTZ

      Marble

      Quartz

      And other stone products to be identified during the course of discovery

RELIANZ GRANITE AND MARBLE

      Granite

      Marble

      Quartz

      And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

64

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

RIO MARBLE & TILE, INC.

  Granite

  Marble

  Slate

  And other stone products to be identified during the course of discovery

RIO STONES, INC.

  Caesarstone

  Granite

  Marble

  Quartz

  Quartzite

  Porcelain

  Travertine

  And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

SAN FERNANDO MARBLE & GRANITE, INC.

     Granite

     Limestone

     Marble

     Onyx

     Quartz

     Travertine

     And other stone products to be identified during the course of discovery

SANTA MARGHERITA USA, INC.

     SM Atmosphera

     SM Marble

     SM Palazzo

     SM Quartz

     SM Voyage

     And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  SEIEFFE CORPORATION

2

3      Okite Quartz

4

5      And other stone products to be identified during the course of discovery

6

7  SOUTHLAND STONE U.S.A., INC.

8

9      Basalt

10

11      Granite

12

13      Limestone

14

15      Marble

16

17      Onyx

18

19      Quartz

20

21      Quartzite

22

23      Sandstone

24

25      Soapstone

26

27      Travertine

28      And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

1  STONE DESIGN

2

3        Granite

4

5        Limestone

6

7        Marble

8

9        Porcelain

10

11       Quartz

12

13       Quartzite

14

15       And other stone products to be identified during the course of discovery

16

17  STONE ITALIANA

18

19       Cosmolite

20

21       Marble

22

23       Marmorea

24

25       Porcelain

26

27       Quartz

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1    Stoneit

2

3    And other stone products to be identified during the course of discovery

4

5  STONE MART

6

7       Dolomite

8

9       Granite

10

11      Limestone

12

13      Marble

14

15      Onyx

16

17      Porcelain

18

19      Quartz

20

21      Quartzite

22

23      And other stone products to be identified during the course of discovery

24

25  //

26  //

27  //

28  //

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1  STONEVILLE USA, INC.

2

3       Caesarstone

4

5       Cambria

6

7       Corian Solid Surface

8

9       Dekton

10

11      Forza Porcelain

12

13      Geoluxe Pyrolithic Stone

14

15      Hanex Solid Surfaces

16

17      Hanstonequartz

18

19      Q Quarts (Premium Natural Quartz)

20

21      Sapienstone Porcelain

22

23      Silestone

24

25      Vadara

26

27      Vetrazzo Recycled Surfaces

28      And other stone products to be identified during the course of discovery

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

STRICTLY STONES

Granite

Limestone

Marble

Porcelain

Quartz

Quartzite

Travertine

And other stone products to be identified during the course of discovery

STYLENQUAZA, LLC

Metroquartz

Vicostone, also known as Pentalquartz

And other stone products to be identified during the course of discovery

//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

1    SUBURBAN MARBLE & GRANITE, LLC

2

3        Granite

4

5        Marble

6

7        Quartz

8

9        Quartzite

10

11       And other stone products to be identified during the course of discovery

12

13   TERRAZZO & MARBLE SUPPLY CO. OF ILLINOIS

14

15       Antolini Tech Porcelain

16

17       Basalt

18

19       Difiniti Surfaces

20

21       Diresco Quartz

22

23       Granite

24

25       Limestone

26

27       Marble

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

Marble Agglomerate

Onyx

Porcelain

Quartz

Quartzite

Sandstone

Soapstone

Terrazzo

Travertine

And other stone products to be identified during the course of discovery

TRI-STONE & TILE, INC.

Granite

Limestone

Marble

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

73

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

Onyx

Porcelain

Quartz

Quartzite

Travertine

And other stone products to be identified during the course of discovery

UNITED MARBLE & TILE, INC.

Caesarstone

Cambria

Eurostone

Granite

Limestone

Marble

Qortstone

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

74

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

Silestone

Soapstone

Travertine

Vadara

Verona

And other stone products to be identified during the course of discovery

VADARA QUARTZ SURFACES

Vadara Quartz Surfaces

And other stone products to be identified during the course of discovery

VERONA QUARTZ, INC.

Verona Quartz

And other stone products to be identified during the course of discovery

WALKER ZANGER, INC.

Granite

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

75

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

1     Limestone

2

3     Marble

4

5     Onyx

6

7     Porcelain

8

9     Quartz

10

11    Quartzite

12

13    Soapstone

14

15    Terrazzo

16

17    And other stone products to be identified during the course of discovery

18

19  WEST COAST MARBLE & GRANITE, INC.

20

21    Caesarstone

22

23    Cambria

24

25    Granite

26

27    Marble

28

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd



Pentalquartz

Porcelain

Quartz

Quartzite

Silestone

Travertine

And other stone products to be identified during the course of discovery

WILSONART LLC

Engineered Stone

Quartz

Technistone

And other stone products to be identified during the course of discovery

//
//
//
//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

## GENERAL ALLEGATIONS

99.     From about 2002 to 2003, Plaintiff, MARTIN MELENDEZ-MURILLO, worked as a fabricator and polisher of stone countertops at ZF Marble in Los Angeles County, California.

100.    From about 2003 to 2005, Plaintiff, MARTIN MELENDEZ-MURILLO, worked as a fabricator and polisher of stone countertops in Los Angeles County, California.

101.    From about 2005 to 2017, Plaintiff, MARTIN MELENDEZ-MURILLO, worked as a fabricator of stone countertops at Ultra Marble and Granite, Inc. in Los Angeles County, California.

102.    From about 2017 to 2022, Plaintiff, MARTIN MELENDEZ-MURILLO, worked as a cutter, fabricator and installer of stone countertops for numerous contractors in Los Angeles County, California.

103.    At various times from 2002 to 2022, Plaintiff, MARTIN MELENDEZ-MURILLO, cut, ground, drilled, edged, polished, fabricated and installed artificial stone and natural stone countertops mostly for home kitchens and bathrooms. Plaintiff is informed and believes and thereon alleges that the injuries from which he suffers and which are the subject of this action, were sustained in the course of his work in Los Angeles County, cutting, fabricating, and installing artificial stone and natural stone countertops.

104.    Throughout the course of his work, Plaintiff, MARTIN MELENDEZ-MURILLO worked with inherently hazardous products manufactured, distributed and/or supplied by the named defendants and Does 1-100.  Plaintiff, MARTIN MELENDEZ-MURILLO, was thereby exposed to and inhaled respirable crystalline silica, metals and other toxins from said products.  As a direct and proximate result of MARTIN MELENDEZ-MURILLO's exposure to silica, metals and other toxins within said products manufactured, distributed and/or supplied by Defendants and Does 1-100, Plaintiff, MARTIN MELENDEZ-MURILLO, developed silicosis and other conditions which have required medical treatments and hospitalizations, and for which Plaintiff needs to receive a lung transplant.

105.    Each of the products manufactured, distributed and/or supplied by the named defendants and Does 1-100 were used by Plaintiff as intended by Defendants in the course of his

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

work as a cutter, fabricator and installer of stone countertops. The foregoing intended use of said products by Plaintiff, MARTIN MELENDEZ-MURILLO, and his co-workers, resulted in the generation and release of toxic airborne dusts and particulates to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed in the course of his work. As a result of his use and exposure to the stone products of Defendants and Does 1-100 throughout his work in Southern California, Plaintiff, MARTIN MELENDEZ-MURILLO, inhaled silica, metal dust and particles, and other toxins from said products that were generated and released during the intended and expected use of said toxic mineral products that were manufactured, distributed and/or supplied by Defendants and Does 1-100. As a direct result of his exposure to silica and metals in Defendants' products, Plaintiff developed silicosis and has required extensive medical treatments and hospitalizations, and needs a lung transplant.

## TOLLING OF STATUTE OF LIMITATIONS

### Appreciable Injury and Diagnosis Postdating Exposure

106.    Plaintiff, MARTIN MELENDEZ-MURILLO, was first diagnosed with silicosis on or about December 9, 2022. Prior to said time, Plaintiff, MARTIN MELENDEZ-MURILLO, did not discover, and could not reasonably have discovered, that he had been injured and was suffering from silicosis, the toxic nature of his injuries and disease, their cause by Defendants, or Defendants' wrongdoing. The pathological effect of Plaintiff's disease occurred without perceptible trauma and Plaintiff was blamelessly ignorant of its cause. It was not until December 2022 that Plaintiff, MARTIN MELENDEZ-MURILLO was even aware he had sustained any appreciable injury.

//
//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

<u>Ignorance</u> <u>of</u> <u>Identity</u> <u>of</u> <u>Injury-Causing</u> <u>Hazardous</u> <u>Substances</u>

107.    At no time did Plaintiff MARTIN MELENDEZ-MURILLO personally ascertain any ingredients or contaminants of the products to which he was exposed in the course of his work that caused his lung disease; Plaintiff personally remains ignorant of the identity of those hazardous substances to which he was exposed at work that caused his lung disease.

<u>Fraudulent</u> <u>Concealment</u> <u>of</u> <u>Toxic</u> <u>Hazards</u> <u>by</u> <u>Defendants</u>

108.    At all material times hereto, Defendants fraudulently concealed from Plaintiff, MARTIN MELENDEZ-MURILLO, material facts concerning the nature of the products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed.

109.    At all material times hereto, Defendants fraudulently concealed the toxic hazards of their products from Plaintiff, MARTIN MELENDEZ-MURILLO, the hazards of the conditions under which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to their products; that Plaintiff MARTIN MELENDEZ-MURILLO, was inhaling toxic invisible particles from Defendants' products during the course of his work; and the cause of the lung disease from which Plaintiff, MARTIN MELENDEZ-MURILLO, suffers.

110.    At all material times hereto, Defendants fraudulently concealed from Plaintiff, MARTIN MELENDEZ-MURILLO, that their products were toxic and that they contained silica, metals and other toxins that cause fibrotic lung disease upon inhalation.

111.    At all material times hereto, Defendants failed to disclose to Plaintiff toxic hazards of their products, which Defendants were required to disclose to Plaintiff, MARTIN MELENDEZ-MURILLO, pursuant to California common law.

112.    Defendants' concealment was sufficiently complete that Plaintiff MARTIN MELENDEZ-MURILLO did not know, nor could he have known, earlier than December 2022 of Defendants' culpability, that he had sustained toxic injuries, that the stone products to which he exposed had caused his silicosis, or that he had causes of action arising from his injuries.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

## A BRIEF HISTORY OF SILICOSIS

113.    Silicon is the second most abundant element on Earth, after oxygen.

114.    The health risks associated with exposure to crystalline silica dust have been known to the stone industry for centuries, indeed for millenia.

115.    Evidence of occupational silicosis dates all the way back to ancient Egypt and Greece. Stonecutters, builders, and masons all exhibited signs of silicosis, as they were the workers who built these ancient cities.

116.    In 1556, Agricola wrote a treatise on mining in which he described a lung disease afflicting stonecutters and miners.

117.    In 1700, Dr. Bernardino Ramazzini, who is considered the "father of occupational medicine," identified evidence of silicosis in stone cutters.  He did this by performing autopsies of the stone workers, noticing a "sand-like" substance in their lungs.

118.    In the early 1900s, Dr. Alice Hamilton, a physician whose work resulted in significant safety and health reforms, documented silica related illnesses among granite workers in Vermont.

119.    In 1917 the United States Public Health Service called attention to the prevalence of silicosis in foundry workers.  Watkins, J., U.S. Bureau of Mines, Bulletin No. 1, Air Hygiene Foundation of America (1917).

120.    In 1918, the U.S. government published a study reporting that the industry with the greatest hazard of silica dust inhalation and disease was the abrasive industry.  Winslow, C.E. et al, "The Dust Hazard in the Abrasive Industry," U.S. Public Health Reports, 34:1171-1187 (1918).

121.    By the early 1930s, industrial journals and periodicals were replete with articles discussing hazards of silica especially as it related to sandblasting.  See e.g., Sayers & Lanza, "Pneumoconiosis," American Public Health Association Yearbook (1932); Bloomfield, J.J. et al., "Sand and Metallic Abrasive Blasting as an Industrial Health Hazard," *J. Industr. Hyg.* 184 (1933) [air pressured abrasive blasting caused extremely lethal exposure to airborne silica]; Merewether, E.R. 7, Tubercle 385 (1936) [silicosis identified as a disease with a higher mortality rate in sand and shot blasters than other jobs in foundries].

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

122.    By the mid-1930s it was well known to industry that silicosis (earlier variously called miner's asthma, potter's rot, or phthisis) is an occupational disease caused by the inhalation of tiny particles of quartz dust in the lungs.  "Village of the Living Dead," 121 Literary Digest 6 (1936).

123.    In 1937, the United States Department of Labor, hosted a National Silicosis Conference, at which a number of occupations were identified as being at high risk of exposure to silica and resulting lung disease.  National Silicosis Conference, Report on Medical Control,  U.S. Department of Labor, Bulletin 21, Part 2B (1938).  At the conference, a powerful observation was made about the necessary protections needed for sandblasters:

> Protection of workmen by means of respirators is also indicated whenever the room air cannot be kept moderately free from dust, and, of course doubly indicated in operations that are unusually dusty.  In all kinds of sandblasting, workmen should be individually protected, without fail.  When possible, the form of respirator which provides for the workman and ample supply of pure, fresh air under direct pressure is certainly the best, provided every precaution is taken to see that the air is free of oily vapor and dust.

> For those companies selling products to sandblasting operations, they need to look no further than the front page of the newspaper or government conferences to learn of the danger of sand. Yet these companies chose to sell their products to businesses, representing that such products could be used for sandblasting--contrary to widely publicized reports about necessary safety measures.  Likewise, sand companies sold sand to business without ever revealing the dangers of silica-abrasives.  While these companies successfully profited in the 40s, 50s and 60s, the price would be devastating for thousands of American Workers.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

124.    The Hawk's Nest disaster is an excellent example of just how deadly respiratory exposure to silica dust can be.  During the great depression, in the early 1930s, a three-mile-long diversion tunnel was being dug through Gauley Mountain to reach the New River, to construct a hydroelectric power dam.  The only dust control used was a two-hour period to let the dust settle after blasting through the rock.  Of the 1200 men who worked underground for only two months, 760 men died within five years, with 2000 men eventually dying as a result of lung disease from silica.  This disaster prompted a Congressional call to action.

125.    The federal government responded and in 1938 the Secretary of Labor, Francis Perkins, held a National Silicosis Conference and initiated a campaign to "Stop Silicosis," stating: "Our job is one of applying techniques and principles to every known silica dust hazard in American industry. We know the methods of control – let us put them in practice."

126.    Despite these efforts, silica exposure continued to be a serious health hazard for workers in the construction industry. As new products, tools, and work practices have been introduced, new means of exposure were created.  An article in a leading construction trade magazine summed up the situation: "With the advent and increased use of dry cutting, drilling and grinding of concrete and masonry material in construction, we often see workers operating in a cloud of dust with no respiratory protection or safety measures to prevent airborne dust.  Exposure levels in settings like construction sites are highly variable for airborne silica dust, which poses a significant risk to workers."

127.    By the 1950s, the hazard of inhaling dust in various industries was well known to American industry.   See, e.g., Forbes, J., Davenport, S.,  Review of Literature on Dusts,  U.S. Department of Interior, Bureau of Mines, Bulletin 478 (1950).

128.    During the period 1968 to 2002, silicosis was recorded as the underlying or contributing cause of death on approximately 74 million U.S. death certificates.  Of these deaths, 98% were males.  From 1968 to 2002, the mortality rate has dropped by 93%.  Bang KM, Mazurek JM, "Silicosis mortality, prevention, and control—United States, 1968–2002," *MMWR: Morbidity and Mortality Weekly Report* 54(16):401-405 (2005).

129.    In 1996, the Secretary of Labor began a new campaign to raise awareness and

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

encourage safer work practices called "It's Not Just Dust," and initiated a Special Emphasis Program (SEP) on Silicosis to provide guidance to "reduce and eliminate the workplace incidence of silicosis from exposure to crystalline silica." In addition, OSHA, NIOSH, and the American Lung Association held a conference "The Campaign to End Silicosis."

130.    In 2007, OSHA estimated that more than two million employees are exposed to silica in general industry, construction, and maritime industry. NIOSH acknowledges that an unknown number of the 3.7 million workers in 2002 engaged in agriculture had exposure to silica from dust-generating activities. According to the U.S. Bureau of Mines, silica is present in nearly all of mining operations. Glenn DD, "Current issues surrounding silica," *Prof. Safety* 5392):37-46 (2008).

131.    It was not until 2011 that OSHA's proposed guidelines made it to the Office of Management and Budget (OMB), under Executive Order 12866.

132.    It was not until 2013, after a group of congressmen sent a letter urging the OMB to "take prompt action" regarding their rulemaking process on respirable crystalline silica, that it was listed on OSHA's regulatory agenda.

133.    On March 24, 2016, after even more public hearings, debates, and reviews, OSHA announced its final rule to protect workers from respiratory exposure to crystalline silica dust.

134.    On September 23, 2017, OSHA's new silica regulations finally became effective, but only for the construction industry.

135.    On June 23, 2018, OSHA extended its silica regulations to maritime industries.

136.    Three years later, on June 23, 2021, OSHA's regulations regarding occupational exposure to silica dust will become effective as to the oil and gas industry to address the hazard of silica exposure from hydraulic fracturing.

137.    Since the fibrogenic hazards of stone products have been known to the stone industry for centuries, indeed millenia, and since those hazards have been well known to the American stone industry since at least the early years of the 20th century, Defendants all were aware of toxic and fibrogenic hazards of their stone products and were legally obligated to warn workers of those hazards and especially to provide them use instructions adequate to prevent fibrotic lung disease.

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

## ARTIFICIAL STONE

138.    Artificial stone is a composite material made of crushed stone that is bound together by an adhesive to create a solid surface.  Artificial stone is also called Agglomerate, Agglomerated Stone, Conglomerate, Engineered Stone, Manufactured Stone, and Synthetic Stone.

139.    Artificial stone was invented in the 1970s by Marcello Toncelli, who founded Breton SpA, an Italian company, at Castello di Godego in the province of Treviso, Italy.  Breton obtained patents for vibro-compression under vacuum and a mixture of fragmented stone or silica dust with a polyester resin binder made of styrene monomer and anhydrides.

140.    The basic raw material and major constituent of most artificial stone products is quartz, i.e., crystalline silica.

141.    Artificial stone is usually sold as slabs, but is sometimes sold as blocks.

142.    Artificial stone is primarily used to fabricate kitchen and bathroom countertops.

143.    Artificial stone is manufactured in large factories, most of which have been located outside the United States, until quite recently.

144.    In 1987 Caesarstone began manufacturing artificial stone at Kibbutz Sdot Yam near Haifa in Israel on the shore of the Mediterranean Sea.

145.     In 1990 Cosentino began manufacturing artificial stone in Almeria, Spain, in Andalusia in southeastern Iberia on the Mediterranean Sea.

146.    Today artificial stone today is manufactured about 30 companies throughout the world:  Aro Granite Industries (India), Baba Quartz (India), Breton (Italy), Caesarstone (Israel), Cambria (US), Cimstone (Turkey), Compac (Spain), Cosentino (Spain), Diresco (Belgium), Dupont (Canada), Guidoni Group (Brazil), Hanwha (South Korea), Hirsch Glass Corp (US), LX Hausys (South Korea),  Lotte Chemical (South Korea), Mohawk Industries (US), MS International (India), Pokarna (India), Quarella (Spain), Quartzform (Germany), RMC (Portugal), Santa Margherita (Spain), Stone Italiana (Italy), Strasser Steine (Austria), Technistone (Czech Republic), Totem Quartz (Iran), USA Quartz (US), Vicostone (Vietnam), Wilsonart (S. Korea).

//

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

147.    There are a few steps involved in the manufacture of artificial stone.  First, raw quartz is mined at a quartz mine.  Next, raw quartz is crushed and sorted in a factory.  Then acids, alcohols, styrene, and peroxide are mixed in a chemical plant to initiate a series of chemical reactions that produce polyester resin.  Pigments are also produced in a chemical plant.

148.    Crushed quartz, polyester resin, and pigments are transported to an artificial stone manufacturing plant where they are combined, placed into molds, compacted, heated, and cured.

149.    Artificial stone is shipped from those countries that manufacture it throughout the world.  Local workers, mostly immigrants, typically working in small shops, fabricate the artificial stone slabs into countertops that are then installed in customers' kitchens and bathrooms.

150.    The workers who do this work have a few different job titles: cutter, fabricator, polisher, and installer.  Using a large, powered circular saw, the "cutter" cuts artificial stone slab to the overall size needed for the job.  Using a smaller powered saw, the "fabricator" cuts holes for the sink, faucet, water return, and detergent dispenser.  Using a powered tool, the fabricator also grinds the edge of the countertop.  Using a powered device, the "polisher" then polishes the surface of the countertop.  In small shops the fabricator also does this task.  Lastly, using powered saws, grinding tools, drills, polishing machines, and chemicals, the "installer" installs the countertop in the customer's kitchen or bathroom and does finishing work, including assembling and gluing artificial stone pieces together, cutting holes for electrical outlets, edging, polishing, and sealing countertops.

## THE NEW ARTIFICIAL STONE SILICOSIS EPIDEMIC

151.    The first case of artificial stone-induced silicosis was seen in 1997 by physicians at the National Lung Transplantation Center in Israel.  This worker was exposed to Caesarstone, developed silicosis, and underwent lung transplantation.  Kramer MR, et al., "Artificial Stone Silicosis: Disease Resurgence Among Artificial Stone Workers," *Chest* 2012; 142(2):419-424.

152.    Over the next 14 years, researchers at the National Lung Transplant Center in Israel diagnosed silicosis in 25 patients exposed to artificial stone.  All these cases were diagnosed based on detailed occupational history.  Histologic confirmation was obtained in all but 2 of the cases.  Of

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

these, 15 (60%) were determined to be lung transplant candidates.  All of these patients worked with the same commercial brand of synthetic stone material, cutting it for kitchen and other countertops.  The material was CaesarStone; it contained at least 85% crystalline silica.   All 25 patients reported that more than 90% of their typical work duties involved handling Caesarstone.  Less than 10% included exposure to other potential sources of silica, primarily natural granite.  Kramer MR, et al., "Artificial Stone Silicosis: Disease Resurgence Among Artificial Stone Workers," *Chest* 2012; 142(2):419-424.

153.    The first cases of silicosis in Spanish artificial stone workers were published in 2010 by researchers at the National Institute of Silicosis at the University Hospital in Asturias, Spain.  They reported 3 cases in workers who had been employed for 17 years by a small ornamental stone company that fabricated and installed in homes and buildings.  The workers were all young: 32, 34, and 37 years old.  Chest x-rays of all 3 workers showed nodular opacities with diffuse bilateral distribution and more profuse localization in the upper lobes, with a slight increase in mediastinal and/or hilar nodes. In case 1, a cluster of nodules was observed with progressive massive fibrosis; this worker was diagnosed with complicated silicosis.  Martínez C, et al., "Silicosis, a Disease With an Active Present," *Arch. Bronconeumol.* 2010; 46(2):97-100 [in Spanish with English abstract].

154.    In 2011, researchers at Galdakao Hospital in Bizkaia, Spain published a study of 11 workers who were exposed to different types of quartz surfaces since 1995.  Four of the subjects worked in the cutting workshop; the rest of the workers worked in assembly (i.e. fabrication), without any specific respiratory protection apparatus.  They diagnosed 6 of the 11 workers with silicosis, which equated to a disease prevalence in this work environment of 54.5%.  Of the 6 workers affected, 5 (83.3%) were assembles (fabricators).  The investigators attributed silicosis in these workers to quartz conglomerates (artificial stone).  Pascual S, et al., "Prevalence of silicosis in a marble factory after exposure to quartz conglomerates," *Arch. Bronconeumol.* 2011; 47(1):50-51 [in Spanish with English abstract].

155.    The next series of cases were reported in 2012 by Italian researchers who identified 7 silicosis cases in a group of 29 fabrication workers.  Bartoli D, et al., "Silicosis in employees in the processing of kitchen, bar and shop countertops made from quartz resin composite.  Provisional

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

results of the environmental and health survey conducted within the territory of USL 11 of Empoli in Tuscany among employees in the processing of quartz resin composite materials and review of the literature," *Ital. J. Occup. Environ. Hyg.* 2012; 3(3):138-143.

156.   "In May 2014, the Texas Department of State Health Services was notified of a case of silicosis with progressive massive fibrosis in a Hispanic male aged 37 years who worked for an engineered stone countertop company as a polisher, laminator, and fabricator.  He was exposed to dust for 10 years from working with conglomerate or quartz surfacing materials containing 70% - 90% crystalline silica.  This is the first reported case of silicosis associated with exposure to quartz surfacing materials in North America."  Friedman GK, et al., "Silicosis in a Countertop Fabricator – Texas, 2014," *Morbidity and Mortality Weekly Report*, Feb. 13, 2015; 64(5):129-130.

157.   "In January 2019, the California Department of Public Health identified, through review of hospital discharge data for silicosis diagnoses (*International Classification of Diseases, Tenth Revision* [ICD-10] code J62.8), a Hispanic man aged 37 years who was hospitalized in 2017 (CA-1) (Table). He worked at a stone countertop fabrication company during 2004–2013, mainly with engineered stone. His work tasks included polishing slabs and dry-cutting and grinding stone edges. Workplace measurements during a California Division of Occupational Safety and Health inspection in 2009 showed respirable crystalline silica levels up to 22 times higher than the permissible exposure limit (PEL) of 0.1 mg/m3 in effect in California at that time.  After developing respiratory symptoms in 2012, he had a chest CT scan, which revealed findings of silicosis. Pulmonary function testing showed restrictive defects with reduced diffusion capacity; surgical lung biopsy showed mixed dust pneumoconiosis with polarizable particles consistent with silica.  He concurrently received a diagnosis of scleroderma, with positive anti-Scl-70 and antinuclear antibodies. He died from silicosis in 2018 at age 38 years.  Further investigation of patient CA-1's place of employment, in collaboration with the California Division of Occupational Safety and Health, identified two additional silicosis cases among stone fabricators."  Rose C, et al., "Severe Silicosis in Engineered Stone Fabrication Workers – California, Colorado, Texas, and Washington, 2017-2019," *Morbidity and Mortality Weekly Report*, Sept. 27, 2019; 68(38):813-818.

158.   "This report describes 18 cases of silicosis, including the first two fatalities reported

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

in the United States, among workers in the stone fabrication industry in California, Colorado, Texas, and Washington. Several patients had severe progressive disease, and some had associated autoimmune diseases and latent tuberculosis infection. Cases were identified through independent investigations in each state and confirmed based on computed tomography (CT) scan of the chest or lung biopsy findings. Silica dust exposure reduction and effective regulatory enforcement, along with enhanced workplace medical and public health surveillance, are urgently needed to address the emerging public health threat of silicosis in the stone fabrication industry." Rose C, et al., "Severe Silicosis in Engineered Stone Fabrication Workers – California, Colorado, Texas, and Washington, 2017-2019," *Morbidity and Mortality Weekly Report*, Sept. 27, 2019; 68(38):813-818.

159.    By 2020 the epidemic was international in scope, with more than 300 cases (including 22 lung transplant cases) in Israel, more than 300 cases in Spain, more than 100 cases in China, 98 cases in Australia, 34 cases in Italy, and 18 cases in the United States.

160.    In 2022 researchers from Australia published an article in which they identified 579 cases of silicosis among workers in the stone benchtop industry in Australia - 238 cases in Queensland, 175 cases in Victoria, 121 cases in New South Wales, 24 cases in Western Australia, 18 cases in South Australia and 3 cases in Tasmania. Hoy RF, et al., "Correspondence on 'Demographic, exposure and clinical characteristics in a multinational registry of engineered stone workers with silicosis,' by Hua et al.," *Occup. Environ. Med.* 2022; 79(9):647-648.

161.    In 2022 researchers from Curtin University in Australia published a study in which they modeled the future course of the artificial stone silicosis epidemic. One of the investigators of this study, Dr. Renee Carey, concluded: "Our modelling predicts more than 10,000 Australians will develop lung cancer and up to 103,000 workers will be diagnosed with silicosis as the result of their current exposure to silica dust at work." Curtin University Press Release: "10,000 Aussie workers set to develop lung cancer from silica dust: study," *News at Curtin,* July 12, 2022.

162.    Recent studies estimating the prevalence of artificial stone-induced silicosis in various countries by extrapolating data from surveillance studies in exposed worker populations to total exposed populations, yielding estimates of hundreds of thousands of new cases throughout the world.

//

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

# ARTIFICIAL STONE DEFENDANTS

## ARIZONA TILE

163.    According to its website, Defendant, "Arizona Tile has become one of the leading tile and slab distributors in the U.S.," with its products being "distributed to residential and commercial customers throughout the Western United States."    According to the company's website, "John Huarte, CEO and Owner of Arizona Tile, founded the company in 1977.  Beginning with a small store in San Diego, California, the company has since grown to have locations in 10 western states." Arizona Tile sells natural stone and artificial stone at its facilities in the following California cities: Anaheim, Livermore, Miramar, Murrieta, Ontario, Palm Desert, Roseville, and Sun Valley.

### Arizona Tile's 2018 Safety Data Sheet

164.    In March 2018 Arizona Tile issued a Safety Data Sheet for its "Engineered Stone - Quartz" product whose "Common Name" Arizona Tile stated was "Quartz" and that the "for purposes of this SDS, the term "Quartz" encompasses all types of engineered quartz stone products sourced/imported by Arizona Tile, LLC."

165.    In the "Hazards Identification" section of its March 2018 Safety Data Sheet, Arizona Tile stated that its products "are mixtures of ... naturally occurring minerals" that "pose no immediate hazard to health," and that its "quartz products are not hazardous as shipped and used by the end user." This statement was false and misleading, because all the artificial stone products that Arizona Tile imported contained extremely high concentrations of crystalline silica, and the slabs of artificial stone products that Arizona Tile sold were not finished products ready for use by consumers, but were instead unfinished industrial products typically sold to industrial companies, i.e., artificial stone slabs that required substantial processing to become finished countertops and, when used as intended and expected, presented extreme health hazards to the workers who performed such work on behalf of the industrial companies to whom they were sold.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

166.    In the Hazards Identification section of its March 2018 Safety Data Sheet, Arizona Tile stated: "Fabrication and processing of engineered stone (i.e. cutting, saying, grinding, breaking, crushing, drilling, sanding or sculpting) will generate dust that can expose you to crystalline silica (quartz)" and that "[u]nprotected and uncontrolled exposure to such dust is dangerous to health and can cause severe illness such a [sic] silicosis, lung cancer, fibrosis of the lungs, tuberculosis, kidney disease, abrasions of the cornea and irritation of the skin and eyes.  Quartz products are not hazardous as shipped and used by the end user." This statement was false, misleading and confusing for several reasons: First, workers who fabricate artificial stone **are** always exposed to crystalline silica dust, so it is misleading to merely state that dust "can expose" them to crystalline silica.  More importantly, the statement is false because even "protected and controlled exposure to such dust" causes silicosis in artificial stone fabricators, because multiple published and peer-reviewed studies have shown that even artificial stone fabricators who use wet processing methods and wear air purifying respirators are nevertheless exposed to dangerous levels of respirable crystalline silica and develop and die from silicosis.  Lastly, the concluding statement that "quartz products are not hazardous as shipped and used by the end user," is misleading and confusing, because these slabs of stone are not finished products and are "used" by fabrication companies and fabricators and installers to produce finished countertops, so the workers are the end users of the product, rather than consumers in whose homes finished countertops are installed.

167.    In the Hazards Identification section of its March 2018 Safety Data Sheet, Arizona Tile provided five "Precautionary Statements" - none of which were to wear any respirators: (1) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions"), (2) "Do not breathe dust/spray" (as though Plaintiff should hold his breath throughout the work day), (3) "Wash skin thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption) (4) "Do not eat, drink or smoke when using this product" (although the products do not present any significant health hazards by ingestion); and (5) "Wear protective gloves, protective clothing, eye protection, face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating and/or installing Defendant's products).

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

168.    In Section 7 of its March 2018 Safety Data Sheet, regarding Handling and Storage, Arizona Tile directed workers to "use respiratory protection in the absence of effective engineering controls," without specifying the type of respiratory protection necessary to prevent silicosis and without specifying what engineering controls are effective.  This was a dangerous instruction that would cause silicosis, because workers could not know whether engineering controls were effective and they would assume that wearing an air-purifying respirator would protect them from silicosis. By merely prescribing workers to "use respiratory protection," Arizona Tile concealed from workers the particular type of respiratory protection (an air supplied respirator) necessary to prevent silicosis.

169.    In Section 8.2 of its March 2018 Safety Data Sheet, regarding Exposure Controls/ Personal Protection, Arizona Tile provided the following ventilation instruction: "Use adequate ventilation to keep dust below recommended exposure levels." This is an inadequate use instruction, because Arizona Tile did not specify what ventilation devices and systems were needed to do this, without specifying the exposure levels that cause silicosis, and without specifying how dust could be kept below such unspecified exposure levels, especially when installing countertops in the kitchens and bathrooms of customers where no special ventilation systems could be installed.

170.    In Section 8.2 of its March 2018 Safety Data Sheet, regarding Exposure Controls/ Personal Protection, Arizona Tile provided the following ventilation instruction: "Avoid inhalation of dust."  However, Arizona Tile did not explain how fabricators and installers could avoid inhaling dust from the artificial stone products that it sold, i.e., whether workers should try to hold their breath to avoid inhaling dust, which workers could not do and it would dangerous for them to attempt to do for a work shift.  Most critically, Arizona Tile did not inform workers that the only way that they could avoid inhaling dust of the product was to wear independent air supply respirators, which Arizona Tile did not advise was necessary to protect workers from harm.

171.    In Section 8.2 of its March 2018 Safety Data Sheet, regarding Exposure Controls/ Personal Protection, Arizona Tile provided the following information regarding Respiratory Protection: "Use of a properly fitted NIOSH/MSHA approved particulate respirator is recommended when cutting engineered stone products for installation."  This was an inadequate and dangerous instruction that was inadequate to prevent silicosis, because there are innumerable NIOSH/MSHA

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

approved particulate respirators, i.e., air-purifying respirators, but wearing an air-purifying respirator is inadequate to prevent silicosis from artificial stone products, the only type of NIOSH-approved respirator that is adequate to prevent silicosis from artificial stone products being a NIOSH-approved air-supplied respirator.  By recommending the use of a NIOSH-approved respirator without specifying that the respirator had to be a NIOSH-approved air-supplied respirator, Arizona Tile endangered workers who wore NIOSH-approved air-purifying particulate respirators, believing that such respirators would protect them from silicosis and other harms caused by crystalline silica.

172.    In Section 11 of its March 2018 Safety Data Sheet, regarding Toxicological Information, Arizona Tile provided the following statement regarding Chronic Effects of exposure: "No chronic effects are known for exposure to intact engineered stone products" (emphasis in original) even though the major health effects of exposure to Defendants' products are chronic health effects such as silicosis and lung cancer.  This statement was therefore misleading and confusing.  The next sentence in the Safety Data Sheet said: "Long-term, continual exposure to respirable crystalline silica at or above established permissible occupational exposure limits may lead to the development of silicosis, a nodular pulmonary fibrosis (NPF)."  This statement was also false and misleading for a number of reasons.  First, workers could not know whether in doing their work they were being exposed to crystalline silica at or above established permissible occupational exposure limits.  Second, the statement that only "long-term, continual exposure to respirable crystalline silica" is vague and confusing, because "long-term exposure" and "continual exposure" are not quantified, so workers could believe that they could not get silicosis unless they were exposed to dust from the product for decades or their use of the product was continuous and uninterrupted throughout their careers. Third, the statement implied that workers could only get silicosis if they had "long-term, continual exposure to respirable crystalline silica," although exposure to respirable crystalline silica among artificial stone fabricators has been associated with the development of acute silicosis and has been most strongly associated with the development of accelerated silicosis, which diseases manifest within as little as 1 to just over 5 years of exposure.  Lastly, the statement falsely indicates that silicosis only occurs when workers are exposed to respirable crystalline silica above permissible occupational exposure limits, although the disease also occurs from exposures below such levels.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**CAESARSTONE**

173.    Defendant, Caesarstone USA, Inc., is the American subsidiary of the Israeli company Caesarstone, Ltd., known as "Caesarstone." The name of the company derives from its location near the ancient town Caesarea on Israel's Mediterranean coast. Caesarstone, Ltd. is a publicly traded company that produces artificial stone slabs used to make kitchen and bathroom countertops.

174.    Caesarstone Ltd. was founded in 1987 and is traded on the NASDAQ in New York (CSTE). Its headquarters are located in Kibbutz Sdot Yam in Israel; its production facilities are in Israel and the US. Caesarstone products are sold in approximately 50 countries around the world through a network of 6 subsidiaries, including Caesarstone U.S.A., Inc., and numerous distributors.

175.    Today Caesarstone Ltd. manufactures Caesarstone in three different factories, two in Israel – Kibbutz Sdot Yam and the Bar Lev Industrial Zone near Karmiel, and, since May 27, 2015, at its plant in Richmond Hill, Georgia, in the United States. Caesarstone also has established warehouses and refinery plants in Shanghai, Beijing, Shenzhen, and Hong Kong.

176.    The initial Caesarstone factory commenced its operations in 1987, at Kibbutz Sdot Yam, in Israel, replacing its terrazzo tile factory. After changing the focus from sale of floor tiles to quartz surfaces and establishing itself in the domestic market, the company started to export its products to different countries around the world.

177.    At the time that Caesarstone first began producing and exporting its artificial stone product in 1987, the officers, directors, and managing agents of the company knew that Caesarstone was an extremely toxic and dangerous product because it contained extremely high concentrations of crystalline silica and the product had to be fabricated and installed by workmen, which involved cutting, grinding, drilling, edging, and polishing the product with electric-powered saws and tools that generates huge amounts of respirable crystalline silica dust.

178.    At the time Caesarstone first began producing its artificial stone product in 1987, the company's officers and directors were aware that the product presented extraordinary risks of silicosis because, unlike marble (which contained about 5% crystalline silica) and granite (which contained about 35% crystalline silica), Caesarstone contained as much as 95% crystalline silica.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

179.    Caesarstone essentially made one product - an artificial stone product that it claimed was comprised of approximately 93% crystalline silica, 7% polymeric resin and lesser amounts of pigments and additives.  At all times the product was known simply as "Caesarstone" and was marketed as "Caesarstone®", a registered tradename.  While the slabs were sold in different sizes and colors, for all practical intents and purposes they were a single product, all called "Caesarstone."

180.    Caesarstone marketed its Caesarstone® product in a few collections, with such names as "Classico," "Concetto," "Motivo," "Supernatural," and more recently "Metropolitan."  Although marketed in these "collections," all Caesarstone was essentially the same artificial stone product made of the same essential ingredients (crystalline silica, polymeric resin, pigments and additives), and all of these "collections" had the same essential toxic properties and hazards.

181.    Caesarstone was the first company in the world to export to the United States artificial stone slabs that were designed and intended to be fabricated and thereupon installed as kitchen and bathroom countertops in American homes and businesses.   Prior to 2010 the only artificial stone product that was generally available in the United States for such use was Caesarstone®.

182.    Caesarstone® is not and never has been a consumer product.  Indeed, an article published in *Business of Home* on January 28, 2020, in response to a series of reports by National Public Radio regarding the artificial stone silicosis epidemic in the United States, explained that consumers - even designers - can't go to a stone supplier or a Caesarstone showroom and order the company's product.  In that article, Elizabeth Margles, Caesarstone's vice president of marketing was quoted, admitting "We sell to the fabricator."  Thus, at all times the product Caesarstone® was never a finished end-use product offered for sale to consumers, but was instead an industrial product that Caesarstone intended and expected would have to be fabricated by being cut, ground, and polished before the material could be installed as finished countertops in consumers' kitchens and bathrooms.

183.    In 2005, an additional production facility was opened at the Bar-Lev Industrial Park.

184.    In 2006, TENE Investment Fund invested 25 million dollars in exchange for 21.7% control in the company, which led to the adding of another production line at the Bar-Lev facility.

185.    Caesarstone began establishing subsidiaries in Australia (in 2008), Canada (in 2010), USA and Singapore (in 2011) and the UK (in 2017), and had distributors in about 50 countries.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**U.S. Quartz Products, Inc.**

186.    On June 22, 1999 Articles of Incorporation of Caesar Stone U.S.A., Inc. were filed with the California Secretary of State.  The Articles of Incorporation were dated June 14, 1999 and signed by Seven D. Kramar as Incorporator.

187.    According to a Certificate of Status of Domestic Corporation issued by Debra Bowen, Secretary of State of the State of California, U.S. Quartz Products, Inc. became incorporated under the law of the State of California by filing its Articles of Incorporation with the Secretary of State on June 22, 1999 – the same date that Articles of Incorporation were filed for Caesar Stone U.S.A., Inc.   Oddly, no company by the name of U.S. Quartz Products, Inc. is listed on the website of the California Secretary of State.  However, on June 20, 2011 a Certificate of Amendment of Amended and Restated Articles of Incorporation of U.S. Quartz Products, Inc. was filed with the California Secretary of State.  The Certificate of Amendment was signed by Arie Tendler, President and Chief Executive Officer and Alex Vorissis, Secretary of the corporation.  Pursuant to this Certificate of Amendment, the name of the corporation was changed to Caesarstone USA, Inc.

188.    On May 18, 2011 Caesar Stone Sdot-Yam Ltd., an Israeli company, entered into a Share Purchase Agreement with U.S. Quartz Products, Inc. and its shareholders whereby Caesar Stone Sdot-Yam Ltd. purchased all of the shares of stock of U.S. Quartz Products.  This transaction resulted in Caesarstone Sdot-Yam Ltd. (currently known as Caesarstone Ltd.) obtaining total control over U.S. Quartz Products, Inc. (currently known as Caesarstone U.S.A., Inc.).  A copy of the Share Purchase Agreement was filed as Exhibit 2.1 of Caesarstone's Form F-1 Registration Statement filed with the Securities and Exchange Commission on February 16, 2012.   See https://www.sec.gov/Archives/edgar/data/1504379/000119312512065539/d258108dex21.htm.

189.    According to an Application by a Foreign Profit Corporation to File Amendment to Application for Authorization to Transact Business in Florida that was filed with the Florida Secretary of State in February 2012, U.S. Quartz Products, Inc. changed its name to Caesarstone USA, Inc.

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Caesarstone Registers with the U.S. Securities and Exchange Commission**

190.    On February 16, 2012 Caesarstone Sdot-Yam Ltd., an Israeli company, filed its Form F-1 Registration Statement under the Securities and Exchange Commission, identifying Caesarstone USA, Inc., 6840 Hayvenhurst Ave. Suite 100, Van Nuys, California 91406; (818) 779-0999 its as its agent for service.

191.    In this document Caesarstone acknowledged that "Silicosis and related claims could have a material adverse effect on our business, operating results and financial condition."  In its Form F-1 Registration Statement, Caesarstone described the hazards of its product and the risks of silicosis from exposure to its product as follows:

> Silicosis and related claims could have a material adverse effect on our business, operating results and financial condition.  Since 2008, fourteen lawsuits have been filed against us or named us as third party defendants in Israel and we have received a number of additional letters threatening lawsuits on behalf of certain fabricators of our products in Israel or their employees in Israel alleging that they contracted illnesses, including silicosis, through exposure to fine silica particles when cutting, polishing, sawing, grinding, breaking, crushing, drilling, sanding or sculpting our products. Each of the lawsuits which has been filed names defendants in addition to us, including, in certain cases, fabricators that employed the plaintiff, the Israeli Ministry of Industry, Trade and Employment, distributors of our products and insurance companies. Silicosis is an occupational lung disease that is progressive and sometimes fatal, and is characterized by scarring of the lungs and damage to the breathing function. Inhalation of dust containing fine silica particles as a result of not well protected and not well controlled, or unprotected and

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

uncontrolled, exposure while processing quartz, granite, marble and other materials can cause silicosis. Various types of claims are raised in these lawsuits and in the letters submitted to us, including product liability claims such as claims related to failure to provide warnings regarding the risks associated with silica dust. We believe that we have valid defenses to the lawsuits pending against us and to potential claims and intend to contest them vigorously. Damages totaling $6.1 million are specified in the lawsuits currently filed; however, the amount of general damages, which includes items such as pain and suffering and loss of future earnings, has not yet been specified in most of the lawsuits. As a result, there is uncertainty regarding the total amount of damages that may ultimately be sought. At present, we do not believe that it is reasonably possible that the lawsuits filed against us to date will have a material adverse effect on our financial position, results of operations, or cash flows, in part due to the current availability of insurance coverage. Nevertheless, all but one of the lawsuits are at a preliminary stage and no material determinations, including those relating to attribution of fault or amount of damages, have been made. There can also be no assurance that our insurance coverage will be adequate or that we will prevail in these cases. We are party to a settlement agreement that is pending court approval with respect to one of the lawsuits filed. In that instance, the total settlement is for NIS 275,000 ($71,970) of which we have agreed to pay NIS 10,000 ($2,617) without admitting liability. Substantially all of the balance is payable by the fabricator that employed the individual in question and insurance companies. We can provide no assurance that other lawsuits will be settled in this manner or at all.

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

Our current liability insurance provider renewed our product liability insurance policy in October 2011 through November 2012. However, there is no assurance that we will be able to obtain product liability insurance in the future on the same terms, including with the premium under our current policy, or at all. If our current insurance provider does not renew our product liability insurance policy in the future, it is uncertain at this time whether we will be able to obtain insurance coverage from other insurance providers in the future. We are not currently subject to any claims from our employees related to silicosis; however, we may be subject to such claims in the future. Our employer liability insurance policy excludes silicosis claims by our employees and, to the extent we become subject to any such claims, we may be liable for claims in excess of the portion covered by the National Insurance Institute of Israel. If our insurance providers refuse to renew our insurance, we are unable to obtain coverage from other providers, our policy is terminated early or we become subject to silicosis claims excluded by our employer liability insurance policy, we may incur significant legal expenses and become liable for damages, in each case, that are not covered by insurance, and our management could expend significant time addressing such claims. These events could have a material adverse effect on our business and results of operations.

Consistent with the experience of other companies involved in silica-related litigation, there may be an increase in the number of asserted claims against us. Such claims could be asserted by claimants in jurisdictions other than Israel, including the United States where we recently acquired our former U.S. third-party

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

distributor, Canada where we recently established a joint venture for the distribution of products there and Australia and could result in significant legal expenses and damages. Existing or future claimants against us, in Israel or elsewhere, may seek to have their claims certified as class actions on behalf of a defined group. We believe that claimants in future silica-related claims involving us, if any, should be limited to persons involved in the fabrication of our products, including, but not limited to, cutting, polishing, sawing, grinding, breaking, crushing, drilling, sanding or sculpting, and those in the immediate vicinity of fabrication activities, but may potentially include our employees. Any pending or future litigation, including any future litigation in the United States, where in May 2011 we acquired our former third-party distributor, Caesarstone USA, formerly known as U.S. Quartz Products, Inc., is subject to significant uncertainty. We cannot determine the amount of potential damages, if any, in the event of an adverse development in a pending or future case, in part because the defendants in these types of lawsuits are often numerous, the claims generally do not specify the amount of damages sought, our product's involvement may be speculative, and the degree to which our product may have caused the alleged illness may be unclear. In addition, punitive damages may be awarded in certain jurisdictions.

Furthermore, we may face future engineering and compliance costs to enhance our compliance with existing standards relating to silica, or to meet new standards if such standards are heightened. Such costs may adversely impact our profitability.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

192.     Caesarstone's Form F-1 filed with the Securities and Exchange Commission on February 16, 2016 identified the following executive officers, directors and director nominees, all of whom were aware of the filing of the Form F-1 Registration Statement with the Securities and Exchange Commission, and the toxic hazards of Caesarstone artificial stone products and the risks of silicosis to fabricators and installers of Caesarstone's products, as set forth therein:

### Executive officers

| | |
|---|---|
| Yosef Shiran | Chief Executive Officer |
| Yair Averbuch | Chief Financial Officer |
| David Cullen | Chief Executive Officer Caesarstone Australia |
| Sagi Cohen | Chief Executive Officer Caesarstone USA |
| Giora Wegman | Deputy Chief Executive Officer |
| Michal Baumwald Oron | General Counsel |
| Eli Feiglin | Vice President Marketing |
| Erez Schweppe | Vice President Sales |
| Harel Boker | Vice President of Operations |
| Tzvika Rimon | Israel Country Manager |
| Dr. Ramon Albalak | Vice President Research and Development |
| Lilach Gilboa | Vice President Human Resources |

### Directors and director nominees

| | |
|---|---|
| Maxim Ohana | Chairman |
| Dori Brown | Director |
| Yonathan Melamed | Director |
| Moshe Ronen | Director |
| Oded Goldstein | Director |
| Ariel Halperin | Director |
| Eitan Shachar | Director |
| Boaz Shani | Director |
| Shachar Degani | Director |
| Gal Cohen | Director |
| Irit Ben-Dov | Director Nominee |
| Ofer Borovsky | Director Nominee |

193.     Caesarstone's Form F-1 Registration Statement that was filed with the Securities and Exchange Commission on February 16, 2012 and is available on the SEC website at: https://www.sec.gov/Archives/edgar/data/1504379/000119312512065539/d258108df1.htm.

//

//

//

//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**Caesarstone Knew Workers Were Getting Silicosis and Needed Lung Transplants**

194.    Due to the extremely high crystalline silica content of Caesarstone, it was not surprising that workers (i.e., fabricators and installers) exposed to Caesarstone in Israel soon began developing silicosis and needing lung transplants.

195.    As previously mentioned, the first case of artificial stone-induced silicosis was seen in 1997 by researchers at the National Lung Transplantation Center in Israel.  This worker was occupationally exposed to Caesarstone, developed silicosis, and underwent lung transplantation.  Kramer MR, et al., "Artificial Stone Silicosis: Disease Resurgence Among Artificial Stone Workers," *Chest* 2012; 142(2):419-424.  Plaintiff is informed and believes and thereon alleges, that the researchers at the National Lung Transplant Center in Israel shared their conclusion that the cause of the silicosis in the worker whom they diagnosed with silicosis in 1997 who thereafter underwent lung transplantation, was his occupational exposure to Caesarstone's artificial stone product.

196.    In 2005, an additional production facility was opened at the Bar-Lev Industrial Park.

197.    In 2006, TENE Investment Fund invested 25 million dollars in exchange for 21.7% control in the company, which led to the adding of another production line at the Bar-Lev facility.

198.    In 2008, Caesarstone began establishing subsidiaries in its main markets: Australia (2008), Canada (2010), USA and Singapore (2011) and UK (2017), along with activity conducted through distributors in approximately 50 countries.

199.    During the 14 years following the first case of Caesarstone®-induced silicosis diagnosed at the National Lung Transplant Center in Israel in 1997, Israeli physicians diagnosed silicosis in 25 patients occupationally exposed to Caesarstone®.  All of these cases were diagnosed based on detailed occupational history, with histologic confirmation of silicosis in all but two of the cases.  Of these 15 (60%) were determined to be lung transplant candidates.  According to the authors of this study, all of these patients worked with the same commercial brand of synthetic stone material, i.e. Caesarstone, which the investigators analyzed and determined that it contained at least 85% crystalline silica.   All 25 patients reported that more than 90% of their typical work duties involved handling Caesarstone®.  Less than 10% included exposure to other potential sources of

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

silica, primarily natural granite.  Kramer MR, et al., "Artificial Stone Silicosis: Disease Resurgence Among Artificial Stone Workers," *Chest* 2012; 142(2):419-424.  The data and the results of this study were published in the journal *Chest*, which is one of the most widely read medical journals in the world, with an impact factor of 11.393 (an impact factor of 3 is considered good and an impact factor of 10 or higher is considered remarkable).

200.    The results of the study by the Israeli researchers that were published in the journal *Chest* concerning 25 workers with silicosis who were occupationally exposed to Caesarstone®, 60% of whom needed lung transplants, were known to the officers, directors and managing agents of Caesarstone at the time.  Originally, the article used the term "Caesarstone silicosis" in its title, in reference to the company's major position in the Israeli market for engineered stone.  But soon after the study appeared, Caesarstone threatened to bring a lawsuit against the American College of Chest Physicians, the organization that publishes the journal, unless the term was removed.  "Utilization of Caesarstone's trademark and trade name as a name of a disease causes the company significant damage and irreparably harms its good will," the company wrote in a 2012 letter to the American College of Chest Physicians.  Dr. Richard S. Irwin, the publication's editor in chief, said he decided to remove the term "Caesarstone silicosis" from the published article because the types of silicosis described in it were not unique to Caesarstone but applied to engineered stone products in general.  "Chest did not make the change because of threatened legal action," Dr. Irwin said in the statement.  Dr. Irwin added that the report's authors agreed with his decision.  Dr. Kramer, the Israeli physician who led the study, estimated that Caesarstone accounted for 99 percent of the market there, adding that the company had faced dozens of lawsuits from injured workers."   Barry Meier, "Popular Quartz Countertops Pose a Risk to Workers," *New York Times* (April 1, 2016).

### Caesarstone's March 26, 2012 Safety Data Sheet

201.    On March 26, 2012 Caesarstone issued a Safety Data Sheet for its product identified as "Caesarstone® / Concetto®."   This document listed four constituents of the product: (1) "Crystalline Silica and other natural stone" at a concentration of >85%, (2) Cristobalite at a

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

concentration of <50%, (3) "Polymeric resin" at a concentration of 7-15%, and (4) "Additives" at a concentration of 0-8%. Since Cristobalite is a form of crystalline silica, according to this document, the crystalline silica concentration of the product was extremely high and at least in excess of 90% of the product, presenting an extreme hazard to the health of workers throughout the world whose job was to fabricate countertops for installation in kitchens and bathrooms.

202.    Notwithstanding the extreme respiratory hazard of its product, on the first page of Safety Data Sheet issued March 26, 2012, Caesarstone concealed the true nature and severity of the hazards of its Caesarstone® product by stating that "this preparation is not classified as hazardous according to the latest adaption of European Union Directives 67/548/EEC and 1995/45/EC." This was a false statement, because EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" those that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

203.    Caesarstone also concealed the true nature and severity of the hazards of its Caesarstone® product by stating in its March 26, 2012 Safety Data Sheet that "Quartz surfaces products are not hazardous as shipped," although Caesarstone® is not a finished consumer product, but is rather than industrial product that must be sawed, ground, routed, drilled, sanded, and polished in fabricating and installing the product, thereby generating respirable crystalline silica dust that causes silicosis.

204.    In its March 26, 2012 Safety Data Sheet, Caesarstone also concealed the true nature and severity of the health hazards of Caesarstone® by making misleading statements about the product, e.g., that "[i]nhalation of . . . dusts, smoke and vapors may cause upper respiratory tract irritation," where the primary respiratory hazard of the product is not upper respiratory tract irritation (as one experiences when cutting an onion), but is rather chronic and progressive severe lung disease, i.e., silicosis and resultant death.

205.    In its March 26, 2012 Safety Data Sheet, Caesarstone also concealed the true nature and severity of the health hazards of Caesarstone® by making other misleading statements such as "Overexposure to airborne crystalline silica can cause silicosis, a chronic and progressively debilitating disease, characterized by the formation of silica-containing scar tissue in the lungs." This

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

statement falsely suggested to Caesarstone's customers and to their workers who fabricated Caesarstone® that workers would have to be "overexposed" to airborne crystalline silica to develop silicosis, whereas the truth, which was known to Caesarstone at the time, was that silicosis is caused by inhalation of extremely small amounts of respirable crystalline silica, i.e., 0.05 milligrams of respirable crystalline silica per cubic meter of air, which is 0.00000175 of an ounce of respirable crystalline silica equally dispersed in one cubic meter of air, which is slightly larger than 1 cubic yard (27 cubic feet). That tiny amount of respirable crystalline silica would appear as a speck of white dust on of the eye of President Lincoln on a penny, but when dispersed in air is so small that it is invisible to the human eye and cannot be discerned by smell, taste or any other human sense. Indeed, in 1996 – the year before the first Israeli worker was diagnosed with silicosis caused by exposure to Caesarstone® - researchers from the University of Michigan and the University of Cincinnati published a study regarding silicosis among foundry workers in which they observed that "[a]t the NIOSH recommended exposure limit of 0.05 mg/m$^3$, there was a 0.3-0.8 percent prevalence of radiographs consistent with silicosis" and concluded that "our data show that the current OSHA standard is not sufficiently low to protect workers against the development of radiologic evidence of silicosis." Rosenman KD, et al., "Silicosis among foundry Workers: Implication for the Need to Revise the OSHA Standard," *Am. J. Epidemiol.* 1996; 144:890-900. At the time that Caesarstone issued its March 26, 2012 Safety Data Sheet for Caesarstone®, indicating that workers would have to be "overexposed" to respirable crystalline silica to develop silicosis, Caesarstone's officers, directors and managing agents were aware that 25 Israeli workers who reported that more than 90% of their typical work duties involved handling Caesarstone® had been diagnosed with silicosis at the National Lung Transplant Center in Israel and that 15 of them needed lung transplants at the time. Kramer MR, et al., "Artificial Stone Silicosis: Disease Resurgence Among Artificial Stone Workers," *Chest* 2012; 142(2):419-424. Although Caesarstone's statement in its March 26, 2012 Safety Data Sheet for Caesarstone® indicated that only "overexposure to airborne crystalline silica" causes silicosis, nowhere in this document did Caesarstone specify the amount of airborne crystalline silica to which one must be exposed to get silicosis so as to enable Caesarstone's customers to determine whether their workers were being dangerously "overexposed" to respirable crystalline

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

silica from Caesarstone®.

206.    In its March 26, 2012 Safety Data Sheet, Caesarstone also falsely stated that "epidemiology studies show limited evidence of an excess of lung cancer in occupations involving exposures to crystalline silica, such as stone cutters and granite industry workers," which statement is contrary to the determination and classification of the International Agency for Research on Cancer (IARC) in its monograph on silica published 15 years earlier, which had concluded: "there is *sufficient evidence* in humans for the carcinogenicity of inhaled crystalline silica in the form of quartz or cristobalite from occupational sources."  International Agency for Research on Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 68: Silica, Some Silicates, Coal Dust and Para-Aramid Fibrils," (IARC 1997).

207.    In its March 26, 2012 Safety Data Sheet, Caesarstone also provided misleading information regarding the engineering controls necessary to prevent countertop fabricators and installers from getting silicosis, by stating: "General room ventilation is satisfactory under anticipated use conditions."  This statement is not merely false; it is extremely and inexcusably harmful, because general room ventilation is never adequate to control occupational exposure to respirable crystalline silica and published studies regarding crystalline silica exposure of artificial stone fabricators all show that general room ventilation is inadequate to prevent harmful respirable crystalline silica exposure in countertop fabricators.  See, NIOSH, *Evaluation of Crystalline Silica Exposure during Fabrication of Natural and Engineered Stone Countertops.*  (HHE Report No. 2014-0215-3250).

208.    In its March 26, 2012 Safety Data Sheet, Caesarstone also provided misleading information regarding the respiratory protection necessary to prevent silicosis, by stating: "Respiratory equipment approved by NIOSH/MSHA for protection against organic vapors and dusts is necessary to avoid inhalation of excessive air contaminants. The appropriate respirator selection depends on the type and magnitude of exposure (refer to 29 CFR 1910.134 for appropriate NIOSH approved respirators and to the NIOSH Pocket Guide to Chemical Hazards, DHHS (NIOSH) Publication NO. 2001-145 for equipment selection)."  This information was misleading, because NIOSH-approved air-purifying respirators that provide protection against organic vapors and some

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

dusts are inadequate to prevent silicosis among fabricators and installers who are exposed to respirable crystalline silica dust, especially from artificial stone products, due to their extremely high crystalline silica content.  Indeed, studies have shown that the use of air-purifying respirators is inadequate to prevent silicosis among fabricators and installers, and that only NIOSH-approved *air-supplied* respirators (respirators attached to a tank of fresh air which workers wear in a backpack) are adequate to prevent silicosis and death to artificial stone countertop fabricators and installers.

209.   In its Safety Data Sheet, Caesarstone also provided the following use instruction: "Do not breathe dust generated in the cutting, grinding and polishing processes."  This instruction was inadequate and harmful, because dust is *always* generated when artificial stone is fabricated and workers must breathe to work and to live.  The instruction did not inform workers how they could do their work and "not breathe dust generated in the cutting, grinding and polishing processes."

**Caesarstone's 2015 Annual Report Filed with the Securities and Exchange Commission**

210.   In 2015 Caesarstone Sdot-Yam Ltd. filed its Annual report for the fiscal year ended December 31, 2014 with the Securities and Exchange Commission.  In this report Caesarstone wrote:

> ***Silicosis and related claims might have a material adverse effect on our business, operating results and financial condition.***
>
> We are party to 60 pending bodily injury lawsuits that have been filed against us directly since 2008 in Israel or that have named us as third-party defendants by fabricators or their employees in Israel, by the injured successors, by the State of Israel or by others. Such lawsuits include, among others, one lawsuit filed by three fabricators, one lawsuit filed by the National Insurance Institute ("NII"), an appeal which was filed in connection with a judgment granted in one of the lawsuits and a lawsuit filed against us where the claimants

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

applied for its certification by the court as a class action. As of today, we have also received ten letters threatening to file claims against us on behalf of certain fabricators and their employees in Israel. The plaintiffs claim that they contracted illnesses, including silicosis, through exposure to silica particles during cutting, polishing, sawing, grinding, breaking, crushing, drilling, sanding or sculpting our products. Silicosis is an occupational lung disease that is progressive and sometimes fatal, and is characterized by scarring of the lungs and damage to the breathing function. Inhalation of dust containing fine silica particles as a result of poorly protected and controlled, or unprotected and uncontrolled, exposure, while working in different occupations, including among other things, processing quartz, granite, marble and other materials and working with quartz, can cause silicosis and other diseases. Silica comprises approximately 90% of engineered stones such as our products, and smaller concentrations of silica are present in natural stones. Therefore, fabrication of engineered stones may create higher exposure to silica dust and, accordingly, may cause a higher risk of silicosis. Recently the Occupational Safety and Health Administration "OSHA" and the National Institute for Occupational Safety and Health "NIOSH" have published a hazard alert, according to which they identified exposure to silica as a health hazard to workers involved in manufacturing, finishing and installing natural and manufactured (engineered) stone countertop products, both in fabrication shops and during in-home finishing/installation.

Most of the claims do not specify a total amount of damages sought and the plaintiffs' future damages, if any, will be determined at trial.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Although we intend to vigorously contest the claims, we cannot provide any assurance that we will be successful. We currently estimate that our total potential exposure with respect to the 47 pending lawsuits is approximately $12.1 million, although the actual result of such lawsuits may vary significantly from such estimate. We cannot make an estimate with respect to the other pending lawsuits. As of today, only one claim was resolved in court proceedings with an Israeli district court, finding that the self-employed plaintiff was 40% at fault and dividing the remaining 60% of liability between the State of Israel and us, with 55% imposed on us and 45% imposed on the State of Israel. This judgment is currently on appeal in Israel to the Supreme Court.

In April 2014, a lawsuit by a single plaintiff and a motion for the recognition of this lawsuit as a class action were filed against us in the Central District Court in Israel. The plaintiff alleges that, if the lawsuit is recognized as a class action, the claim against us is estimated to be for NIS 216 million (approximately $56 million). In addition, the claim includes an unstated sum in compensation for special and general damages. We intend to vigorously contest recognition of the lawsuit as a class action and to defend the lawsuit on its merits, although, considering the preliminary stage of this lawsuit, there can be no assurance as to the probability of success or the range of potential exposure, if any. We may be subject to putative class action lawsuits in the future in Israel and abroad and we cannot be certain whether such claims will succeed in being certified.

//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

We are exposed in Israel to potential future subrogation claims by the NII, providing for reimbursement of its payments related to damages paid or that will be paid to plaintiffs, if we are found liable for the plaintiffs' damages. As of today, one of the 60 pending claims against us was brought by the NII, for payments the NII had made or will make in the future with respect to three fabricators who allegedly contracted silicosis. The amount of damages to which we may be liable to the NII in such a subrogation claim may not exceed the actual amount of an injured person's damages for which we are liable after deducting any compensation which we would pay to such injured pursuant to his/her direct or indirect claim against us.

Any pending or future litigation is subject to significant uncertainty. We cannot determine the amount of potential damages, if any, in the event of an adverse development in a pending or future case, in part because the defendants in these types of claims are often numerous, the contraction of the alleged illness or its degree of severity is unclear, the claims generally do not specify the amount of damages sought, our product's involvement may be speculative and the degree to which our product may have caused the alleged illness may be unclear. In addition, punitive damages may be awarded in certain jurisdictions, even though they are rare in Israel. Furthermore, we may face future engineering and compliance costs to enhance our compliance with existing standards relating to silica or to meet new standards if such standards are heightened. Our fabricator customers may also face engineering and compliance costs related to the fabrication of our products and similar products, which could cause them to resort to fabricating alternative products that do not carry the

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

same risks associated with silica dust generated from the fabrication of our products. OSHA is currently considering lowering the permissible exposure limit to silica dust. Any damages to which we are subject in litigation, the cost of defending any claims, compliance costs, and the loss of business from fabricators who no longer find it practical to fabricate our products may have a materially adverse impact on our profitability. Moreover, because Israeli law and the laws of several other jurisdictions recognize joint and several liability among co-defendants in civil suits, even if we are found only partially liable to a plaintiff's damages, the plaintiff may seek to collect all his damages from us, requiring us to collect separately from our co-defendants their allocated portion of the damages and there can be no assurance that we will succeed in such collection.

We currently have product liability insurance in Israel, which applies to claims that may be submitted against us worldwide during the insurance policy term and our Australian and U.S. subsidiaries have product liability insurance in Australia and the United States, respectively, that covers silicosis. We believe that our current insurance in Israel covers the pending individual product liability claims; however with respect to the claim brought in April 2014 where the plaintiff applied for class certification, our insurer has notified us that our product liability insurance covers such claim only partially. While we believe such class action is fully covered by our product liability insurance policy, there is no certainty that our insurance would also cover the class action. In addition, as discussed in "ITEM 8.A: Financial Information—Legal Proceedings," the amount claimed in the currently pending class action exceeds our

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

insurance coverage by a material amount.

In the scenario that we are unable to renew our insurance at all or in part, from our current insurers or from others, we are unable to obtain coverage from other insurance providers, we cannot obtain insurance on as favorable terms as previously, our insurance is terminated early, our insurance coverage is decreased, our insurance coverage inadequately covers damages for which we are found liable, or we become subject to silicosis claims excluded by our employer liability insurance policy, we may incur significant legal expenses and become liable for damages, in each case, that are not covered by insurance, and our management could expend significant time addressing such claims. Such events might have a material adverse effect on our business and results of operations.

Consistent with the experience of other companies involved in silica-related litigation, there may be an increase in the number of asserted claims against us. Such claims could be asserted by claimants in different jurisdictions, including Israel, the United States, Canada, Australia and other markets where our products are distributed and sold and could result in significant legal expenses and damages. Although we believe that claimants in any future silica-related claims involving us should be limited to persons involved in the fabrication of our products and those in the immediate vicinity of fabrication activities, claimants may potentially include our employees or end consumers, seeking compensation for bodily or emotional/non-physical damages. Four employees currently employed in our plants have been diagnosed with suspected cases of silicosis.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

For more information, see "ITEM 8.A: Financial Information— Legal Proceedings—Claims related to alleged silicosis injuries."

211.    The 2015 annual report contains a section "ITEM 8.A." regarding legal proceedings concerning "Claims related to alleged silicosis injuries" that provides the following information:

### Overview

We are subject to a number of claims in Israel by fabricators or their employees alleging that they contracted illnesses, including silicosis, through exposure to silica particles during cutting, polishing, sawing, grinding, breaking, crushing, drilling, sanding or sculpting our products. Silicosis is an occupational lung disease that is progressive and sometimes fatal, and is characterized by scarring of the lungs and damage to the breathing function. Inhalation of dust containing fine silica particles as a result of poorly protected and controlled, or unprotected and uncontrolled, exposure while working in different occupations, including among other things, processing quartz, granite, marble and other materials and working with quartz can cause silicosis. Silica comprises approximately 90% of engineered stones, including our products, and smaller concentrations of silica are present in natural stones and, therefore, fabrication of engineered stones may create higher exposure to silica dust and, accordingly, may cause a higher risk of silicosis.

### Individual Claims

As of today, we are party to 60 pending claims of bodily injury that have been filed against us directly since 2008 in Israel or that have named us as third-party defendants by fabricators or their employees

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

in Israel, by the injured successors, by the State of Israel, or by others. Such lawsuits include one lawsuit filed by the Israeli NII which was filed with respect to three individuals who filed personal claims against us and one lawsuit where the claimants applied for its class certification. Of 63 claims that had been filed against us, including the 60 pending claims, 62 were filed in Israel and one in the United States, two claims were settled and one claim which was filed in the United States was dismissed, as further detailed below. Out of the 63 claims mentioned above, one claim was filed in 2008, two in 2009, four in 2010, seven in 2011, eight in 2012, eight in 2013, 28 in 2014 and five in 2015 through the filing of this annual report. As of today, we have also received ten letters threatening to file claims against us on behalf of certain fabricators in Israel or their employees in Israel alleging that they contracted illnesses as a result of fabricating our products. Each of the claims named other defendants, such as fabricators that employed the plaintiffs, the Israeli Ministry of Industry, Trade and Employment, distributors of our products and insurance companies. The pending claims include one lawsuit filed with a petition to be certified as class action, one lawsuit filed by three stone fabricators together and one appeal which was filed in connection with a judgment granted in one of the lawsuits (as further detailed below). In addition, one claim was filed by the NII for subrogation of compensation paid by the NII to certain fabricators who allegedly contracted silicosis. Various arguments are raised in the claims, including, among others, product liability arguments and failure to provide warnings regarding the risks associated with silica dust generated by the fabrication of our products.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Most of the claims do not specify a total amount of damages sought, as the plaintiff's future damages will be determined at trial; however, damages totaling approximately $22.3 million are specified in 55 of the claims currently pending against us in Israel (excluding the claim that is seeking class action recognition). A claim filed with the magistrates court in Israel is limited to a maximum of NIS 2.5 million (approximately $642 thousands) plus any fees, and among the 60 pending claims filed against us in Israel, 35 claims were filed in the magistrates court. A claim filed in the district court is not subject to such limitation. As a result, there is uncertainty regarding the total amount of damages that may ultimately be claimed.

We intend to vigorously contest pending claims against us, although there can be no assurance that we will succeed in these claims and there is a reasonable possibility that we will be liable for damages in such lawsuits. We currently estimate our total reasonably possible exposure with respect to 47 pending lawsuits (other than the lawsuits filed with a motion to be recognized as a class action) to be approximately $12.1 million, although the actual result of such lawsuits may significantly vary from such estimate. As of today, only one claim was resolved by an Israeli District court, imposing liability of 40% on the self-employed plaintiff and dividing the remaining 60% liability between the State of Israel and us, with 55% imposed on us and 45% on the State of Israel. That judgment was appealed to the Supreme Court by the plaintiff, the State of Israel and us.

Israeli law, as well as the law of other jurisdictions, recognizes joint and several liability among co-defendants in civil suits. In cases

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

where co-defendants are found liable, the plaintiff is entitled to collect all damages from only one of the liable defendants. Thus, even if we are found only partially liable to a plaintiff's damages, the plaintiff may seek to collect all his damages from us, requiring us to collect separately from our co-defendants their allocated portion of the damages. If defendants are insolvent or we are unsuccessful in collecting their portion of the damages for any other reason, we may incur damages beyond the damages we are liable for.

We currently estimate that contingent losses related to the pending claims mentioned above are no more than reasonably possible. In addition, we believe that an adverse outcome to the claims filed against us to date (other than the class action) would not have a material adverse effect on our financial position, results of operations, or cash flows, in part, due to the current availability of insurance coverage; however, there can be no assurance that our insurance coverage will be adequate or that we will prevail in these cases.

***Class Action Claim***

A lawsuit by a single plaintiff and a motion for its class certification were filed against us in April 2014 in the Central District Court in Israel. The plaintiff claims to be the owner of a fabrication plant and to have contracted silicosis as a result of fabricating our products. In connection therewith, the plaintiff claims that we did not provide adequate warnings with respect to the risks and protection measures required with respect to fabrication of our products, and that we intentionally hid and did not warn about the high risk and irreversible

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

damages that may occur to the persons processing our products and misled the fabricators in Israel by comparing the hazards related to the fabrication of our products to those associated with the fabrication of natural stones. In acting so, the plaintiff claims that we did not act as a reasonable manufacturer; we violated the law and Israeli standards, committed an assault, acted negligently and are liable under the Israeli Law for Liability for Defective Products, 1980. The plaintiff also claims that our products are a "dangerous item" under the Israeli Tort Ordinance, 5728-1968 and, therefore, the plaintiff claims that the burden of proof falls on us to prove that there was no carelessness for which we are liable in connection with our products. The plaintiff claims that by our wrongful conduct we violated the plaintiff's freedom to choose whether to be exposed to the risks associated with the fabrication of our products.

The plaintiff alleges that, if the lawsuit is recognized as a class action, the claim against us is estimated to be NIS 216 million (approximately $56 million), calculated by claiming damages of NIS 18,000 ($4,628) for each individual who worked in fabrication workshops in Israel in fabrication or administrative roles and who have been exposed to dust generated by the fabrication of our products. The plaintiff claims that there are 12,000 such individuals who worked at 400 fabrication workshops in Israel, each of which employed 10 fabricators and five administrative persons, with one rotation during the relevant period. In addition, such claim includes an unstated sum in compensation for special and general damages, such as medical disability, functional disability, pain and suffering, medical expenses, medical and nursing assistance, which will require

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

proof and quantification for each injured person in the purported class action. The plaintiff seeks, among other things, to compel us to notify the alleged group (and potential members of the group) and each individual about the risks, recommending that they undertake a medical examination and assert their rights.

We intend to vigorously contest recognition of the lawsuit as a class action and to defend the lawsuit on its merits, although, considering the preliminary stage of this lawsuit, there can be no assurance as to the probability of success or the range of potential exposure, if any.

***December 2013 Judgment***

The plaintiff alleges that, if the lawsuit is recognized as a class action, the claim against us is estimated to be NIS 216 million (approximately $56 million), calculated by claiming damages of NIS 18,000 ($4,628) for each individual who worked in fabrication workshops in Israel in fabrication or administrative roles and who have been exposed to dust generated by the fabrication of our products. The plaintiff claims that there are 12,000 such individuals who worked at 400 fabrication workshops in Israel, each of which employed 10 fabricators and five administrative persons, with one rotation during the relevant period. In addition, such claim includes an unstated sum in compensation for special and general damages, such as medical disability, functional disability, pain and suffering, medical expenses, medical and nursing assistance, which will require proof and quantification for each injured person in the purported class action. The plaintiff seeks, among other things, to compel us to notify

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

the alleged group (and potential members of the group) and each individual about the risks, recommending that they undertake a medical examination and assert their rights.

We intend to vigorously contest recognition of the lawsuit as a class action and to defend the lawsuit on its merits, although, considering the preliminary stage of this lawsuit, there can be no assurance as to the probability of success or the range of potential exposure, if any.

***December 2013 Judgment***

In December 2013, a judgment was entered by the Central District Court of Israel in one of the lawsuits, according to which we were found to be comparatively liable for 33% of the plaintiff's total damages. The remaining liability was imposed on the plaintiff at 40%, as contributory negligence, and on the Israeli Ministry of Industry at 27%. The total damages of the plaintiff were found by the court to be NIS 5.3 million ($1.4 million). Since the plaintiff received payments from the NII, such payments were subtracted from the total damages after reduction of the damages contributed to the plaintiff's contributory negligence. However, under Israeli law, under certain condition a plaintiff may be awarded as compensation from third party injurers, other than his employer, at least 25% of the damages claimed even if the payments that the plaintiff received from the NII equal or exceed the actual damages of the plaintiff after deducting his contributory liability. Accordingly, in the above claim, the court awarded the plaintiff additional compensation of approximately NIS 800,000 ($0.2 million) plus legal fees and expenses, which reflected

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

25% of the plaintiff actual damages, after deducting the plaintiff's contributory negligence and the amount of NIS 3.3 million ($0.8 million) to which the claimant is entitled from the NII. After giving effect to the Israeli Ministry of Industry's comparative responsibility, the total liability imposed on us in this case was NIS 436,669 ($0.1 million) plus the claimant's legal expenses. Such amount was fully paid by our insurer in January 2014 (apart from our deductible). We, as well as the Israeli Ministry of Industry and the plaintiff, appealed on the judgment to the Israeli Supreme Court. There is no assurance whether we or any of the other appellant shall succeed in the appeals.

***Claim by Former Employee***

One of the fabricators who filed a claim against us was employed by us in the past and claimed that his illness was, in part, the result of his employment with us. Although there can be no assurance that we will succeed in such claim, we believe that his illness is not related to his employment by us. We are not currently subject to any other claim from our employees related to silicosis; however we may be subject to such claims in the future. Our employers' liability insurance policy excludes silicosis claims by our employees, and to the extent we become subject to any such claims, we may face claims in excess of the portion covered by the NII.

***Settled Claims***

We were also a party to two settlement agreements that had been approved by a court with respect to two of the claims filed. In one

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

case, the total settlement was for NIS 275,000 (approximately $71,000) of which we had agreed to pay NIS 10,000 (approximately $3,000) without admitting liability. Substantially all of the balance was payable by the fabricator that employed the individual in question and insurance companies. In the other case, the total settlement was for NIS 130,000 (approximately $33,000) of which we agreed to pay NIS 80,000 (approximately $21,000). The balance was payable by the fabricator that employed the deceased plaintiff.

We can provide no assurance that other lawsuits will be settled in this manner or at all.

### Dismissed U.S. Claim

In 2012, Caesarstone USA was added as a 26th defendant approximately one year after commencement of a lawsuit bodily injury claim in the United States by a fabricator in the United States. The other 25 defendants were manufacturers of equipment utilized in stone fabricating or finishing operations or manufacturers and marketers of stone and engineered stone products. Total damages of approximately $56 million, including approximately $20 million of punitive damages, were sought in the U.S. claim. The case was ultimately dismissed and we were removed as a defendant.

### Insurance

We currently have product liability insurance in Israel, which applies to claims that may be submitted against us worldwide during the

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

insurance policy term and our Australian, and U.S. subsidiaries have product liability insurance in Australia, and the United States, respectively, covering their activities. Our product liability insurance, currently covers claims that are submitted worldwide during the insurance policy term up to an amount of $20 million per claim and per insurance policy term, plus legal fees and litigation costs in three layers. Commencing in 2008, we had five consecutive insurance policies in Israel, effective for periods of 12 to 18 months.

We believe that our current insurance covers the pending individual product liability claims; however, with respect to the claim which was required to be recognized as a class action, our insurer has notified us that our product liability insurance covers such claim only partially. Although, it is our position that such class action is fully covered by our product liability insurance, but subject to the coverage amount limit and to the insurer position, there is no certainty whether our insurance would also cover the class action. In addition, the amount claimed in the currently pending class action exceeds our insurance coverage by a material amount.

Our product liability insurance includes coverage of up to $20 million, plus legal fees and litigation costs. The coverage includes (i) coverage of $5 million provided by an Israeli insurer, which initially insured us for $10 million beginning in March 2014 and then reduced the coverage to $5 million in July 2014 (the "first layer"), (ii) additional coverage of $5 million (the "second layer") in excess of the first layer, and (iii) an additional excess layer of $10 million in excess of the first layer and second layer, starting from July 2014 (the "third

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

layer"). Our product liability insurance policy is effective until March 31 2015. Our current product liability insurance policy includes a double-rate premium compared to our prior year insurance and a deductible of $125,000 per claim that was applied within the renewed policy term, instead of a $5,000 deductible applied previously. The second and third layers apply only for illnesses discovered after February 2010. Our first layer insurer has informed us that the first layer of coverage will not be renewed as of March 31, 2015. Although we will seek to renew our product liability insurance to cover silicosis related claims, there is no assurance that we will be successful.

We believe that our current insurance in Israel covers the pending individual product liability claims; however with respect to the claim brought in April 2014 where the plaintiff applied for class certification, our insurer has notified us that our product liability insurance covers such claim only partially. While we believe that such class action is fully covered by our product liability insurance policy, subject to the coverage amount limit, there is no certainty whether our insurance would also cover the class action. In addition, as discussed below, the amount claimed in the currently pending class action exceeds our insurance coverage by a material amount.

In the event that we are unable to renew our insurance at all or in part, we are unable to obtain coverage from other insurance providers, we cannot obtain insurance on as favorable terms as previously, our insurance is terminated early, our insurance coverage is decreased, our insurance coverage inadequately covers damages for which we are found liable, or we become subject to silicosis claims excluded by

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

our employer liability insurance policy, we may incur significant legal expenses and become liable for damages, in each case, that are not covered by insurance, and our management could expend significant time addressing such claims. Such events might have a material adverse effect on our business and results of operations.

Our employer liability insurance excludes silicosis damages and, therefore, in case that we are found liable for any of our employees' illness with silicosis, we will have to bear compensation for such damages, which might have adverse effect on our business and results of operations.

212.    The information provided in Caesarstone's year-end 2014 annual report was known to the officers and directors of the company that are identified in the report as follows:

### Officers

| | |
|---|---|
| Yosef Shiran | Chief Executive Officer |
| Yair Averbuch | Chief Financial Officer |
| David Cullen | Chief Executive Officer Caesarstone Australia |
| Sagi Cohen | Chief Executive Officer Caesarstone USA |
| Giora Wegman | Deputy Chief Executive Officer |
| Michal Baumwald Oron | Vice President Business Development and General Counsel |
| Eli Feiglin | Vice President Marketing |
| Erez Schweppe | Vice President Sales |
| Harel Boker | Vice President of Operations |
| Tzvika Rimon | Israel Country Manager |
| Erez Margalit | Vice President Research and Development |
| Lilach Gilboa | Vice President Human Resources |

### Directors

| | |
|---|---|
| Maxim Ohana | Chairman |
| Yonatan Melamed | Director |
| Moshe Ronen | Director |
| Shachar Degani | Director |
| Irit Ben-Dov | Director |
| Ofer Borovsky | Director |
| Belinkov | Director |
| Avner Naveh | Director |
| Ofer Tsimchi | Director |
| Or Gilboa | Director |
| Amihai Beer | Director |

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Caesarstone's Knowledge of the Silicosis Epidemic From 2015 to 2020**

213.    In 2015, Caesarstone opened a new facility in the United States with an investment of about 100 million dollars. The plant was built in Richmond Hill, Georgia, and provides Caesarstone® mainly to markets in North America, and other countries as well.

214.    By 2015, another 15 Israeli workers occupationally exposed to Caesarstone had developed silicosis, bringing the total number of silicosis cases attributed to Caesarstone to 40 cases. Of the 40 cases, 16 were lung transplant recipients (an additional 6 transplants above the 10 that the Israeli researchers had report three years earlier). Of the 40 workers who had silicosis from occupational exposure to Caesarstone, 9 also had specific diagnoses of autoimmune diseases, which are also known to be caused by occupational exposure to crystalline silica. The Israeli physicians observed that "[a]ll 40 patients included in the study were male and had substantial occupational histories of silica exposure while working with a high-silica-content synthetic stone material. They all did similar work that included drycutting and polishing the stone for end use, predominantly for kitchens and other countertop applications." The researchers "identified nine patients with a specific diagnosis of autoimmune disease among the 40 persons with silicosis evaluated at our lung transplantation centre, representing 23% of the cohort." Straichman O, et al., "Outbreak of autoimmune disease in silicosis linked to artificial stone," *Occup. Med.* 2015; 65:444-450. The results of this study were known to Caesarstone's officers and directors at the time of publication.

215.    By November 2016, the Israeli physicians had identified 82 workers who had been exposed to artificial stone dust (Caesarstone) and had been diagnosed with silicosis, of whom 13 patients underwent lung transplantation. This was more than double the number of workers exposed to Caesarstone that they had identified in 2015 as having silicosis. The Israeli researchers reported progressive massive fibrosis, indicating advanced and complicated silicosis in 85% of the lung transplant patients. Additionally two patients had silicoproteinosis diagnosed within the resected lung, indicating an acute or accelerated form of silicosis. The researchers concluded that "[t]his silicosis current outbreak is important because of the worldwide use of this and similar high-silica-content artificial stone products, which can cause progressive severe forms of silicosis." Grubstein

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

A, et a., "Radiological Evaluation of Artificial Stone Silicosis Outbreak: Emphasizing Findings in Lung Transplant Recipients," *J. Comput. Assist. Tomogr.* 2016; 40(6):923-927. The findings and conclusions of this study were known to Caesarstone's officers and directors at time of publication.

216.    In 2016, an abstract by Israeli researchers was presented at the 2016 annual meeting of the International Society for Environmental Epidemiology and published the following year in the journal *Environmental Health Perspectives*. The Israeli researchers reported that "Israel's stone industry is witnessing a drastic rise in silicosis" and that "a total of 203 new cases were identified since 2009 alongside with an increase in use of artificial quartz surfaces at ~ 500 enterprises [in Israel]." The abstract further stated that "[t]hese high-end and durable countertops Israeli-made surfaces, introduced in 1987, consist of up to 93% of crystalline silica (SiO2)" and that "[a]nalyses of registered cases (2012-2014) indicate a short latency period (65% ≤20 years; 37%≤10 years), as compared to former registry." Raanan N, et al., "An Outbreak of Artificial Stone Silicosis in Israel – A Call for Worldwide Awareness," Abstract No. P3-208, presented at the 2016 Annual Meeting of the International Society for Environmental Epidemiology in 2016, published in *Environmental Health Perspectives* in 2017 at https://ehp.niehs.nih.gov/doi/abs/10.1289/isee.2016.4338.

217.    In 2017, the Israeli researchers published a study in which they reviewed data for all patients who underwent lung transplantation for silicosis and a matched group undergoing lung transplantation for idiopathic pulmonary fibrosis (IPF) at the National Transplant Center from March 2006 and the end of December 2013. Survival was followed through 2015. They noted that a total of 17 lung transplantations had been performed for silicosis among 342 lung transplantations (4.9%) during the study period. They also observed a survival advantage that was not statistically significant (hazard ratio 0.6; 95% CI 0.24–1.55) for those undergoing lung transplantation for silicosis relative to idiopathic pulmonary fibrosis patients undergoing lung transplantation during the same period. Rosengarten D, et al., "Survival Following Lung Transplantation for Artificial Stone Silicosis Relative to Idiopathic Pulmonary Fibrosis," *Am. J. Ind. Med.* 2017; 60:248-254. This study showed that workers who receive lung transplants for silicosis resulting from occupational exposure to artificial stone (Caesarstone) generally fare well as lung transplant recipients. The study was known to the officers and directors of Caesarstone at or about the time of publication.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Caesarstone's January 2020 Safety Data Sheet**

218.    In January 2020, Caesarstone issued a new Safety Data Sheet for its Caesarstone® product.  In Section 1 of this Safety Data Sheet, headed "Product and Company Identification," Caesarstone identified the "product name" as "Caesarstone® surfaces" and stated:  "This Safety Data Sheet relates to Caesarstone Classico, Supernatural and Metropolitan collections."  This section of the Safety Data Sheet listed five Caesarstone entities (Caesarstone Ltd., Caesarstone USA Inc., Caesarstone Canada Inc., Caesarstone Australia Pty Ltd., Caesarstone South East Asia Pte Ltd., and Caesarstone (UK) Ltd), and provided their addresses and telephone numbers.  The next page of the Safety Data Sheet contains a statement that "In this SDS "Caesarstone® slabs are referred to also as 'products.'"  Thus, this Safety Data Sheet clearly applied to Caesarstone® that was marketed and sold in the United States in slabs which required fabrication before installation in consumers' homes.

219.    Section 2 of Caesarstone's January 2020 Safety Data Sheet, titled "Hazards Identification," began with the following statement:  "The finished Caesarstone® is an inert, stable product that does not release hazardous materials in its fully intact form."  This statement is misleading in two respects.  First, Caesarstone® is not a "finished product," i.e., a product that can be used by consumers, but is instead an industrial product that requires extensive processing before it becomes a finished product that can be installed as countertops in consumers' homes.  As explained in an article published in *Business of Home* that very month, "consumers - even designers - can't go to a stone supplier or a Caesarstone showroom and order the company's product" and Elizabeth Margles, Caesarstone's vice president of marketing was quoted in that article admitting "We sell to the fabricator."  Second, and more importantly, the statement that the product "does not release hazardous materials in its fully intact form" does not identify hazards of the product, but instead misleads readers to believe that the product has no hazards because the of the language that the "product does not release hazardous materials."

220.    Section 2 of Caesarstone's January 2020 Safety Data Sheet contains three "Hazard Statements":

•    (H350) May cause CANCER (inhalation)

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

- (H372) Causes damage to lungs through prolonged or repeated exposure (inhalation)

- (H335) May cause respiratory tract irritation

Although silicosis is the major health hazard of Caesarstone®, the Safety Data Sheet does not mention silicosis at all in the Hazards Identification section of the Safety Data Sheet.

221.    The three hazards identified in the Hazards Identification section of the Safety Data Sheet are all inadequate and misleading for several reasons.  The statement that the product "may cause cancer" is misleading because it suggests that the product is not known to cause cancer, although it is comprised of more than 90% crystalline silica which for more than 20 years had been classified by the International Agency for Research on Cancer as a known human carcinogen.  The statement that the product "causes damage to lungs through prolonged or repeated exposure" is inadequate and misleading for three reasons.  First, it suggests that "lung damage" can only occur as a result of "prolonged" exposure which could mean exposure over a few decades.  Second, it suggests that "lung damage" can occur as a result of "repeated exposure" which could mean hundreds or thousands of exposures.  These statements wrongfully suggest to employers and workers that fabricators can use Caesarstone® safely as long as their use is not unduly "prolonged" or "repeated," although Caesarstone fails to quantify these terms, leaving workers to guess how "prolonged" or "repeated" their exposure to Caesarstone® must be to cause lung damage.  Third, the language that Caesarstone® "causes damage to lungs through prolonged or repeated exposure" does not indicate that the lung damage caused by Caesarstone® is always permanent, irreversible, progressive (continuing after exposure to Caesarstone® ceases), and is often fatal.  The statement wholly fails to convey the severity of the hazard to fabricators' respiratory health.  This failure is compounded by the third hazard statement that Caesarstone® "may cause respiratory tract irritation," because respiratory tract irritation occurs frequently from such harmless activities as chopping an onion, thereby suggesting that the respiratory hazards of inhaling Caesarstone® may not be serious.

222.    Caesarstone's Safety Data Sheet states, on page 3:  "**PREVENTION:** Do not breathe dust generated during the Fabrication, installation and/or removing/demolishing processes."  This is an inadequate and harmful instruction, because dust is always generated during the fabrication of stone products and were a worker to follow the instruction and hold his breath for a full 8 hour work

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

shift, the worker could suffer asphyxia and other harm. The SDS also states: "Wear respiratory protection for particles (P3/N95 or higher)." This is also an inadequate use instruction, because the extremely high silica content of the product (>90% crystalline silica) renders it so dangerous that the instruction to wear a P3 or N95 mask assures harmful respiratory exposure rather than preventing harmful respiratory exposure, which require an air supplied respirator and other protection.

223. Section 8 of the Safety Data Sheet, which is titled "Exposure Controls/Personal Protection," has subheadings for Exposure Guidelines, Engineering Controls, Cleaning and Maintenance, Preventive Maintenance Programmes, and Personal Protective Equipment.

224. The section of the Safety Data Sheet regarding Exposure Guidelines has a subheading: "Permissible Exposure Limit (PEL)." This is misleading because it implies that exposure to crystalline silica dust is "permissible" although the instruction on page 3 of the SDS states: "Do not breathe dust generated during the Fabrication, installation and/or removing/ demolishing processes." The Safety Data Sheet then states: "There is no provision for any risk associated with the finished Caesarstone® product in the CLP (EC) regulation no. 1272/2008." This is misleading because it implies an absence of risk associated with the "finished" product simply because the EC [the European Commission] has not decreed the existence of risk associated with the "finished" product. The Safety Data Sheet then states: "[I]n Fabrication Processes of the product, dust containing crystalline silica ($SiO_2$), other minerals, and titanium dioxide may be generated. USA OSHA determined a total dust PEL of 15 mg/m$^3$, a respirable fraction PEL of 5 mg/m$^3$, and a titanium dioxide (total dust) PEL of 15 mg/m$^3$." This information is misleading because, total dust exposure limits refer to dust that is not toxic (commonly called "nuisance dust") - not to crystalline silica dust. Employers that kept exposures to dust from Caesarstone below 15 mg/m$^3$ would be exposing their workers to respirable silica dust approximately 200 times greater than the regulatory limit.

225. The Safety Data Sheet then states: "Threshold Limit Value (TLV) for crystalline silica α-quartz and cristobalite (ACGIH 2019): 0.025 mg/m$^3$." However, it does not explain what a TLV is or how it differs from the PEL. The SDS then states: "Check the PELs applicable under the regulations of each country where you handle the product. PELs for respirable crystalline silica and

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

cristobalite, measured in mg/m$^3$, 8 hours, TWA are as follows: (These limits may be changed from time to time; you are required to follow local safety announcements.)" The SDS then provides a long list of countries, and for USA OSHA, PEL for respirable crystalline silica states: "0.05 - general industry/ maritime" and "$10 \div (\%SiO_2 + 2)$ - construction*." A footnote explains the asterisk: "Fabricators who work at construction sites (for example, installers) should apply the PEL for construction; others should apply the PEL for general industry." This is unintelligible, leaving workers and employers to speculate what exposure level is "permissible" when all exposure to respirable crystalline silica is prohibited by the instruction on page 3: "Do not breathe dust generated during . . . fabrication, installation."

226. The Personal Protective Equipment section of the Safety Data Sheet has a subsection titled "**RESPIRATORY PROTECTION**" that states: "Properly fitted respiratory protection equipment approved by the National Institute for Occupational Safety and Health (NIOSH; USA) for protection against organic vapours and dusts is necessary to avoid inhalation of crystalline silica during the Fabrication Process of the product, and other processes that generate dust. The appropriate respirator selection depends on the type and magnitude of exposure. Use a positive pressure air supplied respirator if there is a potential for an uncontrolled release, exposure levels are not known, or under any other circumstance where air purifying respirators may not provide adequate protection." This information is inadequate and confusing for several reasons. First, the Safety Data Sheet does not specify the types of respiratory protection equipment that are approved by NIOSH for protection against organic vapors and dusts that are "necessary to avoid inhalation of crystalline silica during the Fabrication Process." Second, the Safety Data Sheet does not explain how the employer or worker can determine whether the unspecified respiratory protection equipment is "properly fitted." Third, it is grossly inadequate to state that "the appropriate respirator selection depends on the type and magnitude of exposure," because the product contains more than 90% crystalline silica, which results in excessive airborne exposures to respirable crystalline silica dust from virtually all fabrication processes, which are defined in Section 2 of the SDS as "cutting, grinding, chipping, sanding, drilling, polishing, etc. manufacturing processes, including during installation or removal of the product." Given the extremely high concentration of crystalline silica

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

in the product (which is many times greater than the silica concentration of natural stone) and the consequent extremely high concentrations of respirable silica dust generated by fabrication processes, the highest level of respiratory protection is necessary to use the product safely, i.e., an independent air supply respirator with full body protection like that typically used by sandblasters, which prevents toxic dust from contacting the body while the worker breathes fresh air from a tank rather than from contaminated workroom air. The language in the Safety Data Sheet that one should "use a positive pressure air supplied respirator if there is a potential for an uncontrolled release, exposure levels are not known, or under any other circumstance where air purifying respirators may not provide adequate protection" is inadequate, because (1) an "uncontrolled release" indicates an extraordinary release of dust as in an industrial accident, whereas all fabrication processes result in the "uncontrolled" release of respirable crystalline silica; (2) exposure levels are never known unless real-time air monitoring is done throughout the workday (which is grossly impractical); and (3) the extremely high concentrations of silica dust generated by fabrication processes of the product containing more than 90% crystalline silica are such that air purifying respirators never provide adequate protection against silicosis.

227.    Section 11 of the Safety Data Sheet regarding Toxicological Information also provides misleading and inaccurate information. This section of the Safety Data Sheet begins with the statement in boldface type:  "**No acute or chronic effects are known from exposure to the intact product.**"  This information is misleading because there is no respiratory exposure, ocular exposure, or exposure by ingestion to Caesarstone as a slab of synthetic stone, and the stone slab is so solid and hard that dermal exposure to the slab would not result in any detectable transfer of silica to human skin.  Thus, for all practical purposes, there is no exposure "to the intact product." Including this language is therefore unnecessary at best and misleading at worst.

228.    The Safety Data Sheet then provides the following information regarding **PRIMARY ROUTES OF EXPOSURE:** "None for intact product.  Inhalation and potential exposure to eyes, hands, lungs or other body parts if contact is made with dust emitted from the Fabrication Process." This information is misleading, because fabrication processes invariably result in the inhalation of crystalline silica dust and contact exposure to eyes, hands, lungs and other exposed body parts.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

229.    Regarding **RESPIRATORY EFFECTS** of Crystalline Silica (SiO$_2$), the SDS states: "Safety measures including wet processing and the use of effective respiratory protection will reduce the burden of inhaled dust and prevent the disease."  This is a false statement, because (1) wet silica dries and becomes airborne by the movement of people, forklifts, other equipment and air currents in fabrication areas, and (2) wet processing does not prevent silicosis.  Indeed, silicosis cases have been reported in artificial stone fabricators who regularly used wet processing methods and wore masks full shift.  While these precautions reduce exposure to crystalline silica, they do not prevent silicosis.  The Safety Data Sheet therefore lulls workers who do their work using wet processing methods and who face masks into a false sense of safety.

**Caesarstone Mounts Public Relations Campaign**

230.    In the Fall of 2019 National Public Radio reported that almost 20 fabrication workers had fallen ill with silicosis after working with engineered stone.  As a result of adverse press, Caesarstone commenced a public relations campaign by announcing an educational initiative, whose real purpose was to inform workers of the hazards of silicosis so Caesarstone could claim that they assumed the risk of silicosis when they were later diagnosed with the dreadful disease.

**Judgment Against Caesarstone**

231.    In 2021, Caesarstone was found liable in Yigal Rozman's lawsuit against the company for causing his silicosis and was ordered to compensate Mr. Rozman for his injuries.

**Caesarstone's Health & Safety Webpage**

232.    As part of this public relations campaign, in 2022 Caesarstone created a webpage titled "Caesarstone® Health & Safety" that stated:  "As part of our ESG commitment, we are committed to developing environmentally friendly and low-silica products.  We launched our low-silica based product into the market in 2022."    Caesarstone® Health & Safety webpage, https://www.caesarstone.com.au/caesarstone-health-safety/.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Caesarstone's Silicosis Statement**

233.    On February 20, 2023, Caesarstone issued a Silicosis Statement in the form of a letter addressed to "Dear Valued Customer," responding to the company's negative press coverage regarding engineered stone.  Caesarstone posted the statement on its website:  https://e925c66phkg. exactdn.com/wp-content/uploads/2023/02/Caesarstone-Silicosis-Statement_Feb-2023.pdf.

234.    After paying lip service to victims of the silicosis epidemic it caused, Caesarstone wrote: "Silicosis is an avoidable occupational disease and we are absolutely committed to playing our role in its eradication."  Both of these statements are false.  First, silicosis is not avoidable from the fabrication of artificial stone, because rigorous use of wet processing methods and wearing air purifying respirators are incapable of preventing silicosis in artificial stone workers.  Second, Caesarstone has never shown commitment to eradicating silicosis, but has always blamed the victims of this horrific disease and their employers who have been unable to protect their workers from silicosis due to misinformation and inadequate, harmful use instructions provided by Caesarstone.

235.    Caesarstone wrote that "we take issue with a number of claims made in the recent news coverage regarding the safety of engineered stone," asserting: "Engineered stone is entirely safe to consumers in its installed form and silica only presents a risk to workers if stone is handled incorrectly."  In the first statement Caesarstone once again seeks to deflect the lethal hazard of silicosis to workers by claiming that "engineered stone is entirely safe to consumers" although Caesarstone is not a consumer product, but is an industrial product and is only sold to consumers as finished countertops after being fabricated.  Caesarstone's statement that "silica only presents a risk to workers if stone is handled incorrectly" is false, because studies have shown that artificial stone fabricators who use wet processing methods and wear air purifying respirators still get silicosis.

236.    Caesarstone then asserts: "Efforts to improve safety standards have been hampered historically by some non-compliance with product handling requirements, a lack of regulatory enforcement and the absence of a national standard.  This is the role of employers and work safety bodies."  These statements are also false.  The major impediment to improving safety standards for silicosis has not been a lack of regulatory enforcement, but has always been opposition by affected

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

industries to lowering occupational exposure standards for respirable crystalline silica, resulting in the absence of adequate national standards and the perpetuation of standards that do not prevent silicosis. Equally false is Caesarstone's assertion that the silicosis epidemic is due to employers and governmental bodies that try to protect workers from the lethal hazards caused by Caesarstone. Thus, Caesarstone once again blames everyone for the epidemic it caused except itself.

237. Caesarstone then asserts that its "response to the issue has been to provide clear warnings and guides for safe handling of stone, to actively work with government and regulators on improved safety regimes and to invest heavily in fabricator education to improve safety standards." Of course, all of these statements are false, because Caesarstone has always failed to provide use instructions that could actually prevent silicosis, as demonstrated by the innumerable false, misleading, and harmful statements in its Safety Data Sheets over the years. Caesarstone did not work with government regulators to improve safety regimes and did not invest in fabricator education until its product had caused thousands of illnesses and deaths and Caesarstone decided to adopt a fabricator education program so that it could claim in defense of lawsuits that artificial stone fabricators knew of the hazards of silicosis, having been belatedly apprised of them by Caesarstone.

238. Caesarstone then advocates a licensing program with rigorous auditing and enforcement, so that when fabricators get silicosis, Caesarstone could blame governmental officials who license the fabricators and could blame the fabricators themselves for causing their own deaths.

239. Lastly, Caesarstone argues that natural stone can also cause silicosis although the epidemic is largely driven by artificial stone, rather than lower silica-containing safer products.

**Knowledge of the Silicosis Hazard by Caesarstone Officers and Directors**

240. Throughout the time that Caesarstone manufactured and sold its artificial stone products, exposing fabricators and installers to crystalline silica from its products, Caesarstone's officers and directors were aware that its artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that it provided were inadequate to prevent silicosis and would actually cause silicosis in exposed

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by its defective artificial stone products. Among Caesarstone's officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators were the following officers and directors of the company:

| Yosef Shiran | Chief Executive Officer |
| Yair Averbuch | Chief Financial Officer |
| David Cullen | Chief Executive Officer, Caesarstone Australia |
| Sagi Cohen | Chief Executive Officer, Caesarstone USA |
| Arik Tendler | President and Chief Executive Officer, Caesarstone USA |
| Giora Wegman | Deputy Chief Executive Officer |
| Michal Baumwald Oron | Vice President Business Development and General Counsel |
| Eli Feiglin | Vice President Marketing |
| Erez Schweppe | Vice President Sales |
| Harel Boker | Vice President of Operations |
| Tzvika Rimon | Israel Country Manager |
| Erez Margalit | Vice President Research and Development |
| Lilach Gilboa | Vice President Human Resources |

**Directors**

| Maxim Ohana | Chairman of the Board of Directors |
| Yonatan Melamed | Director |
| Moshe Ronen | Director |
| Shachar Degani | Director |
| Irit Ben-Dov | Director |
| Ofer Borovsky | Director |
| Avner Naveh | Director |
| Ofer Tsimchi | Director |
| Or Gilboa | Director |
| Amihai Beer | Director |

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

# CAMBRIA

241.    Cambria was founded in 2000 in Le Sueur, Minnesota; it is a privately held company owned by members of the Davis family.  According to information on Cambria's website, "Cambria President and CEO Marty Davis realized the magic of quartz on one day" and "[i]t all began when Marty Davis' friend put him onto this new investment opportunity."  The website states:  "The Davises studied the opportunity and ultimately Mark Davis, Marty's father, made a personal investment in a northern Minnesota business start-up in the late '90s.  They loved the company's technology and quartz product, but didn't know much more than that about the operation.  But taking risks was something the Davis family was familiar with."  That Cambria takes risks is undoubtedly true; every time it sells its lethal product Cambria risks the health and lives of countertop fabricators.

242.    A Cambria YouTube video boasts that "now Cambria is one of the largest state-of-art quartz processing facilities in North America."

### Cambria's January 5, 2001 Material Safety Data Sheet

243.    On January 5, 2001, Cambria issued a Material Safety Data Sheet for a product that it identified as "Quartz Surfaces."  In Section II of this document Cambria provided false and misleading information by identifying the product as a "Non Hazardous- Quartz Surfacing Product" and by stating that "exposure limits may be applicable . . .  when cutting or grinding of the product is performed" because of its crystalline silica (quartz) content.  The latter statement is false and misleading, because exposure limits for crystalline silica *always apply* when it is cut or ground.

244.    Section VI of Cambria's January 5, 2001 Material Safety Data Sheet, regarding Health Hazards, began with the misleading statements that "this product is not hazardous as shipped," and that "grinding and cutting may generate dust containing crystalline silica."  The former statement is misleading because the product is extremely hazardous when used as intended; the latter statement is false and misleading, because dust containing crystalline silica is *always generated* when the material is ground or cut.   This section states that "continued overexposure to respirable

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

crystalline silica can cause silicosis, a chronic and progressively debilitating disease, created by the silica-containing scar tissue which forms in the lungs." This statement is also false and misleading, because it indicates that only "continued overexposure" to respirable crystalline silica can cause silicosis, even though exposure to crystalline silica within occupational exposure limits (which is not an "overexposure") likewise causes silicosis. In this section of the Material Safety Data Sheet, Cambria also misrepresented the carcinogenicity of the product by stating that "this product is not considered to be a carcinogen as shipped, only when dust containing crystalline silica is produced." This statement is false, because the product is almost 100% crystalline silica and is therefore, by definition, carcinogenic to humans, the risk of harm depending on the nature and extent of exposure.

245. Section VII of the January 5, 2001 Material Safety Data Sheet, titled "Precautions for Safe Handling," is the most important section of the Material Safety Data Sheet, because it is this section that must provide clear, specific, and detailed instructions how to use the product safely, i.e., so that it will not cause silicosis. However, this section of the Material Safety Data Sheet only contains two sentences. The first sentence was "Recover material for reuse and reclamation when possible," which does not inform workers how to handle the product safely. The second sentence stated: "For silica dust, use a vacuum or wet down to prevent causing airborne particles." This use instruction is not merely incomplete and inaccurate; it is dangerous because use of a vacuum and "wet down", does not prevent the generation of airborne particles and does not prevent silicosis. Critically, this section for precautions for safe handling does not inform workers that to prevent silicosis they must always wear an air-supplied respiratory when fabricating the material.

246. In section VIII of the January 5, 2001 Material Safety Data Sheet for the product, regarding Control Measures, Cambria provided the following information on the form in the space for "Respiratory Protection *(Specify Type)*: "NIOSH approved respirator during cutting or grinding. Respirators should be used in accordance with OSHA Respiratory Protection Standard CFR 1910.134." This is an inadequate control measure because it does not specify the *type* of respirator that is necessary to prevent silicosis. There are numerous "NIOSH approved respirators." However, only one type of NIOSH-approved respirator is adequate to prevent silicosis when cutting or grinding the product - a NIOSH-approved *air-supplied* respirator. Following the instruction and wearing a

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

NIOSH-approved respirator (i.e., a NIOSH-approved air purifying respirator) will not prevent silicosis, but actually contributes to silicosis. Thus, Cambria concealed this critical information.

247. The last paragraph of the January 5, 2001 Material Safety Data Sheet contains a disclaimer that improperly attempts to shift responsibility for Cambria's false and misleading statements in the document to others (another company and the users of the product themselves): "The opinions expressed herein are those of qualified experts within Davisco Foods Int'l, Inc. We believe that the information contained herein is current as the state of MSDS sheet. Since the use of this information and these conditions of use of this product are not wihin the control of Davisco Foods, Int'l, Inc., it is the users obligation to determine the conditions of safe use of this product."

**Cambria Starts Doing Business in California**

248. On January 12, 2011, Defendant, Cambria Company LLC filed an application to Register a Foreign Limited Liability Company to do business in California

**Cambria's Response to the Artificial Stone Silicosis Epidemic in 2019**

249. On December 2, 2019, Nell Greenfield-Boyce of National Public Radio interviewed Marty Davis regarding Cambria at its artificial stone factory in LeSuere, Minnesota. She observed: "It turns out about 30 thousand slabs of quartz countertop material every month. That means every day 20 to 30 trucks unload large white sacks full of quartz. Some of it's a powder, almost like flour, while some is like little pebbles." Marty Davis acknowledged: "'It's about 30 million pounds of quartz a month - so about 1 million pounds a day." He said this place has millions of dollars worth of air handling systems to control dust. Pointedly, he acknowledged: "There's no good dust. Zero." Ms. Greenfield-Boyce explained the production process: "We put on white disposable respirators and go past a sign warning of silica, into a huge room with mechanical mixers. Here, quartz gets combined with pigments plus a binder to make it stick together. The mixture gets spread out onto a giant baking sheet. It goes through a machine that vibrates and kind-of thumps it. The result is

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

a compressed slab that, at first, is soft.  The slab hardens when it gets heated, then cooled and polished."  She asked Marty Davis "what responsibility does he have for making sure that people he sells it to will cut all this material safely?"  He answered: "You know, how do you police your customers?"  He said that the dangers of silica have been known for decades.  He claimed that "there's clear regulation and clear guidance and governance on how to process materials safely to control dust and respiratory inhalation of dust."  He said he can't follow his products to thousands of countertop shops -- that cutting is safe when companies obey worker protection laws."  Thus, Mr. Davis, the Chief Executive Officer of Cambria, disclaimed any responsibility of Cambria to monitor the use of its lethal product by its customers, any responsibility of Cambria to protect the health of customers' employees and other workers injuriously exposed to its lethal product, and any responsibility to cease selling Cambria's lethal product to customers who fail to use Cambria safely.

### Knowledge of the Silicosis Hazard by Cambria Officers and Directors

250.   Throughout the time that Cambria manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Cambria's officers and directors were aware that Cambria's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Cambria provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Cambria's defective artificial stone products.  Among Cambria's officers and directors who had this knowledge and who nevertheless consciously disregarded the health and safety of fabricators and installers were Marty Davis, President and Chief Executive Officer; Mark Davis, Chairman of the Board; Jim Ward, Chief Operating Officer; Brian Scoggin, Executive Vice President of Operations; Summer Kath, Executive Vice President of Product Development; Tripp Parker, Executive Vice President of Sales; Arik Tendler, Chief Sales Officer; Ben Davis, Executive Vice President and Chief Information Officer; Sarah Ministrelli, Vice President of Operations; and Adam Sura, Director of Corporate Safety.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

### COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**COSENTINO AND ITS DISTRIBUTOR, C&C NORTH AMERICA, INC.**

251. "The Cosentino Group is a family-owned business which was founded in Cantoria, Almeria (Spain) in 1979 that produces surfaces marketed as Silestone®, Dekton® and Sensa®, as well as natural stone marketed as Scalea®. The Group currently employs over 4,500 individuals worldwide in locations throughout, among others, Spain, Portugal, France, the United Kingdom, the United States, Canada, Mexico, Brazil, Argentina, Scandinavia, Turkey, South Africa, Malaysia, Australia and New Zealand. . . . The Cosentino Group is the largest supplier of engineered stone product throughout the world." Letter dated November 29, 2019 to the Hon. Niall Blair, Committee Chair of the Legislative Council Standing Committee on Law and Justice in Sydney, Australia,

252. In 1990 Cosentino began manufacturing artificial stone under the brand name Silestone in Almeria, Spain, in Andalusia in southeastern Iberia on the Mediterranean Sea.

253. "In 1997, Cosentino brought Silestone to a new market by forming a subsidiary called Cosentino North America. And its appeal caught on quickly. Silestone's durability and resistance to stains was huge for kitchen designers, and it was featured in *Time* and *Good Housekeeping*. After that, business grew rapidly, and the company partook in promotional videos through groups like Home Depot and even Super Bowl advertisements. . . . Cosentino also operated its own network of shops called Stone Systems, and it came to have dozens of locations around the U.S." See "US Countertop Workers Falling Sick from Silica Dust," *Occupational Health & Safety* (Dec. 5, 2019).

**Cosentino's 1999 Material Safety Data Sheet for Silestone**

254. On February 22, 1999 Cosentino issued a Material Safety Data Sheet for its Silestone® product which it identified as "Agglomerated stone slabs, tiles and fabricated items." Section 2 of this document, regarding "Hazardous Ingredients" has a table with five columns for Hazardous Ingredients, % by wt., % by vol., CAS #, and Other Limits. However, the table is blank; i.e, it does not identify any hazardous ingredients, even though the product contained as much as 95% crystalline silica, which causes silicosis, lung cancer and other occupational diseases. By

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

failing to disclose crystalline silica as a hazardous ingredient of the product, Cosentino concealed this hazard from customers, their employees, and workers exposed to its lethal product.

255.    Section 7 of the Material Safety Data Sheet concerns "Preventative Measures." The first part of this section concerns "Personal Protective Equipment." In this action Cosentino stated: "RESPIRATOR: Use respirator or particulate mask when cutting or abrading material." This instruction was inadequate and harmful, because the use of an air-purifying respirator or particulate mask is inadequate to prevent silicosis from cutting or abrading the product and misled workers to believe that they would be safe if they wore an air-purifying respirator or mask when cutting or abrading the product. The instruction failed to inform workers that because of the very high crystalline silica content of the product and the high exposures to respirable crystalline silica dust that result from cutting or abrading the product, the only type of respirator that could prevent workers from getting silicosis from cutting or abrading the product was an air-supplied respirator.

256.    Section 7 of the Material Safety Data Sheet next contains information regarding "Procedures and Controls. Regarding "Engineering Controls." It states: "ASTME-1132-86 'Standard Practice for Health Requirements Relating to Occupational Exposure to Dust.'" This information was grossly inadequate, because the document to which it refers was not readily accessible, could only be purchased through the American Society for Testing Materials, and the document related to industrial dust, i.e., a nuisance dust, rather than respirable crystalline silica.

257.    The next section regarding Procedures and Controls" was "Handling Equipment & Procedures" and stated: "Observe local safe handling procedures. Handle with care." This was a totally inadequate and meaningless instruction to workers how to handle Silestone safely. The instruction fails to tell workers to always use wet processing methods, to wear an air-supplied respirator, to wear full body protection to prevent all exposure to respirable crystalline silica dust, and fails to prescribe any engineering, ventilation, or administrative controls to prevent silicosis.

258.    Section 8 of the Material Safety Data Sheet, regarding First Aid Procedures, states that the International Agency for Research on Cancer (IARC) [has] determined that crystalline silica is a probable carcinogen. This is a false statement, because two years earlier, in 1997, IARC determined that crystalline silica is a Group 1 (known human) carcinogen.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Cosentino's 2006 Material Safety Data Sheet for Silestone**

259.    In August 2006 Cosentino issued a Material Safety Data Sheet for its Silestone® product which it described as a "Solid quartz surface." Section 2 of this document contains a table (Table 1) that identified the components of the product as Orthophthalic polyester resin (5-25%), Pigments (<5%), Micronized silica (<0.1 mm) (5-50%) Grounded silica (0.1-10 mm) (10-90%), Grounded quartz (0.1-10 mm) (5-50%), Grounded Glass/Mirror (0.1-10 mm) (5-50%), and Grounded granite (1-10 mm) (5-50%). The Material Safety Data Sheet also contains a table (Table 2) that identified three additives by CAS and EINECS numbers rather than chemical names, so workers could not know what the additives were without reference books to look up code numbers. The additives so mysteriously identified are (1) Cobalt, C5-23-branched carboxylate naphthenate octanoate complexes, (2) tert-Butyl peroxybenzoate, and (3) 3-(Trimethoxysilyl)propyl methacrylate.

260.    After identifying the product's components, the Material Safety Data Sheet states: "This product does not contain free substances that involve a risk for the health in accordance to the Regulation of Dangerous Substances R.D. 255/2003 and according to the European Norms 67/548/EEC, 199/45/EE and its corrections 93/112/EEC, 2001/58/EEC y 2001/60/EEC." This statement, which suggested that Cosentino's Silestone did not entail a risk for health was false, because the expected and intended use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death. Cosentino made this statement even though EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled ... may involve extremely serious ... chronic health risks and even death."

261.    The next sentence of the Material Safety Data Sheet states: "The finished product does not contain any of the substances described in Table 2 since, once completed the production process, these are part of the three-dimensional structure of the polyester, included and immobilized in it. Therefore, this product is not classified as dangerous substance or product that involves a risk for the health according to the Regulation of Dangerous Substances R.D. 255/2003, and according to the European Norms 67/548/EEC, 199/45/EE and its corrections 93/112/EEC, 2001/58/EEC y 2001/60/EEC by means of which the present Security Data Sheet (MSDS) has been written up."

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

This statement is also false because the additives in the product are toxic via inhalation and are known to cause lung disease, including fibrotic lung disease, and when Silestone is cut or ground these components of the product do not remain "immobilized" in the product, but become airborne and are inhaled by workers exposed to dust from Silestone, thereby causing respiratory tract damage.

262. Section 3 of the Material Safety Data Sheet is titled "Risks Identification and General Safety Measures." This section begins with the following statement: "This product presents no type of risks for the human health or environment in accordance to the Regulation of Dangerous Substances R.D. 255/2003, and according to the European Norms 67/548/EEC, 199/45/EE and its corrections 93/112/EEC, 2001/58/EEC and 2001/60/EEC." This is a false statement, because the product contains extremely high concentrations of crystalline silica as well as the other and components and additives that are toxic to the respiratory tract and can cause silicosis and other fibrotic lung disease and death, and because EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

263. Section 3 of the Material Safety Data Sheet also states: "A prolonged exposure to the dust derived from the dry cutting and polishing treatments can cause serious health problems as pneumoniosis, silicosis, as well as a worsening of the people affected by pulmonary diseases as bronchitis, emphysema, etc." This statement is false because silicosis occurs from wet cutting Silesone and polishing treatments, and is misleading because the statement does not quantify the duration of "prolonged exposure" that can cause silicosis, leading workers to believe it would take decades of exposure to cause silicosis, although exposure to Silestone and other artificial stone products causes acute silicosis in less than 5 years and accelerated silicosis in less than 10 years.

264. Section 3 of the Material Safety Data Sheet then states: "In order to reduce a casual [sic] exposure it is always recommended to use water as dust reducer. It is advisable the use of tools cooled by water and to perform the operations of dry cutting, milling and polishing of this product in a suitably ventilated place. Otherwise, it is essential to use respiratory personal protection for dust and particles type FFP1 according to norm UNE-EN 143:2001 and its revisions UNE-EN 143/AC 2002, UNE-EN 143/AC 2005." This instruction is inadequate because it merely recommends the

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

use of wet processing methods to reduce dust, rather than stating that wet processing methods must always be used with all saws, and cutting, grinding and polishing tools to prevent silicosis. It is also inadequate because it doesn't specify the types of ventilation that provide a suitably ventilated space. The last sentence is also inadequate, because it refers to a European Standard that is not available online and is only available for purchase, the referenced standard appears not to be applicable for extremely high exposures to respirable crystalline silica, and the instruction suggests that particle air-purifying respirators are adequate to prevent silicosis, although air-purifying respirators do not prevent silicosis in workers exposed exposed to respirable crystalline silica from fabricating artificial stone. The instruction is harmful because it does not inform workers that the only type of respirator that can prevent silicosis from exposure to high levels of respirable crystalline silica is an air-supplied respirator and it instead suggests that air-purifying respirators provide adequate protection.

265. Section 4 of the Material Safety Data Sheet, titled "First Aids" begins with the following statement: "This product is not hazardous in normal use, but not using the right equipment during fabrication operations as cutting, drilling, etc can cause a situation of emergency." This sentence is false and harmful, because Silestone is indeed hazardous in normal use, because the normal use of the product causes silicosis and death. To the extent that the statement constitutes a use instruction, it is also inadequate, because it indicates that "the right equipment" must be used for fabrication operations, but does not specify what that equipment is.

266. Section 6 of the Material Safety Data Sheet, titled "Manipulation and Storage" Aids" begins with the following statement regarding "Manipulation": "It is not necessary special measures for the manipulation of this product, but it is recommended to follow the next precautions." This statement is false and harmful, because manipulating the product as designed, intended, and expected results in the generation of respirable crystalline silica that causes silicosis and other occupational diseases, such that special measures for "manipulation of this product" are always required.

267. Section 7 of the Material Safety Data Sheet, titled "Control of Exposure/Personal Protection," begins with a subsection titled "Limit Values of Exposure," which states: "In accordance to the previously exposed and relying to the norm 2000/39/CE, as well as to the R.D. 274/2001 which it sends us to the values published by the National Institute of Health and Hygiene

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

at Work (INSHT), the limit of the daily exposition to the dust resulting of the elaboration of Silestone® is 2 mg/m3.  It appears in Table 1 for the y ear 2006 published by the mentioned INST in the line "Silica, vapor.  Breathable fraction"."  This statement is unintelligible and is therefore inadequate.  Assuming that the statement means that the exposure limit for Silestone dust is 2 mg/m3, the statement is incorrect, because as of 2006, the permissible exposure limit and all recommended exposure limits for respirable crystalline silica in the United States were many times lower than 2 mg/m3.  Indeed, by 1991 OSHA had adopted a Permissible Exposure Limit for respirable crystalline silica which was $10 / (\% \text{ quartz} + 2)$ mg/m$^3$.  Since the percentage of quartz in Silestone was approximately 90%, the OSHA permissible exposure limit for the product was approximately 0.1 mg/m$^3$ - 20 times less than that stated in the Silestone Material Safety Data Sheet. The statement was therefore not merely false; it was extremely dangerous because it overstated the permissible exposure limit to the product by a factor of 20 – a level of exposure that causes silicosis.

268.  Section 7 of the Material Safety Data Sheet then has a subsection for "Exposure Controls" that provides the following information regarding "Respiratory protection": "Respiratory personal protection for dust and particles type FFP1 according to norm UNE-EN 143:2001 and its revisions UNE-EN 143/AC 2002, UNE-EN 143/AC 2005, even working with water as dust reducing agent during the elaboration of this product."  This instruction is not only inadequate, but is extremely dangerous and harmful, because the type of respirator prescribed is the least filtering mask of the FFP series of masks that only filters 80% of airborne particles and allows inward leakage up to 22%, which is wholly inadequate to protect workers from respirable crystalline silica exposure and actually causes silicosis rather than preventing silicosis.

269.  Section 10 of the Material Safety Data Sheet, titled "Toxicological Information" states:  "As another product of natural stone that contains quartz or quartz dust as quartz, marble or granite, the operations of dry cutting, milling or any other treatments of this product can generate dust susceptible to produce irritation in eyes, nose and respiratory tract.  A prolonged exposure can cause serious health problems, including pneumoconiosis."  This statement is false and misleading, because Silestone is an artificial stone (engineered stone product), is not a natural stone product and has toxicological properties that are much different than natural stone.  These include the extremely

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

high crystalline silica content of Silestone (which is much higher than the crystalline silica content of natural stone), the extremely small size of the particles of crystalline silica that are generated from cutting and grinding Silestone (most of the particles generated being in the ultrafine to nano-sized range unlike crystalline silica particles from natural stone), and the toxicological properties of the resin, metallic pigments and other additives of the product that are produced during fabrication processes as particles and probably metal fumes, thereby increasing the respiratory toxicity of the product.  None of these toxicological properties of Silestone are mentioned and the information that is provided, which suggests that Silestone is no more toxic than natural stone, is false and misleading.  The statement that "a prolonged exposure can cause serious health problems, including pneumoconiosis," is misleading because the duration of exposure that constitutes "a prolonged exposure" is not specified, so workers are left to speculate whether the "prolonged exposure" that can cause harmful effects is days, weeks, months, years, or decades.  The word "pneumoconiosis" is also vague and confusing, because it is not a commonly used word and readers would unlikely know that it refers to a plethora of occupational dust diseases of the lungs, the most relevant of which is silicosis, which is not mentioned by name in this section even though it is the lung disease most strongly associated with occupational exposure to respirable crystalline silica dust.

270.    The last paragraph of Section 10 of the Material Safety Data Sheet states: "In accordance to RD 363/1995, regulation about notification of new substances and classification, packed and labeled of dangerous substances, the sample put under test is not considered classifiable within any group of risk on the basis of its acute toxicity by ingestion."  This statement is false and misleading, because the referenced regulation requires notification and warnings for new hazardous substances in commerce that companies market and sell, including substances specified in subdivision 2 of Article 2 of the regulation, which includes dangerous substances, including those that are "very toxic," which is defined in subsection (f) of Article 2, subdivision 2 of the regulation as "substances and preparations that, by inhalation, ingestion or skin penetration in small quantities, can cause acute or chronic effects and even death."

271.    Section 15 of the Material Safety Data Sheet, regarding Regulatory Information," states: "Silestone is not classified as dangerous substance or product that involves a risk for the

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

health in accordance to the Regulation of Dangerous Substances R.D. 255/2003 and according to European Norms 67/548/EEC, 199/45/EE and their corrections 93/112/EEC, 2001/58/EEC and 2001/60/EEC." Once again, this is a false statement, because the product contains extremely high concentrations of crystalline silica as well as the other and components and additives that are toxic to the respiratory tract and can cause silicosis and other fibrotic lung disease and death, and because EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

272. Section 16 of the Material Safety Data Sheet, regarding "Other Information," contains three paragraphs, the first of which states: "The information contained in this document is, in accordance to all our actual acknowledges, true and exact. However any recommendation or suggest formulated here are out of our guarantee, because the conditions of use of our product are out of our control. Besides, nothing of contains here can be interpreted like a recommendation to use any product breaking the laws and trials of security or patents come into effect about any subject or its use." This paragraph appears to constitute a representation that the information in the Material Safety Data Sheet is true and correct, although most of the information provided is either, false, misleading or unintelligible, and could not have been genuinely believed by Cosentino to be "true and exact."

273. The second paragraph of Section 16 of the Material Safety Data Sheet states: "The receiver of our product will have to observed, under its responsibility, the corresponding regulations and norms. In any case the data contained in this Security Data Sheet constitute a guarantee of specific properties or generate any contractual relation." Although this paragraph appears to constitute an an attempt by Cosentino to disclaim all responsibility for its dangerous and lethal product and to shift all such responsibility to those who receive the product, the language actually states that "the data contained in this Security Data Sheet constitute a guarantee of specific properties" of the product and therefore actually constitutes a guarantee by Cosentino of safety.

274. The last paragraph of the Material Safety Data Sheet repeats the previous false statements that the MSDS is in accordance with the aforementioned European laws.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Silicosis Cases in Spanish Workers Exposed to Cosentino's Silestone**

275.    The first cases of silicosis in Spanish artificial stone workers were published in 2010 by researchers at the National Institute of Silicosis at the University Hospital in Asturias, Spain. They reported 3 cases in workers who had been employed for 17 years by a small ornamental stone company that fabricated and installed in homes and buildings.  The workers were all young: 32, 34, and 37 years old.  Chest x-rays of all 3 workers showed nodular opacities with diffuse bilateral distribution and more profuse localization in the upper lobes, with a slight increase in mediastinal and/or hilar nodes. In case 1, a cluster of nodules was observed with progressive massive fibrosis; this worker was diagnosed with complicated silicosis.  Martínez C, et al., "Silicosis, a Disease With an Active Present," *Arch. Bronconeumol.* 2010; 46(2):97-100 [in Spanish with English abstract]. These cases were apparently of workers who were exposed to Cosentino's Silestone product.

276.    In 2011, researchers at Galdakao Hospital in Bizkaia, Spain published a study of 11 workers who were exposed to different types of quartz surfaces since 1995.  Four of the subjects worked in the cutting workshop; the rest of the workers worked in assembly (i.e. fabrication), without any specific respiratory protection apparatus.  They diagnosed 6 of the 11 workers with silicosis, which equated to a disease prevalence in this work environment of 54.5%.  Of the 6 workers affected, 5 (83.3%) were assembles (fabricators).  The investigators attributed silicosis in these workers to quartz conglomerates (artificial stone).  Pascual S, et al., "Prevalence of silicosis in a marble factory after exposure to quartz conglomerates," *Arch. Bronconeumol.* 2011; 47(1):50-51 [in Spanish with English abstract].  These workers were exposed to Cosentino's Silestone.

277.    On May 29, 2011 an article appeared in Diario de Cadiz titled "Silicosis has affected almost twenty Pelagatos workers."  The article noted that this irreversible fibrotic-pulmonary disease is contracted through Silestone, a material used to manufacture countertops.  A conference on occupational health organized by Comisiones Obreras (CCOO) in San Fernando brought to light information that affects workers in the Pelagatos industrial estate.  From the Occupational Health Secretariat of that union, Manuel García Túnez, confirmed that a total of 19 workers from that industrial zone who are engaged in the manufacture of Silestone have suffered from silicosis.  The

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

union official pointed out that this disease is contracted through prolonged contact with a material used in countertops, Silestone (a quartz agglomerate), but that this condition is due to the fact that few measures are taken to prevent occupational hazards. Thus, he said that among the twenty people affected by silicosis there are already people with absolute disability and others who are able to work. In the same way, he criticized the functions of the mutuals that, in his opinion, "are more interested in their business than in the worker." He also pointed out that the health authority, in terms of occupational health, "is a real disaster in the entire Andalusian community, but much more in the province of Cádiz."

**Cosentino's 2013 Material Safety Data Sheet for Dekton®**

278.    In April 2013, Cosentino issued a Material Safety Data Sheet for its product DEKTON®, which described the product as an "Ultra-compact surface designed for use indoors and outdoors, particularly kitchen and bathroom worktop, flooring, cladding and facades."

279.    Section 2 of this Material Safety Data Sheet, regarding "Hazards Identification" states:  "There is no provision for any risk associated with the finished DEKTON® material in the CLP (EC) regulation $n^0$. 1272/2008.  However respirable crystalline silica dust can be generated in manufacturing operations.  Respirable crystalline silica causes harm to the lungs, such as silicosis, through prolonged or repeated exposure (Hazard H372).  A series of preventative measures should be adopted to prevent or minimise exposure."  This statement is false and misleading for the following reasons: First, the purpose of the referenced regulation "is to ensure a high level of protection of human health" and to provide "an obligation . . . for suppliers to label and package substances and mixtures placed on the market," suppliers being defined as including "any manufacturer, importer, downstream user or distributor placing on the market a substance, on its own or in a mixture, or a mixture."  Second, crystalline silica is specifically identified in Annex 1 of the regulation as a hazardous substance.  Third, the regulation requires suppliers (including manufacturers) of a hazardous substance or mixture to "ensure that the substance or mixture is labelled and packaged in accordance with [the regulations] before placing it on the market."  Because

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOXTORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

DEKTON® is a chemical mixture that is not a finished, end-use product sold to consumers, but is rather an industrial product sold to companies that fabricate countertops for installation in kitchens and bathrooms, the ordinary, intended and expected use of the product is for it to be cut, ground, and polished, thereby releasing respirable crystalline silica dust. Accordingly, contrary to Cosentino's assertion, there is risk associated with DEKTON® and the referenced regulation does require health hazard and other disclosures for the product.

280.    The Material Safety Data Sheet then states: "Contens [sic] crystalline silica < 11%" and provides the following warning: "HAZARD: H372 Causes damage to lungs through prolonged or repeated exposure (inhalation)." This is information is vague and misleading, because it does not specify how many days, weeks, months, years or decades constitutes "prolonged" exposure or the number of exposures that constitute "repeated exposure" that causes such damage.

281.    The Material Safety Data Sheet then provides four instructions under a heading "Prevention": P260 Do not breathe dust generated in the cutting, grinding, and polishing processes; P264 Wash face and hands thoroughly after handling; P270 Do not eat, drink or smoke when using this material; P284 Wear respiratory protection for particles (P3)." The first instruction is meaningless and impossible of performance, because dust is always generated in cutting, grinding and polishing DEKTON®, and workers cannot hold their breath an entire workshift so as not to breathe dust dust generated in the cutting, grinding, and polishing processes. The second instruction, although a useful general hygiene instruction, not a means of prevention, i.e., washing one's face and hands after handling DEKTON® cannot prevent silicosis. The third instruction is also not a means of preventing silicosis and is a rather useless instruction, because DEKTON® is too hard to eat (one cannot eat stone), DEKTON® dust does not present an appreciable ingestion hazard, so that there is no appreciable risk to one's health of eating or drinking when using DEKTON®, and there is no risk of fire or explosion from smoking when using DEKTON®, because it is not flammable. The fourth instruction, to "wear respiratory protection for particles" (which is accompanied by a pictograph of a worker wearing a particulate filter respirator) is inadequate, because air-purifying respirators are inadequate to prevent silicosis from inhaling DEKTON®, and the only type of respirator that is adequate to prevent silicosis from inhaling DEKTON® is a NIOSH-approved air-

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

supplied respirator.  Thus, this preventive instruction is actually harmful, because it prescribes the wrong type of respirator to prevent silicosis from inhaling respirable crystalline silica dust from DEKTON®, and would thereby mislead workers to believe that wearing a particulate air-purifying respirator would prevent silicosis and thereby preserve their health and safety.

282.    Section 8 of the Material Safety Data Sheet is titled "Exposure Controls/Personal Protection" and contains a section regarding "Exposure Controls (Manufacturing and installation)" that states: "The manufacturer recommends methods that involve the use of water in the manufacturing of this material.  Dust derived from the manufacturing processes could contain respirable crystalline silica ($SiO_2$)."  The first sentence is an inadequate use instruction, because wet processing methods *must* be used whenever DEKTON® is cut, ground or polished, to prevent silicosis, although wet processing methods alone are insufficient to prevent silicosis.  The second sentence is misleading because it suggests that dust from manufacturing processes may not contain respirable crystalline silica, although respirable crystalline silica is generated whenever DEKTON® is cut, ground, drilled, millers, polished, or otherwise fabricated.

283.    The section of the Material Safety Data Sheet regarding "Exposure Controls" then says: "Long term exposure to dust derived from the cutting and manufacturing processes without the use of suitable protection may cause serious deseases [sic] including pneumoconiosis such as silicosis, as well the deterioration of other lungs diseases such as bronchitis, emphysema, etc."  This statement does not constitute an "exposure control," i.e., a means of controlling exposure.  It is also a vague and inadequate description of health hazards, because it indicates that only "long term exposure" to dust from the product can cause silicosis, which could well be understood to be decades of exposure that results in chronic silicosis, although fabricating artificial stone countertops has most strongly been associated with acute silicosis (typically following exposure of less than 3 years) and accelerated silicosis (following exposure between 5 and 10 years).  The sentence is also vague and misleading, because it does not define "suitable protection," which workers would typically understand to be the use of a particulate filter (air-purifying) respirator, which is inadequate to prevent silicosis in artificial stone fabricators, because the only type of respirator that can prevent silicosis in such workers is an air supplied respirator.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

284.    Section 8 of the Material Safety Data Sheet states: "Always use respiratory protection for P3 type particulates according to EN 143:2001 and its revisions EN 143/AC 2002, EN 143/AC 2005 . . . during the preparation of Dekton®."  While this type of air-purifying respirator will reduce exposure to crystalline silica, it will not eliminate such exposure and will not prevent silicosis, as will a NIOSH-approved air supplied respirator.  The instruction to use this respirator is thus harmful.

285.    Section 11 of the Material Safety Data Sheet is titled "Toxicological Information."  This section provides little toxicological information regarding the product.  Although Section 3 of the Material Safety Data Sheet identifies silicoaluminates, amorphous silica, crystalline silica, zircon and inorganic pigments as the ingredients of DEKTON®, no toxicological information is provided regarding any ingredients of the product other than crystalline silica, and the information provided regarding crystalline silica throughout the Material Safety Data Sheet is inadequate, incomplete, misleading and false. Especially because Cosentino did not disclose the cancer hazard that exposure to DEKTON® presents in the Hazards Identification section of the Material Safety Data Sheet, that information should be disclosed in Section 11 of the Material Safety Data Sheet.  In particular, this section of the Material Safety Data Sheet should state that crystalline silica is a known human carcinogen, because the International Agency for Research on Cancer classified crystalline silica as a Group I (known human) carcinogen in 1997.  The only statement regarding cancer in the entire document is the last sentence of Section 11 which states: "Persons affected by silicosis have a higher risk of suffering from lung cancer."  Although true, this statement is misleading, because it suggests that silicosis causes cancer.  However, silicosis does not cause cancer; it is crystalline silica that causes cancer.  Persons who have been diagnosed with silicosis typically have a greater cumulative exposure to crystalline silica than do persons who have not been diagnosed with silicosis, so persons who have silicosis have an increased risk of developing lung cancer because of their greater exposure to crystalline silica.  Cosentino's failure to disclose the carcinogenic hazard of DEKTON® due to its crystalline silica content not only violates the Hazard Communication Standard, but also violates California's Safe Drinking Water and Toxic Enforcement Act ("Proposition 65"), which requires manufacturers of carcinogenic products to warn individuals (including workers) exposed to such products that they contain a chemical (crystalline silica) that is known to the State to cause cancer.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Cosentino Denies Responsibility for Silicosis Cases of Workers in Andalusia**

286.    In July, 2015, Younes Nachett authored an article regarding silicosis among Spanish workers in Andalusia who had been occupationally exposed to crystalline silica from Cosentino's Silestone.  On July 28, 2015 Santiago Alfonso Rodriguez, Cosentino's Director of Communications sent a letter to the newspaper, denying Cosentino's responsibility for the silicosis cases in Andalusia:

> We are contacting you regarding the publication in the newspapers that you direct of the articles titled "The deadly dust" of kitchen countertops with a Quartz base," VivaSevilla, July 28, 2015, and Viva Caldiz, July 28 2015, authored by journalist Younes Nachett and published in the digital edition of the media.

> In the aforementioned publications, false and misleading statements are made regarding Cosentino and products such as Silestone, that are attributed to causing illnesses and even deaths. Extensive documentation and statements from the company were provided to the journalist, Younes Nachett, at his request, which we shared for his knowledge as an attached document.

> The materials that we produce are harmless to health and, as the author who signed the report explained in detail, improper handling is the cause of these diseases, but your newspaper insists that our material is especially harmful to health.

> We ask you to attend to this communication by proceeding to rectify the information in everything related to Cosentino and Silestone, both in the aforementioned article and in any other of your publication in which it may be replicated.

> In the legitimate defense of the good name of our company and our interests, we reserve the right to take any legal action that may be appropriate.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Sincerely,      Santiago Alfonso Rodriguez

Director of Communications, Cosentino

287.   Cosentino stated that according to the National Institute of Silicosis, the measures to control dust in the cutting and polishing process are based on irrigation with water so that the particles settle, and that adequate controls are used that do not return them to the atmosphere and remove them from the environment with aspiration and ventilation. To the extent that these procedures fail, personal protection measures must be used. Devices can be used to filter and prevent the inhalation of these materials when carrying out work such as mining. It is important to avoid tobacco, in any case, but especially in workers who handle the stone and take the appropriate measures to prevent tuberculosis."  Cosentino claimed that "Silestone® is a safe product, that exposure to the material is not harmful in any case . . . , what happens is that these marble factories lacked safety measures of any kind, both for granite and for quartz countertops," which "cannot be attributed" to Cosentino.  Cosentino insisted that "neither was the risk unknown to the marble workers, nor to the mutual companies, nor were the safety measures and health surveillance protocols that had to be adopted different from those of other materials with silica content."  Cosentino also claimed that "since the start of marketing Silestone® products, the company printed commercial catalogs in which it was indicated that their composition contains more than 90% quartz, the composition of Silestone® could not be unknown to the marble workers and in fact it was not, which is why they could have applied safety measures from the beginning that were none other than those that they should already be applying for the handling of granite.  Cosentino also claimed that "already in 2005, coinciding with the entry into force of the European directive that regulates the labeling of products, Cosentino began to include an eye-catching label that warned of the health risks of handling these products without protection and in 2009, this information was expanded with much more explicit labeling. Cosentino argued that responsibility for the silicosis epidemic among Spanish workers exposed to its product was with the workers' employers rather than Cosentino: "Knowing that the focus of the problem is clear, it is essential that those responsible for companies that cut, polish and install stone materials assure compliance with safety measures because they are the ones who must supervise compliance with requirements are also responsible for incorrect actions."

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**American Workers Who Got Silicosis from Cosentino's Products**

288.    Ulbester Rodriguez was a Mexican immigrant who came to the United States at age 14. He spoke no English, did not receive a formal education, and worked in restaurant kitchens until changing jobs and working with countertop cutting. Since 2000, Rodriguez has worked on cutting and polishing slabs of an artificial stone to make kitchen and bathroom countertops." "Just 10 years after beginning work with Cosentino, Rodriguez noticed serious health problems that affected his day-to-day. He had to stop playing soccer for fun because he got tired very easily. He developed a persistent cough, and after getting some X-rays done, the doctor told him he had severe silicosis at 33 years old. Rodriguez had never heard the terms before." "His lungs are so damaged that he is on oxygen about six hours a day. Unfortunately, he will likely need a lung transplant." "The shop Rodriguez worked for is run by Cosentino . . . ." "His employer [Stone Systems] did not explain anything about Silestone's makeup, the fact that it's made from mostly quartz, and it contains a lot of silica. Silestone can be as much as 90 percent crystalline silica – twice as much as natural granite. The only thing his employer warned him about was injuries related to cutting, for example. He explained that no mention of potential lung disease was ever communicated." "Around the time of Rodriguez's diagnosis, the company had just begun to issue warnings around the shop of risk of silicosis, and it had not tested the workplace air until just the year previous. The 2009 inspection fo the air showed that silica exposure levels were well above the legal limit in three of seven workers who wore monitoring devices to assess the air quality around them. Still, a 2011 round of air tests had the same results: three of seven monitored workers above the permissible exposure limit, and employees still at risk. This was the case even though all the processes including cutting and grinding were using water to keep down the dust. The company says it believed it was taking the necessary measures to protect employees, especially since the early 2000s. Travis Dupre, the current vice president of sales for Stone Systems, testified and said the following: "We felt like we were doing what was reasonable. We had switched everything to wet grinding. We had moved into a facility with better ventilation. We'd enforced no dry cutting. We felt like we were taking the reasonable steps." Mr. Rodriguez filed a lawsuit against his employer Stone Systems and against

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Cosentino, which settled in 2016. The lawsuit "was settled confidentially, with no admission of liability. Neither Cosentino nor Stone Systems made public statements regarding the legal proceeding or the documents associated." "US Countertop Workers falling Sick from Silica Dust: More and more cases of countertop workers getting sick indicates the hazards are cutting Silestone, a material made of quartz that releases dangerous silica," *Occup. Health & Safety* (Dec. 5, 2019).

**More Spanish Workers Get Silicosis from Silestone and Sue Cosentino**

289.    On February 19, 2019 the Spanish newspaper Eldiario published an article by Nestor Ash. It was titled "Andalusian silicosis reaches the courts: a court investigates a complaint against the manufacturer of Silestone." This article noted that silicosis is the main occupational disease in Andalusia, according to a report from the Ministry of Health, which attributes it to quartz agglomerate (artificial stone). The article noted that the highest incidence had been registered in Cádiz, although all the production of quartz agglomerate comes from Almería. The article reported that several workers afflicted with the disease had filed a complaint. It related the story of one worker:  José Araque spent the last two years of his life on a sofa, lying on his side to avoid the hemorrhages that every so often flooded his right lung, the only one that barely worked. His lungs had been filled with small silica stones twenty years before, while he was handling the quartz conglomerate that is manufactured in the complex that the Cosentino Group has in Cantoria (Almería) and whose star product is Silestone countertops.  Araque died in 2015, a victim of silicosis, which today is the main occupational disease in Andalusia. Several afflicted with silicosis filed a complaint against those responsible for the company.  They believe that the lack of adequate safety measures caused the death of Araque and injuries to other workers.  "He knew he had little chance of life, but the last few years were spent waiting for death. He was very afraid, he was exhausted, and at the moment he began to bleed . . . he said that he was worthless," recalls his widow, Paqui Silva.  He started suffering from respiratory problems in 1998. "He had a fever.  We would go to the emergency room, antibiotics and work again. He was always very tired." In 2002, a biopsy confirmed that he suffered from silicosis and two years later they removed a large part of

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

his left lung, eaten away by the disease. For years he suffered more and more frequent hemorrhages, which forced him to travel urgently from Huércal-Overa to Granada, intubated to avoid drowning in his own blood. The last years of his life, Araque spent suing his company. In 2004, he started a legal battle to determine the degree of disability that he suffered. A medical court deemed him disabled from work, but did not grant him absolute disability. In his mid-thirties, he was left without a job and with a salary of 800 euros. In 2015, thirteen years after he was diagnosed with silicosis, the labor inspectorate reviewed his case and acknowledged that Araque was completely unable to work. "Now that they know I'm dying, they give me this," lamented the man, as his widow recalled. He died a few months later. Araque's case is one of the few cases brought against Cosentino, the great marketer of quartz agglomerates in Andalusia and Spain. Cosentino employs around 1,500 workers at its factory in Cantoria (Almería). It is the great company of the marble region. It ended 2017 with revenues of 901 million euros and 57 million euros in profit. Last year some affected workers and relatives filed a complaint against the managers of the company, charging them with alleged crimes of reckless homicide and injuries. The article noted that silicosis accounts for 18.55% of occupational diseases in Andalusia and is the most common occupational disease in Andalusia, having displaced pathologies from exposure to asbestos as the most common occupational disease according to the monograph "Communications of suspected occupational diseases 2009-2016," prepared by the surveillance and occupational health service of the Ministry of Health. The report, published in May 2018, links the rise in disease to quartz agglomerates, which became popular in the real estate boom years. The reported cases of silicosis, 279 in total, were concentrated in the provinces of Cádiz, Córdoba and Almería, with a maximum peak in 2011. From that year on, the cases in Almería decreased. The total number of cases reported in the period 2009-2016 was 122 in Cádiz, 37 in Almería and 37 in Córdoba, the most affected provinces. "If there is one, there must be more", thought Dr. Rabadán and his team, who began an active search that led them to 24 small workshops where compacted quartz countertops were cut. "Word spread and among those we searched for and those who turned up, we began to do tests and biopsies. The CT images [chest tomography] were shocking, you could see the white lungs," explains the doctor. The silicosis produced by the quartz agglomerate is especially virulent and evolves much more rapidly than the

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

silicosis of the miners. The reason for the aggressiveness of this variant is the material that produces it. Silestone is a composite material that contains around 80% silica and cristobalite, which is crystalline silica derived from high temperatures. When dumped into a silo, the silica produces dust; when a hopper is cleaned, it produces dust; when a countertop is cut, dust is produced. "The silica particles are so small they are respirable, and masks are not effective in preventing inhalation of the small particles, explained the doctor. In total, 122 cases were reported in the province of Cádiz in the period 2009-2016 and those affected ended up formed the Association of Affected and Sick with Silicosis (ANAES), founded by Agustín Cebada shortly before undergoing a lung transplant that was not successful. Today the president of the association is Ismael Aragón, who suffers from silicosis like two of his brothers, his father and ten other relatives. They all worked in the marble shop. "We did the fine work, the adaptation to the home," he recalls. According to his account, they worked with Cosentino countertops. "A lot of cutting, a lot of sanding." In those *boom times,* no one in the marble shops took any safety measures. "They had not told us everything it contained: lead, arsenic, cadmium. . . . Some labor inspector has come to tell us that this must be worked with Ebola suits," laments Aragón, who noted that a case of the disease has already been detected in an office worker: "We pray that our wives, who worked in the offices, are not sick." The Cosentino company denied any responsibility in these cases, and emphatically claimed that the cutting, manufacturing and installation of the quartz agglomerate slabs could be done in a "totally safe" manner, following the measures indicated on the labels of each slab, the Safety Data Sheet and the Good Practices Guide. "Unfortunately, the implementation and continuity of existing safety measures in each marble shop is the exclusive responsibility of the owner of the same," said the company. According to his widow, Antonio signed a confidentiality agreement with Cosentino. Paqui, the widow of José Araque, also mentioned these clauses, supposedly signed by some workers in exchange for compensation or a new job away from silica dust. José Antonio López, president of the association of affected people from Almería, confirmed that it is a common practice in the company: "They wanted to deal with me, but they played with my life: I was about to die. I don't even want to go through the door. I can tell you about 15 or 20 people who are working in factories with silicosis." The company admitted the existence of confidentiality clauses. The existence of these contracts could explain the sharp drop

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

in reports of silicosis in Almería, after the peak of 2011. Those affected would guarantee themselves a position in the company away, in theory, from the supposed source of contamination, and avoid a retirement with a pension that barely reached half of the worker's salary. "Some workers don't want us to do the examination, because they would be unemployed and they don't know how to do anything else," admitted Dr. Andrés Rabadán. For him, this refusal poses an "ethical" problem. Cosentino, however, claimed that the number of "relocated" workers did not exceed ten, out of the "less than 25 cases" of silicosis registered in his factory. Another possible explanation for the sharp drop in reports of silicosis in Almería is that, following the first cases detected, Cosentino adopted strict safety measures that it claimed was able to effectively protect its employees from silica dust. Cosentino claimed that it adopted comprehensive protective measures according to the work area (water nebulizers, localized exhaust ventilation, forced environmental ventilation) with the use of respirator masks, "thus guaranteeing that the worker does not have any exposure to dust from silica." Just over a year ago, Interviú magazine published some images that refuted this statement. In them you can see areas of the Cosentino factory in Cantoria wrapped in a cloud of dust that barely allows you to see what is a few meters away. Eldiario.es Andalucía has had access to two videos, supposedly made in 2017, and provided by one of the sources consulted for this report. In one of them a massive dust leak is observed in some facilities; in the other, dust is generated by various polishers. However, the place of the recording could not be verified, according to Cosentino. "The images published in the Interviú article did not represent the reality of the factory at all, nor has it been proven in any way that they had been taken in our production centers," the company claimed, attributes its publication to the interest in creating "an unjustified alarm." The company asserted that measurements of exposure to silica dust would "objectively" prove that workers can carry out their work safely. The last possible explanation is that doctors are not detecting the disease. This is what the report of the Junta de Andalucía suggests. For Doctor Rabadán, it would not be strange: "It is not an easy disease to detect. We have experience that no one else in the world has. We have seen more than a hundred cases." Those affected from Almería refer to several workers who were not diagnosed in Almería, and were in Cádiz. Dr. Rabadán believes an active search is necessary for cases of silicosis to surface: "If you wait, not many will appear, and if you do an active search they will."

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Judgment By Spanish Court that Cosentino's Disclosures Were Deficient**

290.    On February 20, 2019 Eldiario published the second in the series of articles by Nestor Ash, titled "A ruling established the responsibility of Silestone manufacturers for failing to warn of the risk of silicosis."  This article stated that "The Provincial Court of Bilbao ruled in 2017 that Cosentino disclosures of the risks of handling quartz agglomerate was "late, insufficient and confusing."  This article noted that the manufacturers and especially Cosentino denied all responsibility for how the material was handled in the marble factories to which it supplied the product.  The Almeria-based company claimed that it currently conducts training courses for marble shops and issues information bulletins in which it explains the protective measures that must be adopted to cut, process and install its countertops.  These measures are also outlined in the safety labels incorporated in each table, the Safety Data Sheet and the Good Practices Guide. "Unfortunately, the implementation and continuity of existing safety measures in each marble shop is the exclusive responsibility of the owner of the same," said the company.  However, a sentence of the Criminal Court 1 of Bilbao, which was confirmed by the Provincial Court of Vizcaya in May 2017, questioned the thesis of the exclusive responsibility of the company fabricating the countertops.  These rulings determined that Cosentino, as a manufacturer of quartz agglomerates, had joint responsibility for the illness of various workers at a Vizcaya marble factory, because Cosentino disclosed the hazards of the material they supplied "late, insufficiently and confusingly." Nevertheless, the heads of Cosentino and Levantina de Granitos (a company that imported a similar product from Israel) were acquitted due to the statute of limitations for the reckless injuries, the crime with which they were charged.  Marmolerías Cid, where several patients with silicosis worked, was a family business that had been dedicated since 1984 to the fabrication and installation of granite countertops. Around 1999, Marmolerías Cid began to acquire and work on Silestone countertops, which at that time were expanding rapidly throughout Spain. From 1999 to 2008, Marmolerías Cid acquired Silestone countertops manufactured by Cosentino for a value of 1.8 million euros, in addition to a similar product, Caesarstone, worth around 250,000 euros.  The judgments declared that it had been proven that up until 2004 neither Cosentino nor Levantina de Granitos disclosed the

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

hazards of handling this product, despite the general duty established by the 1995 Occupational Risk Prevention Law.  In 2004, Cosentino added a label to the slabs with a warning that equated the risks of dry cutting or grinding Silestone to the risks of fabricating "natural stone products such as marble or granite: Prolonged exposure . . . can cause serious health problems, including pneumoconiosis." However, the safety sheets did not begin to be produced until 2005-2006, and there was no record that they were delivered to the marble factory until 2009, according to the judgment, which added that "they gave rise to confusion" because they compared Silestone slabs to those of natural stone, and insisted that they are safe for the end user, obviating the risk for the intermediate handler.  The court concluded that Silestone is a product that workers must handle with extreme safety measures. The court's ruling noted that the International Agency for Cancer Research has concluded since 1997 that silica is a carcinogenic substance, and that the slabs contain free crystalline silica in a percentage between 70% and 90%, "whose inhalation by minimal and continuous exposure for five years can cause silicosis."  Neither the labor inspection, nor the risk prevention mutuals, nor the manufacturers warned of the composition of Silestone or the risks it entails, so the workers "performed the machining tasks without adequate protection, leaving them exposed . . . to respirable dust with a high silica content," the judgment concluded.  The judgment considers that the heads of the marble factory could not be aware of the danger of this material, but that the manufacturers could be held responsible for the generation of silicosis in the workers, for failing to satisfy their "duty of disclosure" regarding the product that they were supplying.  The judge reasoned that this omission resulted in no preventive measures being adopted, but ended up reducing the responsibility of the manufacturers because the legislation was imprecise, the product was new, and the manufacturers provided information, even if it was late, vague or deficient.  In this way, the judge acquitted Francisco Martínez-Cosentino, president and general director of the company, for the offense.  The sentence was appealed before the Provincial Court, which confirmed that "it is clear that there was a violation of the duty of disclosure by the manufacturing company" and affirmed the judgment.

//

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Cosentino Falsely Claims its Products are Not Inherently Dangerous and that Silicosis from Exposure to its Products is Entirely Preventable**

291.     In a letter dated November 29, 2019 to the Hon. Niall Blair, Committee Chair of the Legislative Council Standing Committee on Law and Justice in Sydney, Australia, Cosentino claimed that "Cosentino has been making continuous efforts to raise awareness amongst the companies and persons working with the engineered stone products, by way of holding on-site Occupational Health & Safety educational sessions to the industry during many years, worldwide." This statement is false, because Cosentino only initiated its educational program as a public relations effort to salvage Cosentino's reputation and to avoid liability for causing silicosis worldwide after news media reported the artificial stone fabricator silicosis epidemic in 2019, especially because Spanish courts had issued judgments finding that Cosentino had failed to adequately disclose the toxic hazards of its product and that the disclosures that it made were inadequate, confusing, and late. Whereas Cosentino had previously disclaimed all responsibility for the silicosis cases among Spanish workers who fabricated Silestone and blaming the epidemic on its customers for failing to provide a safe workplace, in its letter to the Chair of the Australian Legislative Council Standing Committee on Law and Justice, Cosentino "acknowledg[ed] its corporate social responsibilities" "for the benefit of employees and suppliers alike" to provide adequate warnings and use instructions for its products. In this letter Cosentino acknowledged that "Silicosis dust disease related illnesses is one of the main challenges to be addressed by the engineered stone industry."  In the letter Cosentino claimed that in the last fiscal year, "the Cosentino Group has provided approximately 1,200 hours of training to suppliers [and] more than 30,000 hours of training directly to employees."  Thus, Cosentino finally acknowledged its duty to make adequate health hazard disclosures and to train its customers' employees regarding the extreme silicosis hazard of its products and how to use Cosentino's products safely so that they would not develop and suffer from silicosis.  This was a complete reversal of Cosentino's prior stated position that it had no responsibility to its customers' employees, that their health and safety was solely the responsibility of their employers, and that Cosentino could not protect the health of its customers' employees because it lacked control over their workplaces.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

The new position that Cosentino presented in its November 29, 2019 letter to the Chair of the Australian Legislative Council Standing Committee on Law and Justice, was expressed as follows:

> At the outset, it is important for Cosentino to emphasise that it shares the concerns expressed on behalf of the AESAG [Australian Engineered Stone Advisory Group] concerning the welfare of persons engaged in the use of engineered stone products. A safe working environment for everyone involved in the lifecycle of those products is of utmost importance to Cosentino and for many years has been accepted as integral component to the sustainability of not only the manufacturers and suppliers of those products, but the many downstream industries and employers which rely on manufactured stone product for their livelihood.

In its letter Cosentino then defended its products, asserting that "Cosentino quartz products (Silestone®) are produced according to very strict quality criteria and comply with all technical requirements of existing regulations." However, this statement was merely an effort by the company to deflect attention from the silicosis epidemic and deaths by urging legislators to instead focus on the product's manufacture being in compliance with regulatory requirements. After defending its compliance with regulatory requirements regarding the manufacture of its lethal products, Cosentino expressed its positions regarding those of the Australian Engineered Stone Advisory Group. The first position that Cosentino expressed was: "Engineered quartz products are not inherently dangerous. Silicosis associated with the use of those products is 100% preventable when manufacture, fabrication and installation occur in accordance with published OH&S guidelines." This assertion was false, because multiple scientific studies published in the peer-reviewed literature have shown that even when all precautions and protections that had been suggested by Cosentino (i.e., use of wet processing methods and air-purifying respirators) were implemented and rigorously followed, workers nevertheless developed silicosis, because the extremely high crystalline silica

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

content of Silestone and other artificial stone products does render them inherently dangerous.  In addition, Cosentino's assertion that "engineered quartz products are not inherently dangerous" because of their extremely high crystalline silica content is refuted by the company's own decision to begin manufacturing products that contained much less crystalline silica, e.g., its Dekton® and Dekton Xgloss® family of products which it reformulated to have a total crystalline silica content of just 5-11% according to Cosentino's October 2018 Safety Data Sheet for the product, its Dekton® LITE product which it formulated to contain just 3-9% crystalline silica according to Cosentino's May 2020 Safety Data Sheet for the product, its SILQ® product which Cosentino formulated to have a crystalline silica content of 51-92% according to Cosentino's May 2022 Safety Data Sheet for the product, and its Sensa® and Scalea® family of natural stone products which contain less crystalline silica than Costentino's traditional artificial stone products according to its September 2022 Safety Data Sheet for the product, although the range or typical crystalline silica content of this product is not stated in the September 2022 Safety Data Sheet for the product.  In its November 29, 2019 letter to the Committee Chair of the Legislative Council Standing Committee on Law and Justice, Cosentino strongly opposed banning all artificial stone products, recommended by the Australian Engineered Stone Advisory Group, arguing that such a ban "would create enormous disadvantage to the countless businesses and households which rely on the trades that are closely aligned with the use of all those products, including the retail, marketing and distribution networks that have developed in parallel with the core trades."  However, Cosentino's argument that "businesses and households which rely on the trades" would suffer "enormous disadvantage" is untrue, because the needs of consumers and business for stone countertops could readily be satisfied by natural stone countertops which contain much less crystalline silica than artificial stone countertops, as well as Cosentino's new artificial stone products, some of which it formulated to have lower concentrations of crystalline silica, such as its Dekton® and Dekton Xgloss® family of products which it formulated to have a total crystalline silica content of just 5-11% according to Cosentino's October 2018 Safety Data Sheet for the product, and its Dekton®  LITE product which it formulated to contain just 3-9% crystalline silica according to Cosentino's  May 2020 Safety Data Sheet for the product.

//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

## Cosentino Admits Negligence

292.    On February 7, 2023, Reuters reported that Francisco Martinez, who owns Cosentino, "admitted in court that he covered up the dangers of his company's star product, which allegedly led to nearly 1,900 workers contracting the occupational lung disease silicosis, court documents showed on Tuesday." He "accepted a six-month suspended prison sentence for five counts of serious injury due to gross negligence in a plea bargain with the court in the northwestern region of Galicia." Reuters wrote: "Cosentino said in a statement the plea deal only admitted liability for insufficient technical information affecting five workers at a specific workshop and therefore could 'not be extrapolated to other past or future proceedings.'" Reuters noted that "Prosecutors had initially sought a prison term of two years and nine months." The Reuters report stated: "Cosentino, based in the southern province of Almeria, is planning an IPO that could be worth more than 3 billion euros. The company employs over 5,000 people worldwide and posted record sales of 1.4 billion euros in 2021. In the ruling, the judge said Martinez had failed to adequately label the 95% silica content of Cosentino's bestselling quartz agglomerate, branded as "Silestone", despite being aware of the safety and health risks its manipulation entailed." Reuters also reported that "the 71-year-old businessman also agreed to pay 1.1 million euros ($1.2 million) in compensation to the five stonemasons - one of whom has since died - who had sued him for failing to warn of the risk of silicosis linked to cutting and polishing Silestone countertops." Reuters further reported that "Cosentino said managers at stone-cutting workshops 'are responsible for ensuring that their workers have the necessary means of protection and that they implement them appropriately.' 'It is entirely incorrect that Cosentino has admitted to having concealed the fact that the handling of Silestone has caused the majority of cases of silicosis that have affected 1,856 workers,' it added." The Reuters report concluded, stating that "Martinez is set to return to the dock in July for a separate trial in the northern city of Bilbao. Prosecutors are asking for two and a half years' imprisonment on six counts of reckless injury. David Latona, "Owner of Spain's Cosentino admits negligence over silicosis in workers - documents," *Reuters* (February 7, 2023).

//

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Cosentino Calls for a Ban on High-Silica-Content Artificial Stone**

293.    On February 22, 2023, WA today, a news agency from Western Australia reported: "One of the world's largest stone benchtop companies and a coalition of health experts have separately called for a ban on products blamed for a deadly silicosis epidemic. The push from manufacturer Cosentino and key health organisations, including the Lung Foundation Australia and Public Health Association Australia, came as a leading government voice on workplace relations also called for immediate action from state and federal governments to 'right a terrible wrong'. . . . Manufacturer Cosentino produces more than one in every five domestic kitchen benchtops sold in Australia and is facing international scrutiny over its safety record. It is now pushing for a nationally co-ordinated approach to reduce risks associated with products containing high levels of silica, ahead of a meeting of workplace safety ministers next week. 'We have an immediate solution without disrupting the construction and building market', a Cosentino spokesperson said. 'And prices won't increase.' Two weeks ago Cosentino was found guilty in a Spanish Court of negligence. Reuters reported that the company's owner accepted a six-month suspended prison sentence after admitting to covering up the dangers of the product. It is also facing legal action in Australia. A coalition of peak health groups, including the one writing a government action plan on silicosis, also backed a ban on high-silica-content products, and urged leaders to boost the policing of workplaces and overhaul compensation schemes for sick workers. The Cosentino spokesperson said restrictions should start tomorrow, not next year or in 18 months. 'The immediate solution is everyone buys products that are less than 40 per cent silica,' he said. . . . The spokesperson said Cosentino had developed a product containing between 10 per cent and 40 per cent silica which could be distributed at scale if products with higher levels of silica were stopped from entering the market." Adele Ferguson and Angus Thompson, "Benchtop giant, health groups demand dangerous-stone ban," Watoday (February 22, 2023).

//

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Knowledge of the Silicosis Hazard by Cosentino Officers and Directors**

294.    Throughout the time that Cosentino manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Cosentino's officers and directors were aware that Cosentino's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Cosentino provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Cosentino's defective artificial stone products.   Among Cosentino's officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers were the following officers and directors of the company:  Francisco Martinez-Cosentino Justo, Chairman/CEO and President of Cosentino Group; Jose Martinez-Cosentino Justo, Vice President and General Treasurer; Pilar Martinez-Cosentino Alfonso, Executive Vice President and Deputy Chairman; Eduardo Martinez-Cosentino Alfonso, Executive Vice President of Global Sales and Chief Executive Officer of Cosentino North America; Valentin Tijeras Garcia, Vice President Global Product and Research and Development; Angel Madariaga Alvarez, Vice President of Engineering & Projects; Alberto Quevedo Gonzalez, Vice President of Global Production; Santiago Alfonso Rodriguez, Vice President of Global Marketing & Communication; Brandon Calvo, Chief Operations Officer of Cosentino North America; Pilar Martínez-Cosentino Alfonso, Director; Isabel Martínez-Cosentino Ramos, Director; Eduardo Martínez-Cosentino Ramos, Director; María del Mar Martínez-Cosentino Ramos, Director; Eduardo Martínez-Cosentino Rosado, Director; and Isabel Martínez-Cosentino Rosado, Director.

//
//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**DAL-TILE**

295.    According to its website, "Daltile is the best-selling tile brand in America and the largest ceramic manufacturer in the world."  Daltile claims that "[u]nlike most of our competitors, many of our collections are proudly designed, developed, and manufactured in the USA."

296.    According to its website, the company is 75 years old, dating back to 1947 when "Robert M. Brittingham founded the Dallas Ceramic Company while operating out of a simple Quonset hut in Dallas, TX."

297.    According to the company's website, in 1980 the "Dallas Ceramic Company change[d] its name to Dal-Tile Corporation."

298.    According to the company's website, in 1999 "Dal-Tile unveil[ed] its eagerly anticipated Natural Stone Collection," opening "its first Tile & Stone Gallery in Dallas, TX."

**Dal-Tile's Knowledge of the Silica Dust Hazard as of 2000 and 2001**

299.    In its Form 10-K Annual Report for the fiscal year ended December 29, 2000 filed with the Securities and Exchange Commission, Dal-Tile International Inc. acknowledged:

> Numerous aspects of the manufacture of ceramic tile currently require
> expenditures for environmental compliance. For example, the mixing
> of raw materials, preparation of glazes, and pressing, drying and
> firing of tile all are sources of air emissions that require expenditures
> for compliance with laws and regulations governing air emissions,
> including the purchase, operation and maintenance of control
> equipment to prevent or limit air emissions. Many of these
> manufacturing processes also currently result in the accumulation of
> dust that contains silica, thereby requiring  expenditures for capital
> equipment in order to comply with Occupational Safety and Health

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Administration ("OSHA") regulations with respect to potential employee exposure to such dust.

https://www.sec.gov/Archives/edgar/data/906611/000091205701007653/a2041503z10-k.txt.

300.    In its Prospectus filed on May 17, 2001 with the Securities and Exchange Commission, Dal-Tile International acknowledged:

> Many of our manufacturing operations result in the processing of raw materials that contain silica. These manufacturing processes require expenditures for capital equipment in order to comply with Occupational Safety and Health Administration regulations with respect to potential employee exposure to dust which may contain silica generated by such processes.

**Dal-Tile Begins Manufacturing Artificial Stone**

301.    According to the company's website, in 2009 "Dal-Tile launche[d] its Manufactured Stone Collection and innovative partnerships with Microban and Dupont."

302.    According to the company's website, in 2014 "Daltile open[ed] its newest Design Studio in San Francisco."

303.    Plaintiff is informed and believes and thereon alleges that prior to 2017 Dal-Tile imported quartz surfaces and distributed them throughout the United States, but in 2017 Dal-Tile announced plants to open a plant in Tennessee to manufacture quartz surfaces domestically and thereafter began manufacturing artificial stone at its Tennessee plant and selling its own quartz product throughout the United States.

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Dal-Tile's 2019 Safety Data Sheet for its One Quartz™ Collection**

304.    In 2019 Dal-Tile issued a Safety Data Sheet for its One Quartz™ Collection.  In Section 1 of this Safety Data Sheet ("Product Identification") Dal-Tile described its slabs as "environmentally preferable building materials" and "one of the most environmentally friendly building materials you can buy today."  However, in Section 3 of the Safety Data Sheet, Dal-Tile states that the product contains 46-52% crystalline silica by weight.  Since exposure to crystalline silica causes silicosis, lung cancer, and other diseases, Dal-Tile's assertion that its product is "one of the most environmentally friendly building materials you can buy today" is false and misleading.

305.    Section 2 of the Safety Data Sheet, regarding Hazards Identification, provides three hazard statements:  "(H35) May cause CANCER," "(H335) may cause respiratory irritation;" and "Causes damage to organs (lung/respiratory) through prolonged or repeated exposure (inhalation)."  The first statement is misleading because it suggests the product is not known to cause cancer, although it contains at approximately 50% crystalline silica, which is a known human carcinogen and was recognized as such by the International Agency for Research on Cancer in 1997.  The second statement is misleading, because, the statement that the product "may cause respiratory irritation," suggests that respiratory exposure to the product is not very harmful, i.e., that one "may" experience irritant effects like one might experience cutting an onion.  The third statement is also misleading, because it does not specify the duration of the "prolonged" exposure or the number of exposures that constitute "repeated" exposure that causes damage to organs.  Workers therefore cannot know whether they must be exposed to the product for weeks, months, years or decades, or must be exposed hundreds, thousands, or tens of thousands of times to suffer organ damage.  The statement is also misleading, because prolonged exposure suggests exposure of many years resulting in chronic disease, although artificial stone workers typically develop acute silicosis in less than 5 years or accelerated silicosis after 5 to 10 years of exposure.  The hazard statements are also deficient because they do not mention silicosis as a health hazard of the product, although it is the major health hazard of the product.  Indeed, the word "silicosis" does not appear in the entire Safety Data Sheet, even though the product contains approximately 50% crystalline silica. This constitutes a

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

failure to warn of the health hazards of the product that violates the Hazard Communication Standard.

306.   After providing the three inadequate hazard statements in the "Hazards Identification" section of the Safety Data Sheet, Dal-Tile provides 5 "Precautionary Statements": (1) "Do not handle until all safety precautions have been read and understood," (although most artificial stone fabricators are immigrants who cannot read English), (2) "Do not breathe dust/spray" (as though workers should hold their breath throughout the work day), (3) "Wash hands thoroughly after handling/installing" (although the products do not present appreciable health hazards by skin absorption); (4) "Do not eat, drink or smoke when handling/installing this product" (although the product does not present any appreciable health hazard by ingestion and is not a fire hazard); and (5) "Wear protective gloves, protective clothing, eye protection, face protection when handling/installing this product" (rather than the critical information that it is essential to wear an air supplied respirator when fabricating or installing the product). Most noteworthy is the absence of any precautionary statement that respiratory protection is necessary, in particular that workers fabricating the product must wear a NIOSH-approved air supplied respirator to prevent silicosis.

307.   After the precautionary statements, the Safety Data Sheet states the following regarding "Potential Health Effects": "Inhalation: Do not breathe dust." This is a grossly inadequate and harmful instruction for four reasons. First, the health effects of inhaling crystalline silica dust are known and very serious; they are not merely "potential." Second, no adverse health effects of inhaling crystalline silica are identified; silicosis and lung cancer are not mentioned as known health effects. Third, the instruction not to breathe dust is impossible to follow, because dust is always generated during the fabrication of artificial stone products and workers must breathe to work and to live. Lastly, the instruction does not inform workers how they can do their work without breathing dust from the product.

308.   Section 3 of the Safety Data Sheet (Composition/Information on Ingredients) begins with the following statements: "Slab products are made of silica, other naturally-occurring minerals, and resin that have been mixed and cured at low temperatures. Slabs are manufactured in various shapes, sizes, and colors. These products do not contain asbestos. Under normal conditions these

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

products do not release hazardous materials after installation and are not considered hazardous waste should disposal be necessary." These statements are misleading, because they indicate that the product is made from "naturally-occurring minerals," which suggests that the product confers health benefits like mineral water and that the product is safe because it does not contain asbestos. The statement that "under normal conditions these products do not release hazardous materials after installation" is misleading because the product does release respirable crystalline silica when used as intended to fabricate countertops, and silica causes silicosis, lung cancer, and other diseases.

309. In Section 8 ("Exposure Controls/Personal Protection")," the Safety Data Sheet provides recommended exposure limits for the "respirable fraction" of crystalline silica and for "total dust" without explaining these terms. The Safety Data Sheet then directs workers to "use adequate ventilation during installation and/or removal to keep exposure to dust below recommended exposure levels," without explaining how workers can know whether they are exposed above or below the recommended exposure levels. Regarding "Respiratory Protection," the Safety Data Sheet states: "Use of a properly fitted NIOSH/MSHA approved particulate respirator is recommended when cutting tiles for installation or during the removal of installed tile." This instruction is confusing, inadequate, and harmful. The instruction is confusing and inadequate, because it directs workers to use a respirator when cutting tile, which suggests that a respirator need not be used when cutting the product, but need only be used when cutting tile. The instruction is harmful, because it instructs workers to use a NIOSH-approved particulate respirator - a type of air-purifying respirator that is inadequate to prevent silicosis – rather than using a NIOSH-approved air-supply respirator – the only type of respirator that is adequate to prevent silicosis from fabricating artificial stone.

310. Section 11 ("Toxicological Information") of the Safety Data Sheet provides the following "Potential Health Effects" information regarding "Primary Routes of Exposure": "None for intact tile. Inhalation and potential exposure to eyes, hands, or other body parts if contact is made with broken tile, and/or during procedures involving the cutting of products, and/or for operations involving the removal of installed products." This statement is confusing, because it concerns health effects of tile rather than the product. The statement is also inadequate, because it does not state that the primary route of exposure for the product is inhalation. The statement is harmful,

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

because it falsely indicates that there is no primary route of exposure for the product, although respirable crystalline silica from the product causes multiple adverse health effects by inhalation.

311.    The Safety Data Sheet then states: "No acute effects from exposure to intact tile are known." This statement is confusing and misleading, because the product is not tile. The statement is also incorrect, because acute silicosis is a known health effect of acute exposure to the product, and is usually fatal, and is primarily caused by inhalation of artificial stone dust rather than by tile.

**Knowledge of the Silicosis Hazard by Dal-Tile Officers and Directors**

312.    Throughout the time that Dal-Tile manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Dal-Tile's officers and directors were aware that Dal-Tile's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Dal-Tile provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Dal-Tile's defective artificial stone products. Among Dal-Tile's officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers were the following officers of the company: Jacques R. Sardas, President, Chief Executive Officer and Chairman of the Board; W. Christopher Wellborn, Executive Vice President, Chief Financial Officer and Assistant Secretary; Scot B. Bernstein, Vice President, Supply Chain Planning; D. Curtis Cook, Vice President, American Olean Distribution; Dan L. Cooke, Vice President, Information Technology; Silvano Cornia, Vice President, Research and Development; David F. Finnigan, Vice President, Home Center Sales and Business Development; William R. Hanks, Vice President, Manufacturing; Matthew J. Kahny, Vice President, Marketing; H. Clay Orme, Vice President, Operations; Javier Eugenio Martinez Serna, Vice President, Mexico Operations; Mark A. Solls, Vice President, General Counsel and Secretary; and the following Directors: Douglas D. Danforth; John F. Fiedler; Vincent A. Mai; Martin C. Murrer; Charles J. Pilliod, Jr., and Norman E. Wells, Jr.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**E.I. DUPONT DE NEMOURS & COMPANY**

313.    E. I. du Pont de Nemours and Company (DuPont) is an American chemical company formed in 1802 by French-American chemist and industrialist Éleuthère Irénée du Pont de Nemours. DuPont is famous for developing such polymers as neoprene, nylon, Teflon, Mylar, Kevlar, Nomex, Tyvek, Lycra and "solid surface composite" products branded Zodiaq® and Corian.®

314.    DuPont's Zodiaq® product contained 93% quartz.  See, DuPont, Material Safety Data Sheet for Zodiaq® *Quartz Surfaces* (Version 2.0) Revision Date 04/03/2014, available online at https://ovsco.com/wp-content/uploads/2015/12/MSDS-Zodiaq.pdf.

315.    "Corian® is "a solid, non-porous surfacing material homogeneously composed of ± 1/3 acrylic resin (also known as PolyMethyl MethAcrylate or PMMA), and ± 2/3 natural minerals," with the "main ingredient" being "Aluminum TriHydrate (ATH) derived from bauxite, an ore from which aluminum is extracted."  E.I. du Pont de Nemours and Company, Spec-Data Sheet for Corian® Solid Surface (April 2003), https://cms.esi.info/Media/documents/Coria_specdata_ML.pdf. This Spec-Data Sheet for Corian® states that "for more information on the composition of the material, please consult the Corian® Material Safety Data Sheets (MSDS) available via the secured www.corianenterprise.com site or via your local supplier."  However, this webpage is not active.

316.    Corian® is the original material of this type, created by DuPont scientists in 1967. Unlike other artificial stone products, Corian® does not contain crystalline silica and therefore does not cause silicosis.  However, workers who fabricate Corian® countertops have been reported to develop a similar fibrotic lung disease due to aluminum trihydrate in the product.

317.    DuPont has long known of the industrial hazards of silicosis.  As early as the 1930s and 1940s DuPont was sued by employees who developed silicosis from industrial exposure to crystalline silica when the company declined to pay them partial disability benefits for their disease. *Del Busto v. E. I. DuPont de Nemours & Co., Inc.* (Supreme Court, New York, 1938) 167 Misc. 920. See also, *Ligiecki v. E. I. DuPont de Nemours & Co., Inc.* (W.D.N.Y. 1942) 46 F.Supp. 266.

318.    In 1960 a book was published that was edited by DuPont's Medical Director, Assistant Medical Director, and the Director of DuPont's Haskell Laboratory for Toxicology and

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Industrial Medicine.  The book included a chapter titled "Occupational Chest Diseases" by Dr. G.W.H. Schepers of the Haskell Laboratory.  In this chapter the first disease that Dr. Schepers discusses was silicosis.  He began his discussion of silicosis as follows:  "Because of the predominance of silica in the earth's crust, it is natural that silicosis should constitute an important occupational chest disease.  Of the more than 3,000 known minerals, more than 500 are compounds of silica. . . .  In recent years, numerous synthetic siliceous substances have been introduced."  The chapter mentioned Corian as one such substance.  Schepers, G.W.H., "Occupational Chest Diseases," in Fleming, et al., eds., *Modern Occupational Medicine* (Lea & Febiger 1990).

**First Case Report of Corian-Induced Pulmonary Fibrosis Published in 2010**

319.    In 2010, the first case report of Corian-induced fibrotic lung disease was published. The patient was a 40-year-old married man with a high school education who was in charge of Corian fabrication in a wooden furniture factory.  He worked in the carpentry area of the factory, polishing and finishing solid surfaces Corian using a "router" machine.  He did this work for 11 years, working from 8:00 a.m. to 5:30 p.m., using protective equipment consisting of a face mask, work uniform, and safety shoes.  In April 2009, he presented with dyspnea on moderate exertion, fits of non-productive cough, fatigue, peri-oral cyanosis and weight loss of 9 kg in 2 months.  On auscultation, he had decreased breath sounds in both lungs, with rales (crackles) during inhalation and exhalation.  Chest x-ray revealed bilateral diffuse interstitial infiltrate of basal predominance, occupying approximately 80% of the lung parenchyma.  Lung function was substantially reduced: FVC 50%, FEV1 55%, REL 115, FEF 25-75 L/S 67%, without reversibility with bronchodilation. Computerized Axial Tomography of the chest showed mild diffuse interstitial fibrosis in both lungs with areas of bronchiectasis.   Corian was described as a solid surface material of consistent color and design that was a mixture of 2/3 aluminum hydroxide and 1/3 acrylic polymer, made of methyl methacrylate with trihydrated aluminum derived from Bauxite, a sedimentary rock composed mostly of alumina (Al2O3) with some iron oxide and silica.  Arriaga JMP, et al., "Pneumoconiosis: Silicosis: A Case Report," *Revista Especializada en Ciencias de la Salud* 2010; 13(1-2):30-35.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**DuPont's 2011 Material Safety Data Sheet for Corian®**

320.    On April 26, 2011, DuPont issued a Material Safety Data Sheet for Corian® Solid Surface Material.  Section 3 of the Material Safety Data Sheet, titled "Composition/Information on Ingredients" lists only one "component" of the product, "Solid Surface Material," at a concentration of 100%.  No ingredients are identified by chemical name, so it is unclear whether aluminum dihydrate or silica are present in the product.  After listing "Solid Surface Material" as 100% of the product, the Material Safety Data Sheet states: "Exposure limits may be applicable for the following: Dust (inhalable and respirable fraction), Methyl methacrylate, Butyl acrylate."  However, no concentration is provided, either for the unspecified dust, or the acrylates.

321.    In section 2 of this Material Safety Data Sheet DuPont provided an "Emergency Overview" which began with the following statement: "The product as such is not hazardous."  This statement is misleading, because persons reading the MSDS might read no further upon reading this statement. After beginning by stating that the product "as such is not hazardous," DuPont then stated: "The hazards of this product associated mainly with its processing.  Operations such as sawing, routing, drilling and sanding can generate dust. . . . High concentrations of dust can irritate eyes, nose and respiratory system and cause coughing and sneezing. . . .  At higher temperatures, small amounts of methyl methacrylate and butyl acrylate can be released.  The amounts are dependent upon temperature, time and other variables."  These statements are misleading.  The first statement suggests that dust formed during processing the product is not hazardous, although the chemical composition of the dust is not disclosed, and both crystalline silica and aluminum hydrate are toxic to the lungs and cause pulmonary fibrosis, although it is unclear whether they remain in the product.

322.    Section 2 of the Material Safety Data Sheet, regarding "Hazards Identification" also provides information regarding "Potential Health Effects," stating: "Additives in this product do not present a respiration hazard unless the product is ground to a powder of respirable size and the dust is inhaled.  All dusts are potentially injurious to the respiratory tract if respirable particles are generated and inhaled.'  The first sentence is highly misleading, because the fabrication process typically entails grinding the product with electric power tools, which generates respirable particles,

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

but persons reading this would often not know this.  The second sentence is also misleading and trivializes the respiratory hazard of the product by stating that "all dusts are potentially injurious to the respiratory tract if respirable particles are generated and inhaled."  While that may be true, there is a difference between "nuisance dusts" that do not cause fibrotic lung disease when inhaled and merely cause transitory respiratory irritation, and toxic dusts such as crystalline silica and aluminum hydrate, which cause fibrosis, and acrylates, which cause asthma.  Indeed, no information is provided regarding the respiratory hazards of methyl methacrylate and butyl acrylate, which are released "at higher temperatures" (apparently temperatures above room temperature) that are generated by power tools such as saws, grinders, drills and routers that are used to process countertop surface materials.

323.    The Material Safety Data Sheet then has a heading "Carcinogenicity" and identifies by acronym three governmental organizations that classify chemicals as to their carcinogenicity, and then identifies two chemicals - titanium dioxide and carbon black as "2B" carcinogens.  The Material Safety Data Sheet does not explain that this numerical classification means that the International Agency for Research on Cancer has classified these two chemicals as possible human carcinogens.

324.    Section 7 of the Material Safety Data Sheet, titled "Handling and Storage" states: "Do not breathe dust.  Do not breathe vapours or fumes that may be evolved during processing."  These are absurd instructions, because workers who process Corian® necessarily inhale Corian® dust and and cannot hold their breath for a full work shift.  The instruction is totally inadequate to protect the health of workers processing the material, because it does not inform the workers *how* to process the product without breathing dust or vapors.  The defective nature of this instruction is compounded by the instruction in Section 8 of the Material Safety Data Sheet regarding respiratory protective equipment that states: "No personal respiratory protective equipment normally required."  However, immediately after that statement, the Material Safety Data Sheet states: "Dust safety masks are recommended when the dust concentration is more than 10 mg/m3."  This recommendation is also inadequate, because workers cannot know when dust concentrations they inhale exceed 10 mg/m3.

325.    Section 11 of the Material Safety Data Sheet, regarding "Toxicological Information" states: "This product has no known adverse effect on human health."  However, this information appears to be contradicted by information in Section 15 of the Material Safety Data Sheet.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**2014 Case Report of Corian-Induced Pulmonary Fibrosis**

326.    In 2014, American physicians published a case report in the *New England Journal of Medicine* of a 64-year-old man who had ground, machined, drilled and sanded Corian for about 16 years and developed pulmonary fibrosis.  They conducted tissue analyses using state-of-art techniques including scanning electron microscopy with energy dispersive x-ray spectroscopy and Raman spectroscopy that showed aluminum trihydroxide (i.e., aluminum trihydrate) in the fibrotic lung, providing support for a causal relationship between the Corian dust and pulmonary fibrosis. Although the patient avoided further exposure to Corian dust, his respiratory status slowly deteriorated over the next 7 years and he died from respiratory failure secondary to pulmonary fibrosis.  High-resolution computed tomographic images of the chest showed an overall pattern that was consistent with endstage usual interstitial pneumonia. At autopsy, the lungs were small; aluminum trihydroxide was detected in the fibrotic lungs.  Raghu G, et al., "Pulmonary Fibrosis Associated with Aluminum Trihydrate (Corian) Dust," *New Engl. J. Med.* 2014; 370(22):2154-2156. Dupont was aware of this publication, because the *New England Journal of Medicine* afforded the company an opportunity to respond to the case report and a physician and toxicologist from DuPont sent a response to the journal that was published with the case report.  The authors of Dupont's response were Dr. Paul Gannon, who, until his retirement in February 2023, was the Chief Medical Officer of E. I. DuPont de Nemours and Company, and Dr. Robert W. Rickard, a toxicologist who, at the time, was Dupont's Director of the Health and Environmental Sciences at the DuPont's corporate headquarters in Wilmington, Delaware.  In their reply to the case report, these managerial employees of DuPont defended Corian®, claiming that the case report merely "suggests a circumstantial association between the patient's pulmonary fibrosis and aluminum trihydrate (a material typically found in solid surfaces)" even though aluminum trihydrate was detected in the patient's fibrotic lungs.  They also argued that "[w]hen handled in accordance with recommended safety guidelines, solid-surface products have been fabricated (i.e., cut, drilled, and sanded) safely for nearly 50 years."  They also questioned "whether the patient . . . may have been exposed to other materials that contributed to or caused pulmonary fibrosis."  Lastly, they suggested that the

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

aluminum in the patient's lungs may not have come Corian®, because "there are many potential sources of exposure to aluminum compounds, especially in industrial settings." Gannon P, et al., "Dupont, the Manufacturer of Corian, Replies," *New Engl. J. Med.* 2014; 370(22):2156-2157. The authors of the case report replied to the response of the DuPont representatives, noting that "the patient confirmed his exposures to dust from Corian and sandpaper that he used at his workplace and had no history of other exposures; the settled dust samples contained distinct particles comprised of aluminum trihydrate and methyl methacrylate (matching reference Corian) and aluminum oxide and cellulose (matching reference sandpaper)," that "[b]oth aluminum trihydrate and aluminum oxide were detected in his lungs," and explaining that methyl methacrylate was not found in the patient's lung tissue because it "dissolves during routine processing for histological examination." They also noted that "[a]luminum exposure is among the metal exposures reported as significantly associated with pulmonary fibrosis," that "[t]he patient did not have any of the medical problems suggestive of systemic aluminum toxicity," and that, "[i]n addition, [they] found no substantial silica, aluminum silicates, or metals other than aluminum in his lungs." Raghu, G., et al., "More on Pulmonary Fibrosis Associated with Aluminum Trihydrate (Corian) Dust," *New Engl J Med.* 2014; 371(10):973.

## DuPont's 2014 Material Safety Data Sheet for Zodiaq

327. On April 3, 2014, Dupont issued a Material Safety Data Sheet for Zodiaq® Quartz Surfaces, available online at https://ovsco.com/wp-content/uploads/2015/12/MSDS-Zodiaq.pdf. In section 2 of this document DuPont provided an "Emergency Overview" which began with the following statement: "The product as such is not hazardous." This statement is misleading, because persons reading the MSDS might read no further upon reading this statement. After beginning by stating that the product "as such is not hazardous," DuPont then stated: "The hazards of this product are associated mainly with its processing. Operations such as sawing, routing, drilling, and sanding can generate dust. Dust generated during handling of Quartz Surfacing Products can contain particles of crystalline silica (quartz). Overexposure to airborne quartz can cause silicosis." These statements are misleading. The first statement wrongly suggests that dust formed during the

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

handling of the product may not contain crystalline silica, although dust formed from sawing, routing, drilling and sanding the product invariably produces crystalline silica dust, especially because crystalline silica comprises 93% of the product. The latter statement is misleading and false because it suggests that only "overexposure" to airborne quartz can cause silicosis, although silicosis also occurs in workers who are exposed to crystalline silica below the permissible exposure limit.

328. Section 2 of the Material Safety Data Sheet, regarding "Hazards Identification" also provides information regarding "Potential Health Effects" from inhalation of quartz: "Gross overexposure may cause: Breathing difficulties, Fever, Cough, Lung damage, May be fatal if inhaled in large quantities." This statement is misleading and confusing because it does not quantify what exposure constitutes "gross overexposure" that can cause these effects, and because extremely minuscule amounts of respirable crystalline silica that are too small to be visible and have no odor also cause these effects, including silicosis, which is not mentioned here as potential health effect. Following the above statement, the words "Repeated exposure" appear as a potential health effect, but no information is provided regarding the potential health effects of "repeated exposure."

329. Section 8 of the Material Safety Data Sheet, regarding Exposure Controls/Personal Protection," provides the following information for Engineering controls: "Provide appropriate exhaust ventilation at places where dust is formed." This statement is unhelpful because it does not specify what type of exhaust ventilation is "appropriate" and does not provide any quantification of exhaust ventilation velocity or other parameters for exhaust ventilation to prevent silicosis.

330. Section 8 of the Material Safety Data Sheet, regarding Exposure Controls/Personal Protection," provides the following information regarding Personal protective equipment for respiratory protection: "In cases of insufficient ventilation, wear suitable respiratory equipment." This information is also inadequate to protect workers from silicosis, because it does not specify what constitutes "insufficient ventilation" so workers cannot know whether they need to wear respiratory equipment. The instruction is also inadequate and harmful because the instruction to "wear suitable respiratory equipment" does not specify the type of respirator that workers must wear to prevent silicosis (i.e., a NIOSH-approved air supplied respirator), thereby misleading workers to believe that an air-purifying respirator will protect them, although air-purifying respirators are

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

inadequate to protect workers fabricating artificial stone countertops from silicosis due to the extremely high respirable crystalline silica dust concentrations generated by fabrication activities.

### 2016 NIOSH Study Regarding Corian Dust

331.    In 2016, researchers from the National Institute for Occupational Safety and Health published a study in which they characterized dust from cutting Corian® with a circular saw. Air samples were collected using filters and direct-reading instruments in an automatic laboratory testing system. The average mass concentrations of the total and respirable dusts from the filter samples were $4.78 \pm 0.01$ and $1.52 \pm 0.01 \, mg \, cm^{-3}$, respectively, suggesting about 31.8% mass of the airborne dust from cutting Corian® is respirable.  Analysis of the metal elements on the filter samples revealed that aluminum hydroxide is likely the dominant component of the airborne dust from cutting Corian®, with the total airborne and respirable dusts containing $86.0 \pm 6.6$ and $82.2 \pm 4.1\%$ aluminum hydroxide, respectively. The results from the direct-reading instruments confirmed that the airborne dust generated from cutting Corian® were mainly from the cutting process with very few particles released from the running circular saw alone.  The number-based size distribution of the dusts from cutting Corian® had a peak for fine particles at 1.05 µm with an average total concentration of 871.9 particles $cm^{-3}$, and another peak for ultrafine particles at 11.8 nm with an average total concentration of $1.19 \times 10^6$ particles $cm^{-3}$.  The authors concluded that the small size and high concentration of the ultrafine particles suggested additional investigation is needed to study their chemical composition and possible contribution to pulmonary effect.  Qi C, et al., "Characterizing Dust from Cutting Corian®, a Solid-Surface Composite Material, in a Laboratory Testing System," *Ann. Occup. Hyg.* 2016; 60(5):638-642.

### 2018 Safety Data Sheet for Corian

332.    In December 2018, Dupont issued a Safety Data Sheet for "Corian® Quartz Surfaces previously known as Zodiaq® Quartz Surfaces sheets/slabs."    Available online at

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

https://www.hllmark.com/QuickTech/CorianQuartzSDS.pdf.

333.    Section 3 of this Material Safety Data Sheet identified two ingredients of the product: Quartz at a concentration of 40-95% and Cristobalite at a concentration of 40-50%.

334.    Section 2 of this Safety Data Sheet, regarding "Hazards identification," provided four "Hazardous warnings": (1) "May form combustible dust concentrations in air," (2) "May cause an allergic skin reaction," (3) "May cause cancer," and (4) "Causes damage to organs through prolonged or repeated exposure. (Lungs)." The last warning is misleading, because it does not state how many days, weeks, months, years or decades constitutes "prolonged" exposure that "causes damage to organs" and it does not quantify the number of exposures that constitute "repeated exposure" that causes such damage.

335.    Section 2 of the Safety Data Sheet then provided 13 "Hazardous prevention measures": (1) "Obtain special instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (as though workers who neither read nor speak English could possibly read and understand the "safety precautions" in English); (3) "Do not breathe dust/fumes/gas/mist/vapors/spray" (as though workers should hold their breath throughout the work day); (4) "Wash skin thoroughly after handling" (although Corian® does not present any appreciable health hazard by skin absorption); (5) "Do not eat, drink or smoke when using this product" (although the product does not present any significant health hazards by ingestion); (6) "Contaminated work clothing should not be allowed out of the workplace," (7) "Wear protective gloves/ protective clothing/ eye protection/ face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating Corian®); (8) "IF ON SKIN: Wash with plenty of soap and water; (9) "IF exposed or concerned: Get medical advice/attention," (although fabricators are constantly exposed to Corian® when they cut, saw, grind, drill, polish Corian®); (10) "If skin irritation or rash occurs: Get medical advice/attentionp;" (11) Wash contaminated clothing before reuse;" (12) "Store in a secure area" (a meaningless instruction, because slabs of Corian® are heavy and can only be stolen with great difficulty; and (13) "Dispose of contents/ container to an approved waste disposal plant." These "hazardous prevention measures"

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

are generally inadequate, misleading, and ineffective, especially because the most critical hazard prevention measures (to use wet-processing methods and to wear an air-supplied respirator whenever using power tools to process Corian®) are absent.

336. Section 2 provides 6 statements regarding "Other hazards": (1) "the product as such is not hazardous" (which wrongly suggests that Corian® is not hazardous despite its high crystalline silica content); (2) "The hazards of this product are associated mainly with its processing;" (3) "Operations such as sawing, routing, drilling and sanding can generate dust," (4) "Dust generated during handling of Quartz Surfacing Products can contain particles of crystalline silica (quartz)," which suggests that this is a mere possibility rather than a certainty; (5) "Overexposure to airborne quartz can cause silicosis" (which is misleading because it does not state what constitutes an "over-exposure" to because exposures to silica below the permissible exposure limit also cause silicosis; and (6) "The following percentage of the mixture consists of ingredients(s) with unknown acute toxicity: 100 %" (which is incorrect because the acute toxic hazards of crystalline silica are known).

337. Section 7 of the Safety Data Sheet, regarding "Handling and Storage" provides four Handling instructions: (1) "Provide for appropriate exhaust ventilation and dust collection at machinery," (which is inadequate because it does not specify what type of exhaust ventilation and dust collection is "appropriate"); (2) "Avoid dust formation," (which is inadequate because it does not explain how dust formation can be avoided; (3) "Handling and processing operations should be conducted in accordance with best practices (e.g. NFPA-654)," (which is inadequate because the best practices are not specified; and (4) "wash hands before breaks and at the end of workday" (which is a good hygiene practice but does nothing to prevent silicosis-the major hazard of crystalline silica).

338. Section 8 of the Material Safety Data Sheet, regarding Exposure Controls/Personal Protection," provides the following information regarding Personal protective equipment for respiratory protection: "In case of insufficient ventilation, wear suitable respiratory equipment." This information is also inadequate to protect workers from silicosis, because it does not specify what constitutes "insufficient ventilation" so workers cannot know whether they need to wear respiratory equipment. The instruction is also inadequate and harmful because the instruction to "wear suitable respiratory equipment" does not specify the type of respirator that workers must wear to prevent

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

silicosis (i.e., a NIOSH-approved air supplied respirator), thereby misleading workers to believe that an air-purifying respirator will protect them, although air-purifying respirators are inadequate to protect workers fabricating Corian® from silicosis due its extremely high crystalline silica content.

### Recent Studies by NIOSH and Others

339.    In 2019, the researchers from NIOSH further characterized the composition of emissions from sawing Corian® by collecting size-classified airborne dust samples for analyses of their aluminum contents, and conducting analyses of VOCs in the emissions and semivolatile organic compounds (SVOCs) in the dust.  The normalized respirable dust generation rate found using a Micro-Orifice Uniform Deposit Impactor was 5.9 milligrams per gram (mg g$^{-1}$), suggesting that 0.59% of the mass removed from sawing Corian® becomes respirable dust.  The alumina trihydrate content of the dust was consistently above 85% in most parts of the respirable size range, verifying their earlier finding that it is the dominant composition of the airborne particles of all sizes, including ultrafine particles. Both the dust generation rate and aluminum content among the ultrafine particles increased with the decrease in particle size.  VOC analyses revealed that methyl methacrylate (MMA) was the most abundant compound, with a generation rate of 6.9 mg g$^{-1}$ (0.69% of the mass removed from sawing Corian® became MMA vapor). The SVOC analysis only found a small amount of MMA (0.55%) in the bulk dust.  The researchers concluded that since the permissible exposure limit (PEL) for respirable dust was much lower than that for methyl methacrylate, the aluminum trihydrate-containing respirable dust could reach its PEL much faster than the VOCs could reach their exposure limits.  Kang S, et al., "The Composition of Emissions from Sawing Corian®, a Solid Surface Composite Material," *Ann Work Exp Health* 2019; 63(4):480-483.

340.    In 2019, researchers from NIOSH published a study in which they examined the pulmonary toxicity of Corian® in mice.  Male mice were exposed to either phosphate buffer saline (PBS, control), 62.5, 125, 250, 500, or 1000 µg of SSC dust, or 1000 µg silica (positive control) via oropharyngeal aspiration.   Body weights were measured for the duration of the study. Bronchoalveolar lavage fluid (BALF) and tissues were collected for analysis at 1 and 14 days post-

### COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

exposure. Enhanced-darkfield and histopathologic analysis was performed to assess particle distribution and inflammatory responses. BALF cells and inflammatory cytokines were measured. The geometric mean diameter of Corian® sawing dust following suspension in PBS was 1.25 μm. BALF analysis indicated that lactate dehydrogenase (LDH) activity, inflammatory cells, and pro-inflammatory cytokines were significantly elevated in the 500 and 1000 μg Corian® exposure groups at days 1 and 14, suggesting that exposure to these concentrations of Corian® induced inflammatory responses, in some cases to a greater degree than the silica positive control. Histopathology indicated the presence of acute alveolitis at all doses at day 1, which was largely resolved by day 14. Alveolar particle deposition and granulomatous mass formation were observed in all exposure groups at day 14. The Corian® particles were poorly cleared, with 81% remaining at the end of the observation period. The researchers concluded that the findings of their study demonstrated that Corian® sawing dust exposure induces pulmonary inflammation and damage that warrants further investigation. Mandler WK, et al., "Mouse pulmonary response to dust from sawing Corian®, a solid-surface composite material," *J. Toxicol. Environ. Health A* 2019; 82(11):645-663.

341. In 2020, the researchers from the National Institute for Occupational Safety and Health published a study that sought to determine the toxicity of respirable particles of Corian® dust in a model of human alveolar macrophages (THP-1). The relative toxicities of subfractions (0.07, 0.66, 1.58, 5.0, and 13.42 μm diameter) of the airborne particles were also determined. THP-1 macrophages were exposed for 24 h to respirable particles from sawing Corian® (0, 12.5, 25, 50, or 100 μg/ml) or size-specific fractions (100 μg/ml). Exposure to respirable Corian® particles induced THP-1 macrophage toxicity in a dose-dependent manner. Viability was decreased by 15% and 19% after exposure to 50 and 100 μg/ml Corian®, respectively, which correlated with increased cell culture supernatant LDH activity by 40% and 70% when compared to control. Reactive oxygen species (ROS) production and inflammatory cytokines were increased in a dose-dependent manner. A size-dependent cytotoxic effect was observed in the cells exposed to subfractions of Corian® particles. Corian® particles of 0.07, 0.66, and 1.58 μm diameter killed 36%, 17%, and 22% of cells, respectively. The researchers concluded that these results indicated a potential for cytotoxicity of respirable Corian® particles and a relationship between particle size and toxicity, with the smallest

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

fractions appearing to exhibit the greatest toxicity. Mandler WK, et al., "In vitro toxicity assessment of respirable solid surface composite sawing particles," *Toxicol. Ind. Health* 2020; 36(4):250-262.

342.    In 2021, the researchers from NIOSH published a study in which they conducted laboratory tests to characterize the composition of emissions from sanding Corian®. Three sandpaper materials (ceramic, silicon carbide, and aluminum oxide) were tested to distinguish the contribution of aluminum-containing dust in the emission from Corian® and sandpaper itself, in order to help identify the main cause of the pulmonary fibrosis from exposure to aluminum-containing dust while sanding Corian®. Airborne dust samples were measured using direct-reading instruments and collected using a Micro-Orifice Uniform Deposit Impactor (MOUDI) for estimating the normalized dust generation rate. The size-classified dust samples from MOUDI were analyzed for elemental aluminum content. Additionally, air samples were analyzed for characterizing methyl methacrylate (MMA). The results from the direct-reading instruments revealed that the size distribution of particulate from sanding Corian® differs from that of sawing Corian®, showing that the size distribution of dust is affected by the fabrication process. The normalized respirable dust generation rate indicated that more respirable dust was generated during sanding Corian® board. However, the use of aluminum oxide sandpaper did not result in a higher aluminum content in the respirable dust from sanding Corian®, suggesting that the aluminum content of the respirable dust is primarily originated from Corian® itself. The generation rates of methyl methacrylate from sanding did not vary much among all types of sandpapers, and they were much lower than that of sawing, likely due to the higher temperature in the sawing process. The researchers concluded that the results of their study verified that aluminum trihydrate from Corian® is the dominant composition of the respirable dust. Kang S, et al., "The Composition of Emissions from Sanding Corian® with Different Sandpapers," *Aerosol. Air Qual. Res.* 2021; 21(2):200377.

343.    In 2021, researchers from Kazakhstan and the United States published a study in which they sought to characterize personal exposure of workers to respirable particulate matter generated in cutting and other fabrication activities when fabricating Corian® synthetic countertops. They collected 29 personal full-day samples of respirable particulate matter from three workers in a small private workshop. They tested differences between- and within-worker variances of mass

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

concentrations using the Kruskall-Wallis test. They used segmented regression to test the means and medians 15-min interval concentrations changes over time and to identify a breakpoint. Respirable particulate matter concentrations ranged nearly 100-fold, from 0.280 to 25.4 mg/m$^3$ with a median of 2.0 mg/m$^3$ (1-min concentrations from 13,920 data points). There were no statistical difference in daily median or geometric mean concentrations among workers, whereas the concentrations were significantly higher on days with three versus two workers present. The 15-min median concentrations (n = 974 measures) increased until 2.35 h (beta 0.177; $p < 0.05$), representing a 0.70 mg increase in exposure per hour. This was followed by a plateau in concentrations. The researchers concluded that the high levels of respirable particulate matter that they observed among workers fabricating aluminium trihydroxide-containing synthetic countertops highlighted an unmet early prevention need. Vinnikov D, et al., "Exposure to respirable dust among workers fabricating aluminium trihydroxide-containing synthetic countertops," *Sci. Rep.* 2021; 11:21219.

344.    In 2022, the researchers from NIOSH reviewed the published medical literature regarding hazardous dusts from the fabrication of solid surface composites (SSC) and engineered stone (ES) artificial countertop materials. They considered that both types of materials may pose significant pulmonary health risks for workers who manipulate them. They observed that these materials have rapidly become popular in the multibillion-dollar countertop industry, rivaling that of natural materials such as granite and marble due to their variety of desirable esthetic qualities and reduced costs. They noted that both SSC and ES consist of a mineral substrate bound together in a polymer matrix – that for SSC the mineral is about 70% aluminum trihydrate (ATH) while ES contains up to 95% crystalline silica by weight. They considered that both materials emit airborne dusts when being manipulated with power tools during the fabrication process. They commented that several deaths and dozens of cases of silicosis have been identified worldwide in workers who fabricate ES, while a single case of fatal pulmonary fibrosis had been associated with SCC dust exposure. They reviewed the current state of knowledge for both SSC and ES regarding composition, particle emission characteristics, workplace exposure data, particle constituent toxicity, and methods for reducing worker exposure. Mandler WK, et al., "Hazardous dusts from the fabrication of countertop: a review," *Arch. Environ. Occup. Health* 2023; 78(2):118-126.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

**Knowledge of the Silicosis and Fibrotic Lung Disease Hazard by Dupont Officers**

345.   Throughout the time that E.I. Dupont de Nemours manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Dupont's officers and directors were aware that the company's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Dupont provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Dupont's defective artificial stone products.  Among Dupont's officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers were the following officers, directors and managing agents of the company: Dr. Paul Gannon, Chief Medical Officer of E. I. DuPont de Nemours and Company; Dr. Robert W. Rickard, Director of the Health and Environmental Sciences; and Edward D. Breen, Chief Executive Officer of E. I. DuPont de Nemours and Company; Charles O. Holliday Jr., formerly Chief Executive Officer and Chairman of E. I. DuPont de Nemours and Company, who also served as the company's chief Safety, Health and Environmental Officer.

//
//
//
//
//
//
//
//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**FRANCINI, INC.**

346.     According to its website, Francini Inc. was founded in 1994, has its headquarters in Sun Valley in Southern California, and is one of the largest importers and distributors of natural and engineered stone products in the United States.

347.     An undated Safety Data Sheet for Lucastone™ quartz by Francini identifies the ingredients of the product as >91% Crystalline Silica and other natural stone and 0-7% Polymeric resin & additives.

348.     Section 2 (Hazards Identification) of the Safety Data Sheet begins by stating: "There is no provision for any risk associated with the finished Lucastone™ product in the CLP (EC) regulation No. 1272/2008." This statement suggests that the product is not hazardous, although the ordinary and expected use of the product results in substantial exposure to respirable crystalline silica that causes silicosis and death. Francini made this statement even though Section 2 of Article 5 of Chapter 1 of Title II of Regulation (EC) No. 1272/2008 of the European Parliament and of the Council requires manufacturers, importers and downstream users of products to examine the relevant published literature for the purpose of determining whether the substance entails a health hazard, with respect to "the forms or physical states in which the substance is placed on the market ***and in which it can reasonably be expected to be used."*** (Emphasis added)

349.     Section 2 of the Safety Data Sheet provides the following hazard statement: "H372: Causes damage respiratory system through prolonged or repeated exposure by inhalation." This statement is inadequate to prevent silicosis, because it does not state how many days, weeks, months, years or decades constitutes "prolonged" exposure that damages the respiratory system and does not quantify number of exposures that constitute "repeated exposure" that causes such damage.

350.     The Safety Data Sheet then provides four use instructions regarding prevention of hazards. The first use instruction is "Do not breathe dust," which is an inadequate and harmful instruction, because dust is always generated during the fabrication of artificial stone products, workers must breathe to work and to live, and the instruction does not inform workers how they can do their work without breathing dust from the product.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

351.    The next use instruction is "Wash hands and face thoroughly after handling."  This instruction encourages good hygiene, but does little to protect workers from silicosis, because crystalline silica does not present an appreciable health hazard by skin absorption.

352.    The next instruction is "Do not eat, drink or smoke when using this product."  This instruction is useless, because the product does not present any appreciable hazard by ingestion, and crystalline silica is not flammable, so there is no risk of fire from smoking while using the product.

353.    The last instruction is "Wear respiratory protection."  This is an important instruction, because adequate respiratory protection is essential to prevent silicosis from fabricating the product, but the instruction is grossly inadequate, because it fails to specify the type of respirator that workers must wear to prevent silicosis.  The instruction is actually harmful, because it suggests that particulate and/or air-purifying respirators will protect workers fabricating the product from silicosis, which is not true, because the only type of respirator that has been shown to be capable of preventing silicosis among workers exposed to dust from products containing high levels of crystalline silica (as artificial stone fabricators are exposed) is a NIOSH-approved air supplied respirator.

354.    Section 8 of the Safety Data Sheet, regarding "Exposure Controls/Personal Protection," repeats the false statement that "[t]here is no provision for any risk associated with the finished Lucastone™ product in the CLP (EC) regulation No. 1272/2008."  The Safety Data Sheet then states: "Due to hazard associated with inhalation exposure during cutting and polishing, work in a well-ventilated area and proper respiratory protection shall be worn."  These statements are misleading because they suggest that working in an area that employers or workers subjectively perceive to be well-ventilated and that wearing ordinary respirators are adequate to prevent silicosis from the product, which is not the case.  The statements are also misleading because they fail to specify the type and extent of ventilation systems that are necessary to prevent silicosis and fail to inform employers and workers that the only type of respirator that is adequate to prevent silicosis among fabricators is a NIOSH-approved supplied air respirator.

355.    Section 8 of the Safety Data Sheet provides the following instruction regarding Respiratory Protection:  "Respiratory equipment approved by NIOSH/MSHA for protection and dusts is necessary to avoid inhalation of excessive air contaminants.  The appropriate respirator

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

selection depends on the type and magnitude of exposure (refer to 29 CFR 1910.134 for appropriate NIOSH approved respirators)." This instruction is inadequate because it does not specify that the only type of respirator that is adequate to prevent silicosis in workers who cut and grind artificial stone with a high crystalline silica content is a NIOSH-approved air supplied respirator, and that air-purifying respirators are inadequate to protect such workers from silicosis.

356. Section 11 of the Safety Data Sheet, regarding Toxicology Information states: "This preparation is not classified as hazardous according to the latest adaptation of European Union Directves 67/548/EEC and 1995/45/EC. This statement is false, because the ordinary and expected use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death. Francini made this statement even though EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

357. Section 11 of the Safety Data Sheet also has a paragraph headed "Preventing" which states that "wear[ing] N95 NIOSH certified respirator" can "prevent[] exposure to crystalline silica." However, this is incorrect, because the only respirator that can prevent exposure to crystalline silica when cutting or grinding artificial stone is a NIOSH-approved air supplied respirator. A N95 respirator is an air-purifying respirator that is inadequate to prevent exposure to respirable crystalline silica, so the recommendation to wear such a respirator is harmful because, if followed by artificial stone fabricators, would likely cause silicosis rather than prevent silicosis in such workers.

358. Section 16 of the Safety Data Sheet states: "We believe that the information contained herein is current as the date of the of the MSDS sheet." This statement is false, because the Safety Data Sheet doesn't state the date of preparation, in violation of the Hazard Communication Standard. The Safety Data Sheet then states: "Since the use of this information and these conditions of use of the product are not within the control of Francini, Inc., it is the user's obligation to determine the conditions of safe use of the product." This is a gross attempt by Francini to disclaim responsibility for selling a product that is inherently dangerous due to its high crystalline silica content, without providing warnings and instructions that are adequate to prevent silicosis. Contrary to the disclaimer, it is Francini's responsibility to determine and to instruct how its product can be safely used.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

# LX HAUSYS AMERICA, INC.

359.    LX Hausys America, Inc. is a subsidiary of LX Hausys Ltd., a company headquartered in Seoul, Korea that operates 7 overseas sales corporations, 4 overseas manufacturing corporations, and 5 overseas representative offices, mainly in the United States.  In 1995 the company began producing acrylic solid surface products under the tradename "HIMACS."  In 2005 it completed construction of a HIMACS plant in Adairsville, Georgia.  Expanding its manufacturing operations in the United States, in 2011 the company completed construction of an engineered stone plant in Adairsville, Georgia and in 2021 it completed expansion of its third production line for engineered stone at the plant.  LX Hausys America's artificial stone product is sold under the tradename Viatera.

360.    LX Hausys America, Inc. is headquartered in Atlanta, Georgia, and registered to do business in California in 1988 as Lucky America, Inc., a New Jersey corporation, and had its principal office in California at 13013 East 166th Street, Cerritos, California 90701.  The company changed its name several times, to LG Chemical America, Inc. in 1995; to LG Chem America, Inc. in 2003, to LG Hausys America, Inc. in 2009, and to LX Hausys America, Inc. in 2021.

**2015 Safety Data Sheet for Viatera**

361.    On June 20, 2015 LG Hausys America, Inc. issued a Safety Data Sheet for Viatera® (Engineered Stone), which it described as an agglomerate of natural quartz and polyester resin.  In Section 3 of this Safety Data Sheet the company identified two hazardous ingredients: Quartz (≥90%) and Pigmented cured polyester (<10%).

362.    Section 2 of the Safety Data Sheet, regarding Hazards identification, provided two hazard statements: "May cause cancer" and "Causes damage to organs through prolonged or repeated exposure."  The first statement is misleading because it suggests the product is not known to cause cancer, although it contains at least 90% crystalline silica, which is a known human carcinogen and was recognized as such by the International Agency for Research on Cancer in 1997.  The second statement is also misleading, because it does not specify the duration of the "prolonged" exposure or the number of exposures that constitute "repeated" exposure that causes damage to organs.  Workers therefore cannot know whether they must be exposed to the product for weeks, months,

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

years or decades, or must be exposed hundreds, thousands, or tens of thousands of times to suffer organ damage. The statement is also misleading, because prolonged exposure suggests exposure of many years resulting in chronic disease, although artificial stone workers typically develop acute silicosis in less than 5 years or accelerated silicosis after 5 to 10 years of exposure. The hazard statements are also deficient because they do not mention silicosis as a health hazard of the product, although it is the major health hazard of the product. Indeed, the word "silicosis" does not appear in the entire Safety Data Sheet, even though the product contains more than 90% crystalline silica. This constitutes a gross failure to warn of the health hazards of the product that violates the Hazard Communication Standard.

363. After providing the two inadequate hazard statements in the "Hazards identification" section of its 2015 Safety Data Sheet, LX Hausys America, Inc., provided 10 "Precautionary Statements": (1) "Obtain special instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (although most artificial stone fabricators are immigrants who cannot read English), (3) "Do not breathe dust/fumes/gas/mist/vapors/spray" (as though workers should hold their breath throughout the work day), (4) "Wash hands thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (5) "Do not eat, drink or smoke when using this product" (although the product does not present any appreciable health hazard by ingestion and is not a fire hazard); (6) "Wear protective gloves/protective clothing/eye protection/face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating the product); (7) "If exposed or concerned: Get medical advice/attention," (although fabricators are constantly exposed to the product when they cut, saw, grind, drill, edge, and polish the product); (8) "Get medical advice/attention if you feel unwell," (a useful instruction although it is generally not related to use of the product), (9) "Store locked up," (a pointless instruction, because slabs of the product are too large to lock up and are so heavy they can only be stolen with great difficulty), and (10) "Dispose of contents/container to hazardous or special waste collection point, in accordance with local, regional, national and/or international regulation." Most noteworthy is the absence of any

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

precautionary statement that respiratory protection is necessary, in particular that workers fabricating the product must wear a NIOSH-approved air supplied respirator to prevent silicosis.

364.    In Section 3 of the Safety Data Sheet, LX Hausys America, Inc., also concealed the identities of the ingredients of the product other than quartz, by stating that the product contains "pigmented cured polyester," without identifying the ingredients of this component of the product, and without identifying any inorganic and/or metallic constituents of the product other than quartz.

365.    In Section 7 of the Safety Data Sheet, LX Hausys America, Inc., provided the following "precautions for safe handling": "Avoid breathing dust. Avoid cotact [sic] with slin [sic] and eyes. Provide good ventilation in process area to prevent formation of vapour. Obtain special instructions before use. Do not handle until all safety precautions have been read and understood. Avoid spilling the product, as this might cause danger of slippage and falls."   The instruction to "avoid breathing dust," is meaningless without explaining how fabricators and installers could avoid breathing dust from the product without wearing air supply respirators (which LX Hausys does not advise is necessary to protect workers from silicosis). The misspelled instruction to avoid contact with skin and eyes is only minimally useful because crystalline silica is not dermally absorbed and no specific dermal or ocular protection is specified. The instruction to "provide good ventilation in process area to prevent formation of vapour," fails to specify the type or degree of ventilation that is necessary to prevent silicosis and fails to explain why vapor would be forming from the fabrication of artificial stone and if vapor formation is a hazard of the product, why it is is a hazard, what vapors form, and how workers should protect themselves from such unspecified vapors. The instruction to "obtain special instructions before use" is meaningless without specifying what "special instructions" are to be obtained and from whom such special instructions can be obtained. The instruction "do not handle until all safety precautions have been read and understood" is pointless, because most artificial stone fabricators are Hispanic immigrants who can neither speak nor read English, and could not understand safety precautions in English, even if LX Hausys provided intelligible safe use instructions. The instruction to "[a]void spilling the product" makes no sense, because the product is extremely hard stone, rather than a liquid. Thus, LX Hausy's use instructions are meaningless and are not protective of worker health and safety.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

366.    In Section 8 of the Safety Data Sheet, regarding "Exposure controls," LX Hausys America, Inc. recommended the following "respiratory protection": "Avoid inhalation of powder generated.  Wear a respirator."  The first of these instructions is nonsensical, because fabricators cannot avoid inhaling respirable crystalline silica dust when fabricating artificial stone; the second instruction concealed critical information necessary to prevent silicosis, i.e., the specific type of respirator that is necessary to prevent silicosis (an air-supplied respirator), and instead provided misleading information – that any respirator would protect workers from harm, although air-purifying respirators do not protect artificial stone fabricators from silicosis and actually contribute to the development of silicosis, because they do not adequately filter out respirable crystalline silica.

367.    In Section 11 of the Safety Data Sheet, regarding "Toxicological information," LX Hausys section of the Safety Data Sheet, Defendant provided misleading information regarding carcinogenicity by stating that the product "may cause cancer," although respirable crystalline silica is a known human carcinogen, i.e., it does cause cancer and has been classified as a known human carcinogen by the International Agency for Research on Cancer since 1997.

**2020 Safety Data Sheet for Viatera**

368.    On January 17, 2020 LX Hausys America, Inc. issued a new Safety Data Sheet for Viatera (Engineered Stone).   In Section 3 of this Safety Data Sheet, LX Hausys identified three ingredients of the product: Crystalline Silica (Quartz) ($\leq$ 93%), Pigmented cured polyester (< 10%), and Polymethylmethacrylate (Polyester Resin Solution) (< 10%).  Like its 2015 Safety Data Sheet, this revised Safety Data Sheet does not mention the hazard of silicosis, but conceals this hazard in violation of the Hazard Communication Standard. While the 2020 Safety Data Sheet corrects the spelling of some misspelled words in the 2015 Safety Data Sheet and provides a Proposition 65 cancer hazard warning, it does not correct the inadequate health hazard warnings regarding silicosis and the inadequate and harmful use instructions of the 2015 Material Safety Data Sheet.

**Knowledge of the Silicosis Hazard by Officers and Directors of LX Hausys**

369.    Throughout the time that LX Hausys America manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, LX Hausys' officers and directors were aware that the company's

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that LX Hausys provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by LX Hausys's defective artificial stone products. Among LX Hausys' officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers were the following officers and directors of the company: In-Sik Kang, Co-Chief Executive Officer, Chief Financial Officer & Director; Gye-Woong Kang, Co-Chief Executive Officer & Executive Director; Min-Hee Lee, Managing Director & Head of the LX Hausys Research Institute; and Kyu-Ho Lee, Head of Compliance & Legal Counsel.

## MS INTERNATIONAL, INC.

370.    MS International, Inc. claims to have been founded in 1975, but was incorporated in Indiana in 1983 and registered with the California Secretary of State on September 7, 1984. M S International, Inc.'s corporate headquarters is located at 2095 N. Batavia Street, in Orange, California; the company has distribution centers in Southern California at 9111 Sunland Blvd., Sun Valley, California, and in Northern California at 22300-B Hathaway Avenue in Hayward, California.

371.    MS International claims that "since our founding in 1975, MSI has grown to over $1 billion in annual revenues, and over 2,000 employees worldwide."

372.    According to its website, "MSI imports materials from 36 countries while maintaining purchasing offices in India, Turkey, Brazil, China, and Italy. Headquartered in Orange, California, MSI's nationwide system of 18 state-of-the-art distribution centers and 2 additional sales office is focused on efficiency, making sure the over 30,000 containers we import arrive as expected."

373.    On its website, M S International, Inc. provides Installation Guidelines for its Premium Natural Quartz. However, these guidelines do not mention any protective measures that workers need to follow to prevent exposure to respirable crystalline silica and silicosis.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TXT-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**MS International's 2021 Safety Data Sheet**

374.   On March 11, 2021, M S International, Inc., issued a Safety Data Sheet for "Quartz" which stated that "encompasses all types of Quartz products manufactured/sourced by M S International, Inc."  The Safety Data Sheet states that the "Recommended Use" of the product is a "Building Material."

375.   Section 2 ("Hazards Identification") of the Safety Data Sheet states:  "Quartz products are mixtures natural occurring minerals that have been mined.   The finished products are odorless, stable, non-flammable, and pose no immediate hazard to health.   Respiratory, hand, and eye protection may be needed to prevent excess exposure to airborne particulates if dust is produced by cutting product during installation or by any other operations, including demolition/removal projects."  The statement that the "finished products . . . pose no immediate hazard to health" is false and misleading for two reasons.  First, the product is not a "finished product" sold to consumers, but is a "building material," i.e., a slab of artificial stone, that must be fabricated as a countertop and installed in a consumer's kitchen or bathroom before it becomes a "finished product." Second, the ordinary, intended and expected use of the product is for workers to cut, grind, polish and otherwise fabricate the product, which generates dangerous levels of respirable crystalline silica dust that causes silicosis and other occupational diseases, including acute silicosis, such that the product does "pose an immediate hazard to health."  The statement that "respiratory, hand, and eye protection may be needed to prevent excess exposure to airborne particulates if dust is produced by cutting [the] product . . . or by any other operations" is also false and misleading for two reasons.  First, dust is *always* produced by cutting the product and by other fabrication processes such as grinding, drilling, routing, edging, and polishing the product.  Second,  an air supplied respirator must always be worn when the product is being fabricated, because fabricating artificial stone slabs generate high levels of crystalline that a NIOSH-approved air supplied respirator must always be worn to prevent all exposure to respirable crystalline silica dust and the consequent development of silicosis.  The statements in the Hazards Identification section of the Safety Data Sheet are also noteworthy for what they do not state: They do not mention the greatest health hazard of the product: silicosis.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Indeed, the only two hazards to the lungs are mentioned. The first is "respiratory tract irritation," a transitory, common effect of exposure that results from many activities, such as cutting an onion. The second respiratory hazard mentioned is "damage to organs (lungs/respiratory) through prolonged or repeated exposure (inhalation)." This statement is misleading, because it does not specify the duration of the "prolonged" exposure or the number of exposures that constitute "repeated" exposure that causes damage to the lungs or the respiratory tract. Workers therefore cannot know whether they must be exposed to the product for weeks, months, years or decades, or must be exposed hundreds, thousands, or tens of thousands of times to suffer lung damage. The statement is also misleading, because prolonged exposure suggests exposure of many years resulting in chronic disease, although artificial stone workers typically develop acute silicosis in less than 5 years or accelerated silicosis after 5 to 10 years of exposure. The misleading statements therefore endanger the health of workers.

**Knowledge of MS International's Officers and Directors of the Silicosis Hazard**

376. Throughout the time that MS International sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, MS International's officers and directors were aware that the company's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that MS International provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by MS International's defective artificial stone products. Among MS International's officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers are: Manu Shah, CEO; Rajesh Shah, Co-President; Rupesh Shah, Co-President, Phillip Caudillo, VP Operations; Judy Hatti Botchlet, VP; and Steve Dickeson, CFO.

//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TXT-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

## PACIFIC SHORE STONES, LLC

377.    Pacific Shore Stones, LLC was organized in California in January 2005.    Its principal office is located at 13148 Raymer Street in North Hollywood, California.   The company claims to be "America's stone distributor of the highest quality," offering "hand selected stone through multiple company-owned distribution centers across the U.S. from coast to coast," "each center ha[ving] a large inventory with a selection of various colors and finishes, plus dedicated staff . . . supporting fabricators, consumers, architects, builders and interior designers in selecting slabs for their projects."   The company claims to "have developed joint ventures with quarries across the world, built on strong relationships, giving us access to the finest blocks."

378.    Pacific Shore Stones "offer[s] granite, marble, quartz, travertine, onyx, limestone, soapstone, quartzite and sintered surface slabs."   Pacific Shore Stones describes its Los Angeles distribution center as a "45,000 square foot facility . . . located in North Hollywood . . . that houses "one of the largest selections of exotic natural stone in the Los Angeles area."

### Pacific Shore Stones' 2015 Safety Data Sheet for Pacshore Quartz

379.    In August 2015 Pacific Shore Stones issued a Safety Data Sheet for "Pacshore Quartz," "for surface applications such as countertops and vanities."  In Section 3 of the Safety Data Sheet, the company states that the product is comprised of "93% natural quartz stone (SiO2) and 7% resin binder and colorant."   It thus appears to be a typical artificial stone product.

380.    Section 2 of the Safety Data Sheet (Hazards Identification) states: "Multi colored engineered stone slabs.   Not considered hazardous in slab form, but dust created when cutting or grinding the quartz slab produces crystalline silica which is harmful to health."   However, the Hazards Identification section of the Safety Data Sheet does not mention silicosis or even damage to the lungs and therefore violates the Hazard Communication Standard and is grossly inadequate. Section 2 of the Safety Data Sheet then provides three hazard statements.

381.    The first statement is "R48/20: Harmful: Danger of serious damage to health by

## COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOXTORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

prolonged exposure through inhalation." This statement is is inadequate, because it does not identify the health damage caused by the product (i.e., silicosis, lung cancer, chronic kidney disease, autoimmune disease, etc.) and does not indicate how long the "prolonged exposure through inhalation" must be to cause health damage, so workers are left to speculate whether the "prolonged exposure through inhalation" that can harm them is an exposure of weeks, months, years, or decades.

382.    The second statement is "S22: Do not breathe dust." This statement is an inadequate and harmful instruction, because dust is always generated when artificial stone is fabricated, workers must breathe to work and live, workers can't hold their breath an entire workshift, and the instruction does not inform workers how they can do their work without breathing dust from the product.

383.    The third statement is "S38: In case of insufficient ventilation, wear suitable respiratory equipment." This statement is also inadequate to protect workers from silicosis, because it does not specify what constitutes "insufficient ventilation" so workers cannot know whether they need to wear respiratory equipment. The instruction is also inadequate and harmful because the instruction to "wear suitable respiratory equipment" does not specify the type of respirator that workers must wear to prevent silicosis (i.e., a NIOSH-approved air supplied respirator), thereby misleading workers to believe that air-purifying respirators will protect them, although air-purifying respirators are inadequate to protect workers fabricating artificial stone from silicosis due to the extremely high crystalline silica content of the product and the dust generated by power tools.

384.    Section 8 of the Safety Data Sheet is titled "Exposure Controls/Personal Protection." It provides the following instruction regarding Engineering Controls: "Ventilation must be adequate to maintain the ambient workplace atmosphere below the exposure limit(s) outlined in the MSDS." This is an inadequate and harmful instruction, because the Safety Data Sheet fails to specify what the exposure limits are for respirable crystalline silica or any other constituent of the product and it is impossible to know whether in those limits are exceeded absent constant exposure monitoring which is infeasible.

385.    Section 8 of the Safety Data Sheet provides the following instruction regarding Respiratory Protection: ""If respiratory protection is needed, use only protection authorized in the U.S. Federal OSHA Standard (29 CFR 1910.134), applicable U.S. State regulations, or the Canadian

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

CSA Standard Z94.4-93 and applicable standards of Canadian Provinces." This instruction is misleading and harmful, for two reasons. First, it suggests that respiratory protection may not always be needed, although exposures to respirable crystalline silica from fabricating artificial stone are such that workers must always wear respiratory protection. Second, the instruction does not inform workers of the specific type of respirator that they need to wear to prevent silicosis. The referenced section of the Code of Federal Regulations describes two different types of respirators: air-purifying respirators and atmosphere-supplying respirators. The former is inadequate to prevent silicosis among artificial stone fabricators and using air-purifying respirators actually contributes to silicosis among artificial stone fabricators. Only atmosphere-supplying respirators (air-supplied respirators) are adequate to prevent silicosis among artificial stone fabricators and these must be worn at all times that fabricators are doing their work or are present where such work is being done.

386. Silicosis is only mentioned as an adverse health effect in Section 11 of the Safety Data Sheet regarding Toxicological Information, which states: "**Silicosis:** causes by the inhalation and retention of respirable crystalline silica dust." This statement is inadequate because it does not appear in the Health Hazards section on the first page of the Safety Data Sheet, it is inconspicuously located on the second page of the Safety Data Sheet between sections concerning Stability and Reactivity (Section 10), and Ecological Information (Section 12). The statement is also inadequate, because it does not explain that silicosis is a progressive and irreversible disease in which the lung tissue becomes fibrotic (scarred), that the disease continues to progress even after exposure ceases, and that the disease is ultimately fatal.

387. The last paragraph the Safety Data Sheet states: "We believe that the information contined herein is current as the date of the SDS sheet. Since the use of thsi information and these conditions of use of the product are not wiithin the control of Pacshore Quartz, it is the user's obligation to determine the conditions of safe use of the product." Although the Hazard Communication Standard imposes duties on manufacturers and importers of hazardous chemical products to evaluate their hazards and to provide safe use instructions, Defendant Pacific Shore Stones disclaims those duties, fails to take responsibility for its defective product and defective warnings and use instructions, and wrongfully attempts to shift its responsibility to users.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Knowledge of Pacific Shore Stones' Members of the Silicosis Hazard**

388.    Throughout the time that Pacific Shore Stones LLC sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Pacific Shore Stones' members were aware that the company's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Pacific Shore Stones provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Pacific Shore Stones' defective artificial stone products. Among Pacific Shore Stones' members who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers are: Marco A. Pereira, Founder and Owner; Vinny Tavares, Co-Founder; and Donald Ciceri, Member.

**PARAGON INDUSTRIES, INC.  DBA BEDROSIANS TILE AND STONE**

389.    Paragon Industries was incorporated in California in 1974; it conducts its business under the fictitious business name Bedrosians Tile and Stone.

390.    On March 12, 2021, Paragon Industries issued a Safety Data Sheet for its product Sequel Encore™, identifying the manufacturer/supplier of the product as Bedrosians.  Section 3 of this Safety Data Sheet identified one "Dangerous Component" in the product: Quartz (SiO2) at a concentration > 90%.  This section of the Safety Data Sheet also identified as "Non-hazardous components" "Resins and trace minerals including: $Fe_2O_3$, $Fe_3O_4$, $TiO_2$, $Al_2O_3$, CaO, MgO, $Na_2O$, $K_2O$ . . ."

391.    Section 2 of the Safety Data Sheet, regarding "Hazard(s) Identification" identified two health hazards: "H350 May cause cancer" and "STOT RE 1 H372 Causes damage to the lung through prolonged or repeated exposure.  Route of exposure: Inhalation."  The first statement, that exposure to the product "may cause cancer," is misleading, because it suggests that crystalline silica

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

is not a known cause of cancer although crystalline silica is, in fact, a known human carcinogen, i.e., it does cause cancer and has been classified as a known human carcinogen by the International Agency for Research on Cancer since 1997.   The second statement is also misleading, because it does not specify the duration of the "prolonged" exposure or the number of exposures that constitute "repeated" exposure that "causes damage to the lung." Workers therefore cannot know whether they must be exposed to the product for weeks, months, years or decades, or must be exposed hundreds, thousands, or tens of thousands of times to suffer lung damage.   The statement is also misleading, because prolonged exposure suggests exposure of many years resulting in chronic disease, although artificial stone workers typically develop acute silicosis in less than 3 to 5 years or accelerated silicosis after 5 to 10 years of exposure.  The hazard statements are also deficient because they do not mention silicosis as a health hazard of the product, although it is the major health hazard of the product.  Lastly, the statement conceals from workers the true nature and severity of "damage to the lung," i.e., that exposure to the product causes silicosis, a progressive, irreversible and fatal lung disease.

392.    After providing inadequate hazard statements in the "Hazards identification" section of the Safety Data Sheet Bedrossian's provided 15 "Precautionary Statements": (1) "Obtain special instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (although most artificial stone fabricators are immigrants who cannot read English), (3) "Do not breathe dust/fumes/gas/mist/ vapors/spray" (as though workers should hold their breath throughout the work day), (4) "Avoid breathing dust/fume/gas/mist/vapors/ spray" (same); (5) "Wash hands thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (6) "Do not eat, drink or smoke when using this product" (although the product does not present any appreciable health hazard by ingestion and is not a fire hazard); (7) Use only outdoors or in a well-ventilated area (without defining quantitatively or by ventilation type what constitutes a "well ventilated area"), (8) "Wear protective gloves/protective clothing/eye protection/face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating the product); (9) "IF INHALED:

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Remove person to fresh air and keep comfortable for breathing" (although fabricators always inhale respirable crystalline silica dust from the product in doing their work); (10) IF exposed or concerned: Get medical advice/attention" (although fabricators are constantly exposed to the product when they cut, saw, grind, drill, edge, and polish the product); (11) "Call a poison center/doctor if you feel unwell" (although poison control centers do not treat silicosis, a chronic disease); (12) "Get medical advice/attention if you feel unwell," (a useful instruction although it is generally not related to use of the product), (13) "Store in a well-ventilated place. Keep container tightly closed" (an inapplicable instruction because artificial stone slabs need not be stored in a well-ventilated place and need not be stored in containers whether tightly closed or not); (14) "Store locked up," (a pointless instruction, because slabs of the product are too large to lock up and are so heavy they can only be stolen with great difficulty), and (15) "Dispose of contents/container to hazardous or special waste collection point, in accordance with local, regional, national and/or international regulation." Absent is any precautionary statement that respiratory protection is necessary, i.e., that workers fabricating the product must wear a NIOSH-approved air supplied respirator to prevent silicosis.

393. In Section 7 of the Safety Data Sheet, Bedrossian's provided the following "precautions for safe handling": "When cutting, grinding or removing, use equipment with integral dust collection and/or use local exhaust ventilation. Use wet cutting methods to reduce generation of dust. Use respiratory protection in the absence of effective engineering controls." These statements are inadequate because individually and collectively, they are insufficient to prevent silicosis, and therefore mislead workers to believe that following these instructions will keep them safe. In particular, the instruction to "use respiratory protection in the absence of effective engineering controls" is misleading and inadequate, because the instruction does not inform workers that the only type of respirator that can prevent silicosis is a NIOSH-approved air supplied respirator and that air-purifying respirators are inadequate to prevent silicosis, and because engineering controls alone are never effective in preventing silicosis when performing artificial stone fabrication tasks.

394. In Section 8 of the Safety Data Sheet, Bedrossian's recommended the following "Exposure controls": "Ventilation must be adequate to maintain the ambient workplace atmosphere below the exposure limit(s) outlined in the SDS. Where acceptable concentrations cannot be

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

maintained by general mechanical ventilation, local exhaust ventilation is recommended." This is an inadequate and harmful instruction, because general mechanical ventilation is never adequate to prevent workplace exposure to respirable crystalline silica dust among artificial stone fabricators below exposure limits due to the extremely high crystalline silica content of the product, and is therefore inadequate to prevent silicosis, and it is impossible for a worker to know whether exposure limits are being exceeded, absent constant exposure monitoring which is industrially infeasible.

395. In Section 8 of the Safety Data Sheet, Bedrossian's states the following regarding "Breathing equipment": "Use of a properly fitted NIOSH-MSHA approved particulate respirator is recommended when cutting natural stone products for installation or during the removal of installed product." This instruction conceals critical information necessary to prevent silicosis, i.e., the specific type of respirator that is necessary to prevent silicosis (an air-supplied respirator), and instead provides misleading information – that a particulate respirator would protect workers from harm, although air-purifying respirators do not protect artificial stone fabricators from silicosis and contribute to the development of silicosis, because they do not filter out respirable crystalline silica. The instruction is also inadequate because wearing a particulate filter respirator provides no protection for toxic vapors generated from other fabricating artificial stone products.

396. In Section 11 of the Safety Data Sheet, regarding the carcinogenicity of crystalline silica Bedrossian's states: "According to the current state of the art, worker protection against silicosis can be consistently assured by respecting the existing regulatory occupational exposure limits." This is a false statement, because silicosis has been reported among workers in various industries despite compliance with regulatory occupational exposure limits and published studies have long concluded that regulatory exposure limits have been set at levels that cause silicosis, such that compliance with regulatory exposure limits causes silicosis rather than preventing silicosis.

397. Section 15 of the Safety Data Sheet, regarding "Regulatory Information" provides a warning regarding California Proposition 65 that states: "WARNING: This product can expose you to chemicals including crystalline silica (airborne particles of respirable size) in dust created during fabrication/installation only if the product is dry cut/ground or pulverized, which are known to the State of California to cause cancer." This is a false statement, because artificial stone fabricators are

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

always exposed to respirable crystalline silica when they cut, grind, drill, polish, or otherwise fabricate artificial stone when using power tools, even when they use wet processing methods. The warning statement fails to comply with California's Safety Drinking Water and Toxic Enforcement Act (Proposition 65) and is false and misleading, because it falsely suggests to workers that they cannot be and are not exposed to respirable crystalline silica unless they dry-cut the product, which multiple published studies have shown is not true.

398. Lastly, Section 16 of the Safety Data Sheet states: "It is the responsibility of the user to determine applicability of this information and the suitability of the material or product for any particular purpose." Although the Hazard Communication Standard imposes duties on manufacturers and importers of hazardous chemical products to evaluate their hazards and to provide safe use instructions, by this statement Bedrossian's appears to disclaim those duties, fails to take responsibility for its defective product and defective warnings and use instructions, and wrongfully attempts to shift its responsibility for causing silicosis among fabricators to "the user," i.e., to the fabricators themselves who are the victims of the artificial stone silicosis epidemic.

**Knowledge of Paragon Industries' Officers and Directors of the Silicosis Hazard**

399. Throughout the time that Paragon Industries sold artificial stone products, exposing stone countertop fabricators and installers to crystalline silica from the products, Paragon Industries' officers and directors were aware that its artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that the company provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators from the lethal silicosis hazard presented by Paragon Industries' defective artificial stone products. Among Paragon Industries' officers and directors who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators are: Larry E. Bedrosian, CEO; Gardnar O'Brien, CFO; Janice A. Bedrosian, Secretary; Nirbhay Gupta, CTO; Matteo Polvara, VP Italia Operations; Bob Papazian, Director Medical & Science Operations; and Eddie Bedrosian, Marketing Director.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOXTORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

## PENTAL GRANITE AND MARBLE, LLC

400.    Pental Granite & Marble, Inc., the predecessor of Pental Granite and Marble, LLC, was a Washington corporation and was a wholesale tile and stone distributor with showrooms in Washington and Oregon.  Its products consist of tile and slabs made of natural stone, ceramic, glass, metal, porcelain, terrazzo, and quartz.  (Affidavit of Parminder Singh Pental dated March 13, 2012, Docket No. 8 in *Cambria Company, LLC v. Pental Granite & Marble, Inc.* et al., United States District Court, D. Minn., Civil No. 12-228, March 27, 2013, 2013 WL1249216).

401.    Some of the products sold by Pental were manufactured by Vicostone, a Vietnamese corporation.  (Second Declaration of Parminder Singh Pental dated May 8, 2012, Docket no. 29 in *Cambria Company, LLC v. Pental Granite & Marble, Inc.* et al., United States District Court, D. Minn., Civil No. 12-228, March 27, 2013, 2013 WL1249216).

### Pental Quartz 2015 Safety Data Sheet

402.    On May 5, 2015 Vicostone Joint Stock Company issued a Safety Data Sheet for Vicostone Quartz Surfaces, also known as PentalQuartz in North America.  Section 3 of the Safety Data Sheet (Composition/information on ingredients) identifies three ingredients in the product: Crystalline Silica (quartz) (~90%), Polymeric resin (7-12%), and Pigment and Trace Minerals (~2%).

403.    Section 2 of the Safety Data Sheet (Hazard(s) identification) states: "VICOSTONE® Quartz Surfaces are safe for delivery, storage and use as certified by GREENGUARD for indoor air quality, children and schools and by NSF for food safety (ANSI 051).  However, operations such as sawing, drilling, grinding, sanding and routing can generate silica dust.  The fine dust of quartz (silicon dioxide) containing crystalline silica can cause potential health effects."  These statements are misleading, because the product supplied is not a finished product that is sold to schools or consumers.  Rather, the product is a slab of artificial stone, an industrial product that is sold to countertop fabrication companies that fabricate the slab into a countertop that is sold to consumers. It is the finished countertops that are safe for children and for schools - not the industrial product.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

The statement that "operations such as sawing, drilling, grinding, sanding and routing can generate silica dust" is also misleading, because the statement suggests that these operations do not necessarily generated silica dust, although they invariably generate high concentrations of respirable crystalline silica dust. Further, the fine crystalline silica dust generated by fabrication processes is not such as merely "can cause potential health effects;" those operations **do** cause **real** health effects, including silicosis, chronic obstructive pulmonary disease, lung cancer, chronic kidney disease, and several autoimmune diseases. Thus, the statement in the Safety Data Sheet minimizes these hazards.

404. Section 2 of the Safety Data Sheet provides the following statements regarding Chronic Exposure: "Prolonged exposure to respirable crystalline silica can cause silicosis and has been linked to other diseases, such as lung cancer, tuberculosis, fibrosis of the lungs, chronic obstructive pulmonary disease and kidney disease." The statement that "prolonged exposure to respirable crystalline silica can cause silicosis" is misleading, because it does not state how many days, weeks, months, years, or decades of exposure to crystalline constitutes the "prolonged exposure" that can cause silicosis. The statement is also misleading, because exposure to artificial stone dust typically causes accelerated silicosis within 5-10 years of exposure or acute silicosis within 1-5 years of exposure, which are relatively short durations of occupational exposure.

405. Section 8 of the Safety Data Sheet, titled "Exposure controls/personal protection," provides the following information regarding Respiratory Protection: "Respirators may protect workers from inhaling crystalline silica dust when carefully and properly selected, worn and used. Use only respiratory protection authorized in the U.S. Federal OSHA Standard (29 CFR 1910.134), applicable U.S. State regulations, or the Canadian CSA Standard Z94.4-93 and applicable standards of Canadian Provinces." This statement is inadequate, because it does not inform workers that the only type of respirator that will protect them from inhaling crystalline dust when fabricating artificial stone products is a NIOSH-approved air supply respirator. By failing to provide this critical safety information, the Safety Data Sheet misleads workers to believe that a NIOSH-approved air purifying respirator will adequately protect them. However, studies have shown that air-purifying respirators are inadequate to prevent silicosis from the fabrication of artificial stone because of its extremely high crystalline silica content. The statement is therefore inadequate, misleading and thus harmful.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

406.    Section 11 of the Safety Data Sheet, regarding Toxicological information, provides three statements regarding chronic effects of exposure: The first statement is: "Prolonged and/or massive inhalation of crystalline silica can cause pulmonary fibrosis and pneumoconiosis and silicosis, as well as a worsening of other pulmonary diseases (bronchitis, emphysema, etc)."  This statement is misleading, because it is not only "prolonged" or "massive" inhalation of crystalline silica that causes silicosis and other lung diseases.  Studies have shown that exposure to artificial stone dust either causes accelerated silicosis within 5-10 years of exposure or acute silicosis within just 1-5 years of exposure.  Studies have also shown that tiny amounts of crystalline silica where exposures are below the permissible exposure limit also cause silicosis.  Thus, the statement that "prolonged and/or massive inhalation of crystalline silica can cause pulmonary fibrosis and pneumoconiosis and silicosis" is misleading because workers can also get silicosis from relatively short and low-level exposure to crystalline silica from fabricating artificial stone.

407.    The second statement regarding chronic effects of exposure is:  "The main symptom of silicosis is the loss of pulmonary capacity."  The second statement is also misleading and incorrect, because loss of pulmonary capacity is not a symptom of silicosis, but is rather an adverse effect of the disease. The main symptoms of silicosis are shortness of breath after exercise, chest pain, a harsh dry cough and fatigue - not loss of pulmonary capacity.  Indeed, it is not until workers have lost about half of their lung function that they begin to have symptoms, at which point the worker has advanced disease that is irreversible and progresses even after silica exposure ceases.

408.    The third statement regarding chronic effects of exposure is: "People with silicosis have a greater risk of getting lung cancer."  Although true, this statement is misleading, because it suggests that silicosis causes cancer.  However, silicosis does not cause cancer; it is exposure to respirable crystalline silica that causes cancer.  Persons who have been diagnosed with silicosis typically have had a greater cumulative exposure to crystalline silica than do persons who have not been diagnosed with silicosis, so persons who have silicosis have an increased risk of developing lung cancer because of their greater exposure to crystalline silica.

409.    Thus, all three statements regarding the effects of chronic exposure to the product are incorrect and misleading, and are therefore potentially harmful to workers exposed to the product.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Knowledge of Pental's Officers of the Silicosis Hazard**

410.    Throughout the time that Pental Granite & Marble LLC sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Pental's officers were aware that the company's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Pental provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Pental's defective artificial stone products. Among Pental's officers and members who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers is  Parminder "Peter" Pental, the Founder and Chief Executive Officer of Pental Granite & Marble, LLC.

**VADARA QUARTZ SURFACES AND ITS PARENT US SURFACE WAREHOUSE**

411.    According to a press release that was on Vadara's website, "Vadara Quartz Surfaces was founded in 2016 in Los Angeles, California, under the parent company US Surface Warehouse." According to the press release, "Vadara represents the collaboration of Arik Tendler, former CEO of Caesarstone Quartz, and solid surface pioneer Robert Butts, who currently owns US Surface Warehouse.  Together, they have catapulted Vadara to success with a savvy combination of leader-ship experience, innovative products, and state-of-the-art technology integration."  "Vadara Quartz Surfaces has become the fastest growing quartz brand in 2016 with rapid openings of distribution centers across the United States.  In 2016, the company opened their first distribution center in Los Angeles and by year's end added three more locations in San Francisco, Chicago, and Atlanta." https://www.vadaraquartz.com/news-press/press-release/year-in-review-vadara-quartz-surfaces-opens-four-distribution-centers-in-2016/#:~:text=Vadara%20represents%20the%20collaboration%20of,currently%20owns%20US%20Surface%20Warehouse.

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TXT-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Vadara's 2017 Safety Data Sheet**

412.    On May 1, 2017 Vadara issued a Safety Data Sheet for Vadara Quartz Surfaces, identifying the manufacturer/supplier of the product as Vadara Quartz Surfaces, 8969 Bradley Avenue, Sun Valley, CA 91352."

413.    Section 3 of the Safety Data Sheet states that the ingredients of the product as Quartz (>85%) and "Non-Regulated Ingredients" (<15%)."

414.    Section 2 of the Safety Data Sheet, titled "Hazards Identification," provides the following statement regarding "Classification" of the product: "As shipped, non-hazardous quartz surfacing product." This is a misleading statement, because the product is not a finished consumer product, but is rather an industrial product that must be fabricated into a countertop before being installed in kitchens and bathrooms as a consumer product, and in the process of fabricating the product, respirable crystalline silica dust is generated at air concentrations that cause silicosis.

415.    Section 2 of the Safety Data Sheet then provides the following information as Hazard Warnings: "Exposure limits may be applicable when cutting or grinding product creating dust, which can contain particles of crystalline silica (quartz). Overexposure to airborne quartz particles can cause silicosis." The first statement is false and downplays the hazard of silicosis, because exposure limits **are always** applicable when cutting or grinding artificial stone that contains crystalline silica. The second statement is misleading, because it does not explain what constitutes an "overexposure" to airborne quartz particles, and because exposures to crystalline silica below the permissible exposure limit have been shown to cause silicosis among workers exposed to artificial stone dust.

416.    Section 2 of the Safety Data Sheet then provides the following information as "Signal Word": "Danger: Do not breathe dust (522). Wear suitable respiratory equipment when ventilation insufficient (538)." The first statement an inadequate and harmful instruction, because dust is always generated when artificial stone is fabricated, workers must breathe to work and live, workers cannot hold their breath an entire workshift, and the statement does not inform workers how they can do their work without breathing dust from the product. The second statement is also inadequate, because it does not explain to workers how they can tell whether ventilation is insufficient and it

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

does not specify the type of respiratory equipment that workers must wear to prevent silicosis (i.e., a NIOSH-approved air supplied respirator), thereby misleading workers to believe that air-purifying respirators will protect them, although air-purifying respirators are inadequate to protect workers fabricating artificial stone from silicosis due to the extremely high crystalline silica content of the product and the very fine respirable crystalline silica dust that is generated using power tools.

417.    Section 2 of the Safety Data Sheet then provides the following statement as a "Risk Phrase":  "Danger of serious health damage by prolonged exposure through inhalation.  (R 20/48)." This statement is also inadequate, because it does not explain whether the "prolonged" exposure that can cause serious health damage is one that lasts days, weeks, months, years, or decades, and because acute silicosis has typically been reported among artificial stone fabrication workers after about 3 years of exposure, but has even been detected in artificial stone workers after as little as 1 or 2 years of exposure, which is not a "prolonged" exposure.  The statement is therefore inadequate and would mislead workers to believe they are safe because they have been exposed for just a few years.

418.    Section 8 of the Safety Data Sheet, titled Exposure Control/ Personal Protection, provides the following information regarding Exposure Limit Values:  "Not appropriate for material as shipped from manufacturer.  When cutting or grinding for example, workers should seek from their employer appropriate personnel protective equipment as required by the work environment conditions and equipment."  This first statement is incorrect, because the product is an industrial material that must be fabricated into countertops which necessarily involves cutting, grinding and polishing the product, generating respirable crystalline silica dust and other airborne particulates and fumes for which regulatory exposure limits apply.  The second statement is inadequate and constitutes a refusal on the part of the company to provide critical safe use and handling information. Since Vadara knows that its high silica content product will be cut, ground and polished, it is incumbent on Vadara to inform workers that they must wear a NIOSH-approved air supplied respirator when performing any and all fabrication tasks to prevent exposure and silicosis.

419.    Section 8 of the Safety Data Sheet, titled Exposure Control/ Personal Protection, also provides the following information regarding Respiratory Protection: "In case of insufficient ventilation, wear suitable respiratory equipment.  Dust masks do not provide suitable respiratory

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

protection." This use instruction is inadequate and constitutes a dangerous, harmful use instruction for several reasons. First, to prevent silicosis, adequate respiratory protection is necessary whenever workers fabricate artificial stone or are present where it is being fabricated. However, the instruction suggests that respiratory protection may not be needed when workers are fabricating artificial stone, thereby subjecting them to harmful exposure to respirable crystalline silica and putting them at substantial risk of silicosis and other occupational diseases. Second, the the instruction does not provide workers with any quantitative information or explain to them how they can determine whether the ventilation where they are working is "insufficient," although ventilation of respirable crystalline silica from the fabrication of artificial stone is always insufficient to prevent silicosis. Third, although the statement that "dust masks do not provide suitable respiratory protection" is true, it is misleading, because it suggests to workers they should wear a particulate filter respirator or an organic vapor respirator, although all air-purifying respirators are inadequate to protect artificial stone fabricators from silicosis, because only a NIOSH-approved air supply respiratory can do so.

## Knowledge by Vadara's Officers of the Silicosis Hazard

420. Throughout the time that Vadara Quartz Surfaces manufactured and sold its artificial stone products, exposing stone countertop fabricators and installers to respirable crystalline silica from the company's products, Vadara's officers were aware that the company's artificial stone products were defective because they contained extremely high concentrations of crystalline silica, were aware that the use instructions that Vaada provided were inadequate to prevent silicosis and would actually cause silicosis in exposed workers, and were aware that fabrication companies could not protect fabricators and installers from the lethal silicosis hazard presented by Vadara's defective artificial stone products. Among Vadara's officers and directors members who had this knowledge but who nevertheless consciously disregarded the health and safety of fabricators and installers are Stephen A. Schwarzman, Chairman and Chief Executive Officer; Jonathan D. Gray: President & Chief Operating Officer; Hamilton E. James, Executive Vice Chairman; and David S. Blitzer, Global Head of Tactical Opportunities.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**WILSONART LLC**

421.   Wilsonart LLC is a global manufacturer and distributor of high pressure laminates and other engineered composite materials, used in countertops, worktops and other applications. Headquartered in Temple, Texas, Wilsonart was founded by Ralph Wilson Sr. in 1956.

422.   On October 23, 2012 Wilsonart filed an Application with the California Secretary of State to register to do business in California as a foreign limited liability company.

**2017 Safety Data Sheet for Wilsonart Quartz**

423.   On June 30, 2017, Wilsonart issued an updated Safety Data Sheet for its artificial stone product Wilsonart Quartz, stating that the product contains 60-100% crystalline silica (quartz). Although this Safety Data Sheet stated that the crystalline silica content of the product was as much as 100%, Wilsonart totally concealed the hazard of silicosis from the use of this product.  Indeed, the word "silicosis" is not found anywhere in the entire Safety Data Sheet.

424.   In the "Hazards identification" section of its 2017 Safety Data Sheet, Wilsonart disclosed only two health hazards: "May cause cancer" and "Causes damage to organs through prolonged or repeated exposure," without explaining how many days, weeks, months, years or decades constitutes "prolonged" exposure that "causes damage to organs" and without quantifying the number of exposures that constitute "repeated exposure" that causes such damage.  Wilsonart falsely stated that "No additional information [is] available regarding "Other hazards," although much additional information regarding the hazard of silicosis was known to Wilsonart.

425.   Wilsonart provided 8 "Precautionary Statements" - none of which were to wear any respirators: (1) "Obtain special instructions before use (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions" in English), (3) "Do not breathe dust" (as though Plaintiff should hold his breath throughout the work day), (4) "Wash

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

clothing, hands forearms and face thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (5) "Do not eat, drink or smoke when using this product" (although the product does not present any significant health hazards by ingestion); (6) "Wear eye protection, face protection, protective clothing, protective gloes" (rather than the critical information that it is essential to wear an air supplied respirator when fabricating and/or installing artificial stone products); (7) "If exposed or concerned: Get medical advice/attention," (although fabricators are constantly exposed to the product when they cut, saw, grind, drill, edge, and polish the product); and (8) "Store locked up," (a meaningless instruction, because slabs of the product are too large to lock up and are so heavy they can only be stolen with great difficulty).

426.    In its 2017 Safety Data Sheet, Wilsonart also concealed the identities of the ingredients of the product other than quartz, by stating that the product contains "binding resins" and "colorants" without identifying the ingredients of these components of the product, and without identifying any inorganic and/or metallic constituents of the product other than quartz.

427.    In a section about Exposure controls, Wilsonart provided the following "appropriate engineering controls" instruction: "Provide adequate general and local exhaust ventilation." This instruction not only failed to specify the type or degree of ventilation that is necessary to prevent silicosis, but constitutes a dangerous, lethal instruction, because general ventilation is never adequate when artificial stone containing 60-100% crystalline silica is sawed, cut, ground, routed, drilled, sanded or polished. Indeed, when fabricating artificial stone products, special ventilation is always required; using general ventilation for these tasks will cause silicosis, rather than prevent it.

428.    In the "Exposure controls" section of the Safety Data Sheet, Wilsonart recommended the following "respiratory protection": "Use NIOSH (or other equivalent national standard) - approved dust/articulate respirator." This instruction concealed critical information necessary to prevent silicosis, to wit, the specific type of respirator that is necessary to prevent silicosis (an air-supplied respirator), and instead provided misleading information – that a dust/particulate respirator would protect workers from harm, although air-purifying respirators do not protect artificial stone fabricators from silicosis and actually contribute to the development of silicosis, because they do not adequately filter our respirable crystalline silica.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

# FIRST CAUSE OF ACTION

## FOR NEGLIGENCE

(By Plaintiff MARTIN MELENDEZ-MURILLO Against All Named Defendants and Does 1-100)

429.    Plaintiff refers to paragraphs 1 through 428 and, by this reference, incorporates said paragraphs herein as though set forth in full.

430.    As manufacturers and distributors of stone products, Defendants owed Plaintiff a legal duty to exercise due care in importing, producing, and distributing stone products to which Plaintiff was exposed in his work as a countertop fabricator and installer.

431.    Defendants negligently and carelessly imported, produced, and distributed the foregoing stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed in his work as a countertop fabricator and installer in Southern California.

432.    Defendants failed to adequately warn Plaintiff, MARTIN MELENDEZ-MURILLO, of the toxic hazards of their stone products and failed to provide adequate instructions to Plaintiff, MARTIN MELENDEZ-MURILLO, how to safely use their products so as to prevent him from developing and suffering from silicosis.

433.    Labor Code § 6390.5 is a health and safety statute enacted to protect, among others, employees in the position of Plaintiff, MARTIN MELENDEZ-MURILLO, and imposing on manufacturers and distributors of any hazardous substance the duty to label each container of a hazardous substance consistent with the Hazard Communication Standard. (8 C.C.R. § 5194).

434.    The Hazard Communication Standard (8 C.C.R. § 5194) is a health and safety regulation promulgated to protect, among others, employees in the position of Plaintiff, MARTIN MELENDEZ-MURILLO, and imposing on manufacturers and distributors of chemical products the duty to, among other things:

(a) evaluate their products to determine if they are hazardous [8 C.C.R. § 5194(d)(1)];

(b) identify and consider the available scientific evidence concerning such hazards [8 C.C.R. § 5194(d)(2) et seq.];

(c)  consider a product containing at least one percent of a component as presenting

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

the same health hazard as that component [8 C.C.R. § 5194(d)(5)(B)];

(d) consider as carcinogenic a product containing at least 0.1% of a component which has been determined under 8 C.C.R. § 5194(d)(4) to be a carcinogen [8 C.C.R. § 5194(d)(5)(B)];

(e) consider as hazardous a product which contains a component in a concentration of less than one percent which could be released in concentrations which would exceed the established OSHA permissible exposure limit or ACGIH Threshold Limit Value, or could present a health hazard to employees in those concentrations [8 C.C.R. § 5194(d)(5)(D)];

(f) consider as carcinogenic a product which contains a component which has been determined under 8 C.C.R. § 5194(d)(4) to be carcinogenic in a concentration of less than .1% which could be released in concentrations which would exceed the established OSHA permissible exposure limit or ACGIH Threshold Limit Value, or could present a health hazard to employees in those concentrations [8 C.C.R. § 5194(d)(5)(D)];

(g) ensure that each container of hazardous chemicals leaving their facilities is labeled, tagged or marked with the (I) identity of the hazardous chemical(s); (ii) appropriate hazard warnings; and (iii) the name and address of the chemical manufacturer or other responsible party [8 C.C.R. § 5194(f)(1)];

(h) obtain or develop a material safety data sheet for each hazardous substance they produced [8 C.C.R. § 5194(g)(1)];

(i) include on the material safety data sheet the chemical and common names of each hazardous substance [8 C.C.R. §5194(g)(2)(A)];

(j) include on the material safety data sheet the health hazards of the hazardous substance, including signs and symptoms of exposure, and any medical conditions which are generally recognized as being aggravated by exposure to the substance [8 C.C.R. § 5194(g)(2)(D)];

(k) include on the material safety data sheet the primary routes of entry [8 C.C.R. § 5194(g)(2)(E)];

(l) include on the material safety data sheet the OSHA permissible exposure limit, ACGIH Threshold Limit Value, and any other exposure limit used or recommended by defendants [8 C.C.R. § 5194(g)(2)(F)];

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

(m) include on the material safety data sheet whether the hazardous chemical is listed in the National Toxicology Program (NTP) Annual Report on Carcinogens (latest edition) or has been found to be a potential carcinogen in the International Agency for Research on Cancer (IARC) Monographs (latest editions), or by OSHA [8 C.C.R. § 5194(g)(2)(G)];

(n) include on the material safety data sheet generally applicable precautions for safe handling and use known to defendants, including appropriate hygienic practices, protective measures during repair and maintenance of contaminated equipment, and procedures for clean-up of spills and leaks [8 C.C.R. § 5194(g)(2)(H)];

(o) include on the material safety data sheet generally applicable control measures known to defendants, such as appropriate engineering controls, work practices, or personal protective equipment [8 C.C.R. § 5194(g)(2)(I)];

(p) include on the material safety data sheet a description in lay terms, if not otherwise provided, of the specific potential health risks posed by the hazardous substance intended to alert the person reading the information [8 C.C.R. § 5194(g)(2)(M)];

(q) ensure that the information contained on material safety data sheets accurately reflects the scientific evidence used in making the hazard determination [8 C.C.R. § 5194(g)(5)];

(r) update material safety data sheets with newly-discovered significant information regarding the hazards of products and/or their components within three months [8 C.C.R. § 5194(g)(5)]; and,

(s) ensure that material safety data sheets complying with the Hazard Communication Standard are provided to employers, directly or via a distributor [8 C.C.R. § 5194(g)(6) & (7).

435.    Defendants are importers, producers, or distributors of stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed in the course of employment, and were obligated to comply with California Labor Code § 6390.5 and the Hazard Communication Standard (8 C.C.R. § 5194).

436.    Defendants violated California Labor Code § 6390.5 and the Hazard Communication Standard (8 C.C.R. §5194) in the importation, production, and distribution of their toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was so exposed by, among other

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

things:

(a) failing and refusing to evaluate their products to determine if toxic chemicals contained in their products presented a health hazard of causing silicosis and lung disease to employees using or exposed to their products [8 C.C.R. § 5194(d)(1)];

(b) failing and refusing to identify and consider the available scientific evidence to determine if the toxic chemicals contained in their products presented a health hazard of causing silicosis to employees using or exposed to their products  [8 C.C.R. § 5194(d)(2) et seq.];

(c) failing and refusing to identify their products as presenting a health hazard of causing silicosis even though the toxic chemicals contained in their products presented a health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(d)(5)];

(d) failing and refusing to ensure that each container of their products was labeled, tagged or marked to (I) identity the toxic chemicals contained in their products and (ii) appropriately warn that the toxic chemicals contained in their products presented a health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(f)(1)];

(e) failing and refusing to obtain or develop a material safety data sheet for the toxic chemicals contained in their products [8 C.C.R. § 5194(g)(1)];

(f) failing and refusing to include on the material safety data sheet the chemical and common names for the toxic chemicals contained in their products [8 C.C.R. § 5194(g)(2)(A)];

(g) failing and refusing to include on the material safety data sheet that the toxic chemicals contained in their products presented a health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(2)(D)];

(h) failing and refusing to include on the material safety data sheet the primary routes of entry for the toxic chemicals contained in their products in respect of the health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(2)(E)];

(i) failing and refusing to include on the material safety data sheet the OSHA permissible exposure limit, ACGIH Threshold Limit Value, and any other exposure limit used or recommended by defendants for the toxic chemicals contained in their products in respect of the health hazard of causing interstitial lung disease to employees using or exposed to their products [8

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

C.C.R. § 5194(g)(2)(F)];

(j) failing and refusing to include on the material safety data sheet whether the toxic chemicals contained in their products is listed in the National Toxicology Program (NTP) Annual Report on Carcinogens (latest edition) or has been found to be a potential carcinogen in the International Agency for Research on Cancer (IARC) Monographs (latest editions), or by OSHA [8 C.C.R. § 5194(g)(2)(G)];

(k) failing and refusing to include on the material safety data sheet generally applicable precautions for safe handling and use known to Defendants for the toxic chemicals contained in their products in respect of preventing the health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(2)(H)];

(l) failing and refusing to include on the material safety data sheet generally applicable control measures known to Defendants for the toxic chemicals contained in their products in respect of preventing the health hazard of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(2)(I)];

(m) failing and refusing to include on the material safety data sheet or otherwise the specific potential health risks posed by the toxic chemicals contained in their products in respect of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(2)(M)];

(n) failing and refusing to ensure that the information contained on material safety data sheets accurately reflects the scientific evidence of the health risks posed by the toxic chemicals contained in their products in respect of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(5)];

(o) failing and refusing to update material safety data sheets with newly-discovered significant information regarding the hazards of the toxic chemicals contained in their products in respect of causing silicosis to employees using or exposed to their products [8 C.C.R. § 5194(g)(5)];

(p) failing and refusing to ensure that material safety data sheets complying with the Hazard Communication Standard (including specifying the potential health risks posed by the toxic chemicals contained in their products in respect of causing silicosis to employees using or exposed to their products) were provided to Plaintiff MARTIN MELENDEZ-MURILLO's employers,

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

directly or via a distributor. [8 C.C.R. § 5194(g)(6) & (7)]

437.    Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to each of Defendants' products, including those products manufactured and supplied by Doe Defendants as alleged above, and to silica, metals and other toxins contained therein and released therefrom as further alleged above.

438.    Plaintiff, MARTIN MELENDEZ-MURILLO, is a member of the class of persons designed to be protected by Labor Code § 6390.5 and the Hazard Communication Standard (8 C.C.R. § 5194).

439.    As a result of Plaintiff, MARTIN MELENDEZ-MURILLO's exposure to each of Defendants' stone products, silica, metals and other toxins entered Plaintiff MARTIN MELENDEZ-MURILLO's body and caused Plaintiff to suffer from specific illnesses, to wit, silicosis and related medical conditions.

440.    Each of Defendants' stone products contained silica and toxic metals, that entered Plaintiff, MARTIN MELENDEZ-MURILLO' body and was a substantial factor in causing, prolonging, and aggravating his silicosis and his related and consequential injuries.

441.    As a direct and proximate result of Defendants' negligence as alleged herein, Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from silicosis and related injuries.

442.    As a direct and proximate result of said negligent acts and omissions of Defendants, Plaintiff, MARTIN MELENDEZ-MURILLO, has been required to spend money and incur obligations for medical and related expenses in an amount which is in excess of the jurisdictional minimum of the Court, and he has been unable to attend to his usual work and activities.

443.    As a further direct and proximate result of the negligent acts and omissions of defendants resulting in his severe toxic injuries, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered lost income and will continue to suffer loss of future income, all to Plaintiff's damage in a sum to be established according to proof.

444.    As a further direct and proximate result of the negligent acts and omissions of Defendants, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered and continues to suffer mental anguish, emotional distress, fear of death, diminished quality of life, and other damages.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**SECOND CAUSE OF ACTION**

**FOR STRICT LIABILITY - FAILURE TO WARN**

(By Plaintiff MARTIN MELENDEZ-MURILLO

Against All Named Defendants and Does 1-100)

445.    Plaintiff refers to paragraphs 1 through 444 and, by this reference, incorporates said paragraphs herein as though set forth in full.

446.    At all times mentioned herein, defendants were the importers, producers, and distributors of inherently hazardous stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed in fabricating and installing stone countertops in Southern California.

447.    The stone products which Defendants imported, produced, and distributed, and to which Plaintiff was exposed, were defective, because they lacked warnings adequate to apprise Plaintiff of their toxic hazards and their serious effects upon the human body, and they lacked instructions for handling and use adequate to prevent exposure to Plaintiff, MARTIN MELENDEZ-MURILLO, causing serious injury and disease, to wit, silicosis.

448.    Plaintiff, MARTIN MELENDEZ-MURILLO, was occupationally exposed to all of Defendants' toxic stone products.

449.    Each of the toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed, was manufactured and/or supplied by Defendants, including the Doe Defendants.

450.    From his use of the foregoing toxic stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to Defendants' toxic stone products, including artificial stone products as well as natural stone products including granite, marble and other natural stone products.

451.    Each of the toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed, was manufactured and/or supplied by Defendants.

452.    As a result of Plaintiff, MARTIN MELENDEZ-MURILLO's exposure to the foregoing toxic stone products, silica, metals and other toxins within said stone products entered Plaintiff, MARTIN MELENDEZ-MURILLO's body.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

453.    Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from a specific illnesses, to wit, silicosis as well as other related and consequential injuries.

454.    Each of the foregoing toxic stone products caused Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis, and his related and consequential injuries.

455.    Each toxin, including silica and metals, that entered Plaintiff, MARTIN MELENDEZ-MURILLO' body was a substantial factor in bringing about, prolonging, and aggravating Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis and his related and consequential injuries.

456.    As a direct and proximate result of the defective warnings and use instructions of Defendants' stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from silicosis and other related and consequential medical conditions.

457.    As a direct and proximate result of the defective warnings and use instructions of Defendants' stone products, Plaintiff has been and will be required to expend money and incur obligations for medical and related expenses in an amount not yet determined but which is well in excess of the jurisdictional minimum of the Court, and Plaintiff, MARTIN MELENDEZ-MURILLO, has been unable to attend to his usual work and activities.

458.    As a further direct and proximate result of the defective warnings and use instructions of Defendants' stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

459.    As a further direct and proximate result of defective warnings and use instructions of Defendants' chemical products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered and will continue to suffer general damages, according to proof at trial.

460.    In exposing Plaintiff, MARTIN MELENDEZ-MURILLO, to said toxic and fibrogenic stone products, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their products, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff. Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known hazards of their stone products from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their stone products, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants.

461. Defendants consciously decided to market their stone products with knowledge of their harmful effects, without remedying the toxic effects of their stone products, and without providing use instructions adequate to prevent silicosis, despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their stone products, by withholding information from Plaintiff regarding toxic and fibrogenic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

462. Defendants' conduct in exposing Plaintiff to said toxic and fibrogenic stone products without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use of their toxic and lethal products was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiff, entitling Plaintiff to punitive and exemplary damages.

//
//
//
//
//
//
//
//
//
//

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

### THIRD CAUSE OF ACTION

### FOR STRICT LIABILITY - DESIGN DEFECT

(By Plaintiff MARTIN MELENDEZ-MURILLO

Against all Named Defendants and Does 1-100)

463.    Plaintiff refers to paragraphs 1 through 462 and, by this reference, incorporates said paragraphs herein as though set forth in full.

464.    At all times mentioned herein, Defendants were the importers, producers and distributors of stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed in the course of his work as a countertop fabricator and installer.

465.    Defendants' stone products were defective in their design because they failed to perform as safely as an ordinary user would expect when used in an intended or reasonably foreseeable manner and the risks inherent in said design outweighed the benefits thereof.

466.    Said design defects existed in Defendants' stone products when said stone products left defendants' possession.

467.    As a direct and proximate result of said design defects, while using Defendants' stone products in a manner that was reasonably foreseeable and intended by Defendants, Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to said stone products in the course of his work in Southern California, and has suffered serious injuries and disease, including silicosis and other related and consequential medical conditions.

468.    Each of the toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed, was manufactured and/or supplied by Defendants, including the Doe Defendants.

469.    As a result of Plaintiff MARTIN MELENDEZ-MURILLO's exposure to Defendants' stone products, silica, metals and other toxins within said stone products entered Plaintiff, MARTIN MELENDEZ-MURILLO's body.

470.    Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from specific illnesses, to wit, silicosis and other related and consequential medical conditions.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

471. Each of Defendants' stone products caused Plaintiff, MARTIN MELENDEZ-MURILLO' silicosis and other related and consequential injuries.

472. Each toxin, including silica and metals, that entered Plaintiff, MARTIN MELENDEZ-MURILLO' body was a substantial factor in bringing about, prolonging, and aggravating Plaintiff, MARTIN MELENDEZ-MURILLO' silicosis, and related and consequential injuries.

473. As a direct and proximate result of the defective design of Defendants' stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from silicosis and other related and consequential medical conditions.

474. As a direct and proximate result of the defective design of Defendants' stone products, Plaintiff has been and will be required to expend money and incur obligations for medical and related expenses in an amount not yet determined but well in excess of the jurisdictional minimum of this Court, and Plaintiff, MARTIN MELENDEZ-MURILLO, has been unable to attend to his usual work and activities.

475. As a further direct and proximate result of the defective design of Defendants' stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered lost income and will continue to suffer loss of future income, all to Plaintiff's damage in a sum to be established according to proof.

476. As a further direct and proximate result of defective nature of said stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered and will continue to suffer general damages, according to proof at trial.

477. In exposing Plaintiff to their toxic and fibrogenic stone products, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their products, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff. Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known toxic hazards of their stone products from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their stone products, and such hazards were known by and such

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

concealment was ratified by the corporate officers and managers of each of the defendants. Defendants consciously decided to market their stone products with knowledge of their harmful effects and without remedying the toxic effects of their stone products, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their stone products, by withholding information from Plaintiff regarding toxic and fibrogenic chemicals, including silica and metals, released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the Defendants.

478.    Defendants' conduct in exposing Plaintiff to said toxic and fibrogenic stone products without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use to prevent disabling lung disease was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic tort & environmental litigation occupational & environmental lung disease, cancer, and toxic injuries

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**FOURTH CAUSE OF ACTION**

**FOR FRAUDULENT CONCEALMENT**

(By Plaintiff MARTIN MELENDEZ-MURILLO

Against all Named Defendants and Does 1-100)

479.    Plaintiff refer to paragraphs 1 through 478 and, by this reference, incorporate said paragraphs herein in full.

480.    At all times mentioned herein, Defendants were the importers, producers and distributors of stone products which Plaintiff, MARTIN MELENDEZ-MURILLO, used and to which he was exposed in his work as a countertop cutter, fabricator and installer.

481.    Defendants' stone products are toxic and fibrogenic to the human lungs.

482.    Prior to Plaintiff's exposure to Defendants' stone products, Defendants were all aware of the toxic and fibrogenic nature of their stone products and that exposure to their products causes silicosis.

483.    Pursuant to the Hazard Communication Standard, Defendants were under a legal duty to disclose by labels to Plaintiff, MARTIN MELENDEZ-MURILLO and by Safety Data Sheets to his employers both the toxic and fibrogenic properties of their products and use instructions to that were adequate to prevent silicosis.

484.    Pursuant to California common law, Defendants were under a legal duty to fully disclose the toxic and fibrogenic properties of their products directly to Plaintiff, MARTIN MELENDEZ-MURILLO.

485.    Defendants also owed a duty to disclose the toxic hazards of their stone products to Plaintiff, MARTIN MELENDEZ-MURILLO, because Defendants alone had knowledge of material facts, to wit the toxic properties of their products, which were not accessible to Plaintiff, MARTIN MELENDEZ-MURILLO.

486.    Defendants also owed a duty to disclose the toxic hazards of their stone products to Plaintiff, MARTIN MELENDEZ-MURILLO, because Defendants made representations regarding their products, but failed to disclose additional facts that materially qualify the facts disclosed, and/or

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

which rendered the disclosures made, likely to mislead Plaintiff, MARTIN MELENDEZ-MURILLO.

487.    Defendants also owed a duty to disclose the toxic hazards of their stone products to Plaintiff, MARTIN MELENDEZ-MURILLO, because a transactional relationship existed between Plaintiff, MARTIN MELENDEZ-MURILLO, and Defendants inasmuch as Plaintiff, MARTIN MELENDEZ-MURILLO purchased and/or received toxic stone products from Defendants.

488.    Notwithstanding their knowledge of the toxic and fibrogenic hazards of their stone products, at all material times hereto, Defendants concealed said toxic hazards from Plaintiff, MARTIN MELENDEZ-MURILLO, so that he would use Defendants' stone products in his work.

**Arizona Tile**

489.    Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers the true nature and severity of the hazards of its artificial and other stone products by making misleading statements in its written materials, including safety data sheets, e.g., by stating that its products "are mixtures of ... naturally occurring minerals" that "pose no immediate hazard to health," and that its "quartz products are not hazardous as shipped and used by the end user."

490.    Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers the need for fabricators and installers to wear air supply respirators to prevent them from getting silicosis, and provided five "Precautionary Statements" - none of which were to wear any respirators: (1) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions"), (2) "Do not breathe dust/spray" (as though Plaintiff should hold his breath throughout the work day), (3) "Wash skin thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption) (4) "Do not eat, drink or smoke when using this product" (although the products do not present any significant health hazards by ingestion); and (5) "Wear protective gloves, protective clothing, eye protection, face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating and/or installing Defendant's products).

491.    Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers those

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

ventilation systems that were necessary to prevent fabricators and installers from developing silicosis, by vaguely instructing employers to "use adequate ventilation to keep dust below recommended exposure levels," without specifying what ventilation devices and systems were necessary to do this, without specifying the exposure levels which cause silicosis, and without specifying how such could be accomplished, especially when installing Defendant's products in the kitchens and bathrooms of customers where no special ventilation systems could be installed.

492.    Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers the means by which employers could prevent fabricators and installers from getting silicosis, by providing meaningless instructions like "avoid inhalation of dust," without explaining how fabricators and installers could avoid inhaling dust from Defendant's stone products without wearing independent air supply respirators (which Defendant did not advise was necessary to protect Plaintiff from harm).

493.    Defendant, Arizona Tile, LLC, also provided misleading information to Plaintiff and his employers regarding the chronic effects of exposure to Defendants' products by stating:   "No chronic effects are known for exposure to intact engineered stone products" (emphasis in original) even though the major health effects of exposure to Defendants' products are chronic health effects such as silicosis and lung cancer.

494.    Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers the respiratory protection necessary to prevent fabricators and installers from getting silicosis, by directing them to "use respiratory protection in the absence of effective engineering controls" in a section of its document headed "Handling and Storage," without specifying the type of respiratory protection necessary and without specifying what engineering controls are effective.  Defendant, Arizona Tile, LLC, concealed from Plaintiff and his employers the respiratory protection necessary to prevent fabricators and installers from getting silicosis, by stating that "use of a properly fitted NIOSH/MSHA approved particulate respirator is recommended when cutting engineered stone products for installation," without informing them that only a NIOSH-approved air-supplied respirator is adequate to prevent fabricators and installers from getting silicosis, and that the use of NIOSH-approved air purifying respirators are inadequate to prevent fabricators and installers from getting silicosis, and actually results in fabricators and installers getting silicosis.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**Caesarstone**

495.    Defendant, Caesarstone USA, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of its artificial stone products by making false and misleading statements in its written materials, e.g., by stating that "this preparation is not classified as hazardous according to the latest adaption of European Union Directives 67/548/EEC and 1995/45/EC," thereby suggesting that the product is not hazardous, although the ordinary and expected use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death. Defendant made this statement even though EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

496.    Defendant, Caesarstone USA, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making misleading statements in its written materials, e.g., by stating that "Quartz surfaces products are not hazardous as shipped," although Defendants' product is not a finished consumer product, but is rather than industrial product that must be sawed, ground, routed, drilled, sanded, and polished in fabricating and installing the product, thereby generating respirable crystalline silica dust that causes silicosis.

497.    Defendant, Caesarstone USA, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making misleading statements, e.g., "[i]nhalation of . . . dusts, smoke and vapors may cause upper respiratory tract irritation," where the primary respiratory hazard of the product is not transient upper respiratory tract irritation (as one experiences when cutting an onion), but is rather chronic disease, i.e., silicosis and consequent death.

498.    Defendant, Caesarstone USA, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making misleading statements such as "Overexposure to airborne crystalline silica can cause silicosis, a chronic and progressively debilitating disease, characterized by the formation of silica-containing scar tissue in the lungs," without specifying what constitutes "overexposure to airborne crystalline silica," i.e., how much airborne crystalline silica to which one must be exposed to cause silicosis.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

499.    Defendant, Caesarstone USA, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by falsely stating that "epidemiology studies show limited evidence of an excess of lung cancer in occupations involving exposures to crystalline silica, such as stone cutters and granite industry workers," contrary to the determination and classification of the International Agency for Research on Cancer (IARC) in its monograph on silica published in 1997, which concluded: "there is *sufficient evidence* in humans for the carcinogenicity of inhaled crystalline silica in the form of quartz or cristobalite from occupational sources." International Agency for Research on Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 68: Silica, Some Silicates, Coal Dust and Para-Aramid Fibrils," (IARC 1997).

500.    Defendant, Caesarstone USA, Inc., also provided misleading information to Plaintiff and his employers regarding the engineering controls necessary to prevent fabricators and installers from getting silicosis, by stating: "General room ventilation is satisfactory under anticipated use conditions." This statement is not merely false; it is extremely and inexcusably harmful, because studies regarding crystalline silica exposure of synthetic stone fabricators all show that general room ventilation is inadequate to prevent harmful respirable crystalline silica exposure in stone fabricators. See, NIOSH, *Evaluation of Crystalline Silica Exposure during Fabrication of Natural and Engineered Stone Countertops.* (HHE Report No. 2014-0215-3250).

501.    Defendant, Caesarstone USA, Inc., also provided misleading information to Plaintiff and his employers regarding the respiratory protection necessary to prevent silicosis, by stating: "Respiratory equipment approved by NIOSH/MSHA for protection against organic vapors and dusts is necessary to avoid inhalation of excessive air contaminants. The appropriate respirator selection depends on the type and magnitude of exposure (refer to 29 CFR 1910.134 for appropriate NIOSH approved respirators and to the NIOSH Pocket Guide to Chemical Hazards, DHHS (NIOSH) Publication NO. 2001-145 for equipment selection). This information is misleading, because NIOSH-approved air-purifying respirators that provide protection against organic vapors and some dusts are totally inadequate to prevent silicosis among fabricators and installers who are exposed to extremely high concentrations of respirable crystalline silica, especially from artificial stone

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOXTORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

products, due to their extremely high crystalline silica content. Indeed, studies have shown that the use of air-purifying respirators is inadequate to prevent silicosis among fabricators and installers, and that only NIOSH-approved air-supplied respirators are adequate to prevent silicosis and death.

502. Defendant, Caesarstone USA, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by instructing: "Do not breathe dust generated in the cutting, grinding and polishing processes" – an inadequate and harmful instruction because dust is always generated during the fabrication of stone products, workers must breathe to work and to live, and because the instruction does not tell the worker how he can do his work and "not breathe dust generated in the cutting, grinding and polishing processes."

**Cambria Company, LLC**

503. Defendant, Cambria Company, LLC, concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making false and misleading statements in its written materials, e.g., by stating in a section regarding "Hazards Identification" that the product is a "Non-Hazardous - Quartz Surfacing Product."

504. Defendant, Cambria Company, LLC, concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making false and misleading statements in its written materials, e.g., "Do not breathe dust" – an inadequate and harmful instruction because dust is always generated during the fabrication of stone products, workers must breathe to work and to live, and the instruction does not tell the worker how he can do his work without breathing dust from Defendant's products.

505. Defendant, Cambria Company, LLC, also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making misleading statements in its written materials, e.g., by stating: "Due to hazard associated with inhalation exposure during cutting and polishing, work in a well-ventilated area and proper respiratory protection shall be worn." These statements are misleading because they suggest that working in an area that employers or workers subjectively perceive to be well-ventilated and that wearing ordinary respirators are

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

adequate to prevent silicosis, whereas neither is true. The statements are misleading because they fail to specify the nature and degree of ventilation systems that are necessary to prevent silicosis and they fail to inform employers and workers that the only type of respirator that is adequate to rpevent silicosis among fabricators and installers is a NIOSH-approved supplied air respirator. Defendant, Cambria Company, LLC, compounded the misleading nature of its instruction, by showing a pictogram of a worker wearing a cartridge respirator, i.e., an air-purifying respirator which is inadequate to prevent fabricators and installers from getting silicosis, and is associated with the development of silicosis and other related medical conditions.

506. Defendant, Cambria Company, LLC, also provided false and misleading information to Plaintiff and his employers in its written materials, e.g., by stating: "Respiratory equipment approved by NIOSH for protection and dusts is necessary to avoid inhalation of excessive air contaminants" and that "the appropriate respirator selection depends on the type and magnitude of exposure." This information is false and misleading, because it incorrectly suggests that only inhalation of "excessive air contaminants" need be avoided, whereas inhalation of extremely tiny concentrations of respirable crystalline silica cause silicosis, and it suggests that wearing ordinary respirators may be adequate to prevent silicosis, whereas such is not the case, inasmuch as the only type of respirator that is adequate to prevent silicosis among fabricators and installers is a NIOSH-approved air-supplied respirator.

507. Defendant, Cambria Company, LLC, also provided false and misleading information to Plaintiff and his employers in its written materials, e.g., by stating "This product is not hazardous as shipped" and that "continued overexposure to respirable crystalline silica can cause silicosis," although "continued overexposure to respirable crystalline silica" (whatever duration and intensity of exposure that may mean) is not necessary to cause silicosis, because silicosis has been documented in workers exposed to respirable crystalline silica below occupational exposure limits and among workers who had only very brief exposures to respirable crystalline silica.

//

//

//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Cosentino and its distributor, C&C North America, Inc.**

508.    Defendants, Cosentino Group and C&C North America, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of their stone products by concealing critical information in Material Safety Data Sheets for their products, e.g., by failing to include a statutorily required section regarding Health Hazards in Safety Data Sheets for their stone products.

509.    Defendants, Cosentino Group and C&C North America, Inc., also concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by falsely stating in Material Safety Data Sheets for their artificial stone products that "this product is not hazardous in normal use," whereas the normal and intended use of the product involves cutting, grinding, drilling, edging, and polishing the product – all of which tasks produce huge quantities of toxic respirable crystalline silica dust, which cause silicosis and death.

510.    Defendants, Cosentino Group and C&C North America, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by falsely stating that "[t]his product does not contain free substances that involve a risk for the health in accordance to the Regulation of Dangerous Substances R.D. 255/2003 and according to the European Norms 67/548/EEC," thereby suggesting that the product is not hazardous, although the ordinary and expected use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death.  Defendants made this statement even though EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

511.    Defendants, Cosentino Group and C&C North America, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by stating that "a prolonged exposure to the dust derived from the dry cutting and polishing treatments can cause serious health problems as penumoconiosis [and] silicosis," by falsely suggesting that only "prolonged exposure" (whatever that may mean in terms of days, months, weeks, years, or decades) can cause silicosis, whereas silicosis has been reported among artificial stone fabricators and installers acutely, with short exposure periods, and has also been reported to occur among workers

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

who regularly use wet processing methods.

512.   Defendants, Cosentino Group and C&C North America, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making false and misleading statements, e.g., that the crystalline silica in its artificial stone products is merely a "probable" carcinogen - contrary to the classification of the International Agency for Research on Cancer (IARC) in its 1997 monograph which concluded:  "There is sufficient evidence in humans for the carcinogenicity of inhaled crystalline silica in the form of quartz or cristobalite from occupational sources."

513.   Defendant, Cosentino Group and C&C North America, Inc., also provided misleading information to Plaintiff and his employers regarding the respiratory protection necessary to prevent fabricators and installers from getting silicosis, by stating: "Use respirator or particulate mask when cutting or abrading material.'  This statement is actually harmful because (1) it does not specify the type of respirator that fabricators and installers must wear to prevent silicosis; (2) it does not inform fabricators and their employers that the only type of respiratory protection that is adequate to prevent silicosis among fabricators and installers is a NIOSH-approved air supplied respirator; and (3) it incorrectly suggests that use of a particulate (air purifying) respirator is adequate to prevent silicosis, which is harmful because studies show that fabricators and other workers exposed to respirable crystalline silica who wear air purifying respirators nevertheless develop and die from silicosis.

//
//
//
//
//
//
//
//
//
//

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Dal-Tile**

514.    Dal-Tile concealed critical health information and misled workers regarding the toxic hazards of its product by stating, in its Safety Data Sheet for its One Quartz Collection, that its product is "one of the most environmentally friendly building materials you can buy today," although the product's ordinary and intended use – fabricating artificial stone countertops – results in harmful exposure to respirable crystalline silica, causing silicosis, lung cancer and other terrible diseases.

515.    Dal-Tile also misled workers, by stating in its Safety Data Sheet for the product that it "causes damage to organs (lung/respiratory) through prolonged or repeated exposure (inhalation)," without quantifying duration of exposure or number of exposures that cause silicosis, thereby leading workers to believe they could safely use the product for many years, although artificial stone workers typically develop acute silicosis in less than 3 to 5 years of exposure.

516.    Dal-Tile also concealed critical use information from workers, by recommending that workers use a NIOSH-approved particulate filter respirator, a type of respirator that is inadequate to prevent silicosis and actually contributes to the occurrence of the disease, rather than instructing workers that they must wear a NIOSH-approved air supply respirator to prevent silicosis.

517.    Dal-Tile also concealed critical health hazard information from workers by omitting any mention in the "Potential Health Effects" section of its Safety Data Sheet that exposure to the product can cause silicosis, a serious, progressive, and rapidly fatal lung disease.

518.    Dal-Tile also misled workers by stating that "Slab products are made of silica, other naturally-occurring minerals, and resin" and "do not contain asbestos," thereby suggesting that the product is healthy like mineral water and is safe because it does not contain asbestos.

519.    Dal-Tile also mislead workers by stating in Section 11 of its Safety Data Sheet that there are no "Primary Routes of Exposure" "for intact tile," although inhalation is the primary route of exposure for the product when used as intended and expected, and such exposure is known to cause silicosis, lung cancer, as well as several other diseases, each of which is potentially fatal.

//

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**E.I. Dupont de Nemours & Company**

520.    Defendant, E.I. Dupont de Nemours & Company, concealed from Plaintiff and his employers the true nature and severity of the hazards of its artificial stone products by making false and misleading statements in its written materials, e.g., by stating in a section of its Material Safety Data Sheet that "The product as such is not hazardous."

521.    Defendant, E.I. Dupont de Nemours & Company, also provided false and misleading information to Plaintiff and his employers in its written materials, e.g., by stating, regarding inhalation of quartz from its products, that "Gross overexposure may cause: Breathing difficulties, Fever, Cough, Lung Damage, May be fatal if inhaled in large quantities," although "gross overexposure" (whatever that may mean in terms of duration, frequency, intensity, or cumulative exposure) is not necessary to cause silicosis, because silicosis has been documented in workers exposed to respirable crystalline silica at very low levels of exposure, including levels below occupational exposure limits and among workers with brief exposures to respirable crystalline silica.

522.    Defendant, E.I. Dupont de Nemours & Company, also provided Plaintiff and his employers with misleading information regarding engineering controls, by stating: "Provide appropriate exhaust ventilation at places where dust is formed" without specifying what type or degree of exhaust ventilation is needed to prevent fabricators and installers from developing silicosis.

523.    Defendant, E.I. Dupont de Nemours & Company, also provided Plaintiff and his employers with misleading information regarding respiratory protection by stating: "In case of insufficient ventilation, wear suitable respiratory equipment."  This instruction is so vague and misleading as to be harmful, because it suggests that respiratory protection need only be worn where ventilation is "insufficient," whatever that may mean, although, in fact, extremely powerful ventilation is necessary to prevent fabricators from getting silicosis, and, in addition to superb ventilation systems, NIOSH-approved air supply respirators must always be worn by fabricators to prevent silicosis.  The direction to wear "suitable respiratory equipment" is harmful, because it suggests that air-purifying respirators may provide adequate protection to fabricators from silicosis, although they do not; only NIOSH-approved air supplied respirators are adequate to prevent silicosis.

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**Francini, Inc.**

524.    Defendant, Francini, Inc., misrepresented facts and concealed information from Plaintiff and his employers regarding the true nature and severity of the hazards of its stone products, by stating in a section regarding "Hazards Identification" of its Safety Data Sheet that "there is no provision for any risk associated with the finished Lucastone™ product in the CLP (EC) regulation No. 1272/2008," thereby suggesting that the product is not hazardous, although the ordinary and expected use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death.  Defendant made this statement even though Section 2 of Article 5 of Chapter 1 of Title II of Regulation (EC) No. 1272/2008 of the European Parliament and of the Council requires manufacturers, importers and downstream users of products to examine the relevant published literature for the purpose of determining whether the substance entails a health hazard, with respect to "the forms or physical states in which the substance is placed on the market ***and in which it can reasonably be expected to be used.***"  (Emphasis added)

525.    Defendant, Francini, Inc., concealed from Plaintiff and his employers the true nature and severity of the hazards of its stone products by making false and misleading statements in its written materials, e.g., by stating that "this preparation is not classified as hazardous according to the latest adaption of European Union Directives 67/548/EEC and 1995/45/EC," thereby suggesting that the product is not hazardous, although the ordinary and expected use of the product generates extremely hazardous respirable crystalline silica that causes silicosis and death.  Defendant made this statement even though EU Directive 67/548/EEC classifies as "dangerous" "substances and preparations" that are "very toxic," "which if they are inhaled . . . may involve extremely serious . . . chronic health risks and even death."

526.    Defendant, Francini, Inc., also concealed from Plaintiff and his employers and misrepresented the true nature and severity of the hazards of its products by making false and/or misleading statements in its written materials, including the statement that ""Material does not contain any hazardous substances that would be of environmental concern upon accidental release," which is a false statement, because the product contains extremely high concentrations of crystalline

TELEPHONE (562) 437-4499
TOLL-FREE (877) TX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

silica, which causes silicosis and lung cancer, and is therefore a toxic and hazardous air pollutant.

527. Defendant, Francini, Inc., also provided misleading information to Plaintiff and his employers regarding the true nature and severity of the hazards of its stone products by making false and/or misleading statements in its written materials, e.g., by providing the following instructions for "Prevention" of hazards: (1) "Do not breathe dust" (an inadequate and harmful instruction because dust is always generated during the fabrication of stone products, workers must breathe to work and to live, and the instruction does not inform the worker how he can do his work without breathing dust from Defendant's products); (2) "Wash hands and face thoroughly after handling" (although the products do not present any appreciable health hazard by skin absorption); (3) "Do not eat, drink or smoke when using this product" (although the products do not present any significant health hazards by ingestion); and (4) "Wear respiratory protection," which is an inadequate and potentially harmful instruction, because it suggests that particulate and/or air-purifying respirators will protect fabricators from getting silicosis, which is not true, because the only type of respirator that has been shown to be capable of preventing silicosis among heavily exposed workers like artificial stone fabricators and installers is a NIOSH-approved air supplied respirator, which is not mentioned as a means of "Prevention."

528. Defendant, Francini, Inc., also provided misleading information to Plaintiff and his employers by stating: "Due to hazard associated with inhalation exposure during cutting and polishing, work in a well-ventilated area and proper respiratory protection shall be worn." These statements are misleading because they suggest that working in an area that employers or workers subjectively perceive to be well-ventilated and that wearing ordinary respirators are adequate to prevent silicosis, whereas such is not the case. The statements are also misleading because they fail to specify the nature and degree of ventilation systems that are necessary to prevent silicosis and fail to inform employers and workers that the only type of respirator that is adequate to prevent silicosis among fabricators is a NIOSH-approved supplied air respirator. Francini also recommended wearing a "N95 NIOSH certified respirator" as a means of "preventing" silicosis, although a N95 air-purifying respirator is grossly inadequate to prevent silicosis among fabricators and only a NIOSH-approved air supplied respirator can prevent silicosis among such heavily exposed workers.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**LX Hausys Amerinca, Inc.**

529.    Defendant, LX Hausys America, Inc., concealed from Plaintiff the true nature and severity of the hazards of its artificial products by concealing the hazard of silicosis from exposure to respirable crystalline silica from its artificial stone products.  In June 2015 Defendant, known at the time as LG Hausys America, Inc., issued an updated Safety Data Sheet for its artificial stone product Viatera, describing this product as an engineered stone product that is an agglomerate of natural quartz and polyester resin.  Although this Safety Data Sheet stated that the quartz content of the product was greater than 90%, Defendant totally concealed the hazard of silicosis from the use of this product.  Indeed, the word "silicosis" is not found anywhere in the entire Safety Data Sheet.

530.    In the "Hazards identification" section of its 2015 Safety Data Sheet, Defendant, LX Hausys America, Inc., disclosed only two health hazards: "May cause cancer" and "Causes damage to organs through prolonged or repeated exposure," without explaining how many days, weeks, months, years or decades constitutes "prolonged" exposure that "causes damage to organs" and without quantifying the number of exposures that constitute "repeated exposure" that causes such damage.

531.    Defendant, LX Hausys America, Inc., concealed from Plaintiff the need for fabricators and installers to wear air supply respirators to prevent them from getting silicosis, and provided 10 "Precautionary Statements" - none of which were to wear any respirators: (1) "Obtain special instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions" in English), (3) "Do not breathe dust/fumes/gas/mist/vapors/spray" (as though Plaintiff should hold his breath throughout the work day), (4) "Wash hands thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (5) "Do not eat, drink or smoke when using this product" (although the product does not present any significant health hazards by ingestion); (6) "Wear protective gloves/protective clothing/eye protection/face protection," (rather than the critical

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

information that it is essential to wear an air supplied respirator when fabricating and/or installing artificial stone products); (7) "If exposed or concerned: Get medical advice/attention," (although fabricators are constantly exposed to the product when they cut, saw, grind, drill, edge, and polish the product); (8) "Get medical advice/attention if you feel unwell," (an useful instruction although it is generally not related to use of the product), (9) "Store locked up," (a meaningless instruction, because slabs of the product are too large to lock up and are so heavy they can only be stolen with great difficulty), and (10) "Dispose of contents/container to hazardous or special waste collection point, in accordance with local, regional, national and/or international regulation."

532.    Defendant, LX Hausys America, Inc., also concealed the identities of the ingredients of the product other than quartz, by stating that the product contains "pigmented cured polyester," without identifying the ingredients of this component of the product, and without identifying any inorganic and/or metallic constituents of the product other than quartz.

533.    Defendant, LX Hausys America, Inc., also concealed important information by failing to provide use instructions adequate to prevent silicosis.  Instead of providing this critical information, Defendant provided the following useless and nonsensical "precautions for safe handling":  "Avoid breathing dust.  Avoid cotact [sic] with slin [sic] and eyes.  Provide good ventilation in process area to prevent formation of vapour.  Obtain special instructions before use. Do not handle until all safety precautions have been read and understood.  Avoid spilling the product, as this might cause danger of slippage and falls."    The instruction to "avoid breathing dust," is meaningless without explaining how fabricators and installers could avoid breathing dust from Defendant's stone products without wearing air supply respirators (which Defendant did not advise was necessary to protect Plaintiff from harm).  The misspelled instruction to avoid contact with skin and eyes is minimally useful because crystalline silica is not dermally absorbed and no specific dermal or ocular protection is specified.  The instruction to "provide good ventilation in process area to prevent formation of vapour," fails to specify the type or degree of ventilation that is necessary and fails to explain why vapor would be forming from the fabrication of artificial stone and if such is a hazard of the product, why such is a hazard, what vapors form, and how workers should protect themselves from such unspecified vapors.    The instruction to "obtain special

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

instructions before use" is meaningless without specifying what "special instructions" are to be obtained and from whom such special instructions could be obtained. The instruction "do not handle until all safety precautions have been read and understood" is pointless, because most artificial stone fabricators are Hispanic immigrants who, like Plaintiff, can neither speak nor read English, and could not understand safety precautions, even if Defendant provided intelligible safe use instructions. The instruction to "[a]void spilling the product" makes no sense, because the product is extremely hard stone, rather than a liquid. Thus, Defendants' use instructions are meaningless and not protective.

534.   In the "Exposure controls" section of the Safety Data Sheet, Defendant, LX Hausys America, Inc., recommended the following "respiratory protection": "Avoid inhalation of powder generated. Wear a respirator." The first of these instructions is nonsensical, because fabricators cannot avoid inhaling respirable crystalline silica dust when fabricating artificial stone; the second instruction concealed critical information necessary to prevent silicosis, to wit, the specific type of respirator that is necessary to prevent silicosis (an air-supplied respirator), and instead provided misleading information – that any respirator would protect workers from harm, although air-purifying respirators do not protect artificial stone fabricators from silicosis and actually contribute to the development of silicosis, because they do not adequately filter our respirable crystalline silica.

535.   Lastly, in the "toxicological information" section of the Safety Data Sheet, Defendant provided misleading information regarding carcinogenicity by stating that the product "may cause cancer," although respirable crystalline silica is a known human carcinogen, i.e., it does cause cancer.

**Pacific Shore Stones**

536.   In the hazards identification section of its Safety Data Sheet for Pacshore Quartz dated August 2015, Defendant Pacific Shore Stones concealed silicosis as a health hazard of its product: "Multi colored engineered stone slabs. Not considered hazardous in slab form, but dust created when cutting or grinding the quartz slab produces crystalline silica which is harmful to health." The Safety Data Sheet stated: "Harmful: Danger of serious damage to health by prolonged exposure through inhalation," without specifying the length of prolonged exposure through inhalation that

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

presents a danger of such damage.   The hazards identification section of the Safety Data Sheet provided two unhelpful use instructions.  The first was "Do not breathe dust" - an instruction that is impossible to follow, because artificial stone fabricators breathe respirable silica dust whenever they work and they cannot hold their breath for a full workshift, which itself would be very dangerous.  The second instruction was "in case of insufficient ventilation, wear suitable respiratory equipment."  This was a dangerous, indeed harmful instruction, for two reaons.  First, it suggested that there may be times when an artificial stone fabricator need not wear a respirator, although it is always necessary for artificial stone fabricators to wear a respirator to prevent silicosis.  Second, the instruction did not specify what constitutes "suitable respiratory equipment," although the only type of respirator that can prevent silicosis among artificial stone fabricators is a NIOSH-approved air supply respirator.

537.   In the section of the Safety Data Sheet regarding composition and information on ingredients, Defendant Pacific Shore Stones provided misleading information and concealed hazardous ingredients.  The information provided was "93% natural quartz stone (SiO2) and 7% resin binder and colorant."  This information was misleading because the product is artificial stone - not natural stone.  Further,  Defendant Pacific Shore Stones concealed the identities of the resin binder and the colorant, which are also hazardous ingredients that likely affect respiratory toxicity.

538.   In the section of the Safety Data Sheet regarding First Aid Measures, Defendant Pacific Shore Stones stated: "If inhalation occurs, remove the affected individual to an area with fresh air immediately."  This instruction is nonsensical, because inhalation of respirable crystalline silica from the product occurs whenever fabricators cut, saw, grind, drill, and polish the product, so following this instruction would require fabricators constantly be removed from the workplace.

539.   In the section of the Safety Data Sheet regarding Engineering Controls, Defendant Pacific Shore Stones stated: "Ventilation must be adequate to maintain the ambient workplace atmosphere below the exposure limit(s) outlined in the MSDS."  This was an inadequate and harmful instruction, because the Safety Data Sheet failed to specify what the exposure limits are for respirable crystalline silica or any other constituent of the product and because it is impossible to know whether in those limits are exceeded absent constant exposure monitoring which is infeasible.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

540.    In the section of the Safety Data Sheet regarding Respiratory Protection, Defendant Pacific Shore Stones stated: "If respiratory protection is needed, use only protection authorized in the U.S. Federal OSHA Standard (29 CFR 1910.134), applicable U.S. State regulations, or the Canadian CSA Standard Z94.4-93 and applicable standards of Canadian Provinces." This instruction is misleading and harmful, for two reasons.  First, it suggests that respiratory protection may not always be needed, although exposures to respirable crystalline silica from fabricating artificial stone are such that workers must always wear respiratory protection.  Second, the instruction does not inform workers of the specific type of respirator that is necessary to prevent silicosis.  The referenced section of the Code of Federal Regulations describes two different types of respirators: air-purifying respirators and atmosphere-supplying respirators.  The former is inadequate to prevent silicosis among artificial stone fabricators and using air-purifying respirators actually contributes to silicosis among artificial stone fabricators.  Only atmosphere-supplying respirators (air-supplied respirators) are adequate to prevent silicosis among artificial stone fabricators and these must be worn at all times that fabricators are doing their work or are present where such work is being done.

541.  Lastly, although the Hazard Communication Standard imposes duties on manufacturers and importers of hazardous chemical products to evaluate their hazards and to provide safe use instructions, Defendant Pacific Shore Stones disclaimed those duties, asserting in the last sentence of the Safety Data Sheet that since "conditions of use of the product are not within the control of Pacshore Quartz, it is the user's obligation to determine the conditions of safe use of the product."

**Paragon Industries, Inc.  dba Bedrosians Tile and Stone**

542.    As recently as 2021 Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, concealed from Plaintiff the true nature and severity of the hazards of its artificial and other stone products by omitting from the Hazard(s) Identification section of its Safety Data Sheet for its artificial stone products the hazard of silicosis and that silicosis is a known lethal hazard of the product.  In one of its Safety Data Sheets for an artificial stone product, Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, stated, in the Hazard(s) Identification section of the

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Safety Data Sheet for the product that it "[c]auses damage to the lung through prolonged or repeated exposure," without in any way specifying the duration of exposure that constitutes "prolonged" exposure and without in any way quantifying the number of exposures that constitute "repeated exposure" that cause damage to the lung.

543.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also concealed from Plaintiff the true nature and severity of the hazards of its artificial stone products by making misleading statements in its written materials, including safety data sheets, e.g., by stating that "resins and trace minerals" in its products, including several metals are "non-hazardous components," when these ingredients and constituents are, in fact, hazardous components.

544.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, concealed from Plaintiff the need for fabricators and installers to wear air supply respirators to prevent them from getting silicosis, and provided 17 "Precautionary Statements" - none of which were to wear any respirators: (1) "Obtain special instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions" in English), (3) "Do not breathe dust/fumes/gas/mist/vapors/spray" (as though Plaintiff should hold his breath throughout the work day), (4) "Avoid breathing dust/fume/gas/mist/vapors/spray" (which is contradictory of the prior Precautionary Statement); (5) "Wash thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (6) "Do not eat, drink or smoke when using this product" (although the products do not present any significant health hazards by ingestion); (7) Use only outdoors or in a well-ventilated area," (without defining what constitutes a "well-ventilated area" and without explaining how a worker could install the product in a customer's home without using the product indoors in customers' homes that lack special ventilation); (8) "Wear protective gloves/protective clothing/eye protection/face protection," (rather than the critical information that it is essential to wear an air supplied respirator when fabricating and/or installing artificial stone products); (9) "IF INHALED: Remove person to fresh air and keep comfortable for breathing," which is nonsensical because fabricators inhale respirable crystalline silica from artificial stone

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

products whenever they cut, saw, grind, drill, edge, and polish artificial stone products, so that fabricators would constantly have to be removed whenever they do their work); etc., etc.

545.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, concealed from Plaintiff the respiratory protection necessary to prevent fabricators and installers from getting silicosis, by directing them to "use respiratory protection in the absence of effective engineering controls" in the "Handling and Storage" section of its Safety Data Sheet, without specifying the type of respiratory protection necessary and without specifying what engineering controls are effective. Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, concealed from Plaintiff the respiratory protection necessary to prevent fabricators and installers from getting silicosis, by instructing workers to "use respiratory protection" without specifying that only air-supplied respirators are adequate to prevent silicosis from inhaling respirable crystalline silica from artificial stone products.

546.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also provided misleading information to fabricators by stating, in the "Exposure controls" section of its Safety Data Sheet for it artificial stone product that "[v]entilation must be adequate to maintain the ambient workplace atmosphere below the exposure limit(s) outlined in the SDS," without explaining how a worker could know whether ventilation is maintaining ambient levels of respirable crystalline silica exposure below the exposure limits and without informing workers that workers still get silicosis when exposures to respirable crystalline silica are below occupational exposure limits.

547.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also provided false and misleading information to fabricators by stating, in the "Exposure controls" section of its Safety Data Sheet for it artificial stone product that "where acceptable concentrations cannot be maintained by general mechanical ventilation, local exhaust ventilation is recommended." This use instruction is false, because general mechanical ventilation is never adequate to protect workers against the hazards of respirable crystalline silica and local exhaust ventilation is always required to prevent fabricators from getting silicosis.

548.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also provided false and misleading information to fabricators by stating, in a "Breathing equipment" section of its

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

Safety Data Sheet for its artificial stone product that "[u]se of a properly fitted NIOSH/MSHA approved particulate respirator is recommended when cutting natural stone products for installation." This statement is false, misleading and harmful for several reasons. First, defendant's stone product that is the subject of the Safety Data Sheet is not a natural stone product, but is an artificial stone product - an important distinction because a natural stone product, e.g. marble, contains only a few percent crystalline silica whereas Defendant's artificial stone product contains >90% crystalline silica. Second, a particulate respirator is a type of air-purifying respirator, all of which are inadequate to prevent silicosis among artificial stone fabricators, who, in order to prevent silicosis, must wear air-supplied respirators at all times that they are fabricating artificial stone products and when they are present where artificial stone products are being fabricated. Thus, Defendant's recommendation that fabricators wear a particulate respirator is a harmful and potentially lethal instruction, because it instructs artificial stone fabricators to wear the wrong type of respirator and fails to inform them that only a NIOSH-approved air-supplied respirator is adequate to prevent artificial stone fabricators and installers from getting silicosis, and that use of NIOSH-approved air purifying respirators are inadequate to prevent fabricators and installers from getting silicosis and actually result in fabricators and installers getting silicosis.

549.    As recently as 2021, Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also concealed the true hazard of lung cancer from respiratory exposure to crystalline silica. In a Safety Data Sheet for one of its artificial stone products dated March 12, 2021, Defendant referred to a 1997 evaluation of the carcinogenicity of crystalline silica by the International Agency for Research on Cancer (IARC), noting that although IARC concluded at that time that crystalline silica can cause lung cancer in humans, "carcinogenicity was not detected in all industrial circumstances studies," and that "[c]arcinogenicity may be dependent on inherent characteristics of the crystalline silica or on external factors affecting its biological activity or distribution of its polymorphs." However, in 2012 – almost a decade earlier than the date of the Safety Data Sheet – IARC updated its evaluation of the carcinogenicity of respirable crystalline silica, concluding, that "[t]here is sufficient evidence in humans for the carcinogenicity of crystalline silica in the form of quartz or cristobalite," that "[c]rystalline silica in the form of quartz or cristobalite dust causes cancer

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

of the lung," and that "[t]here is sufficient evidence in experimental animals for the carcinogenicity of quartz dust," whereupon IARC concluded, without equivocation or qualification that "[c]rystalline silica in the form of quartz or cristobalite dust is carcinogenic to humans (Group 1)."  By quoting qualifying language regarding the carcinogenicity of crystalline silica from an outdated monograph and concealing the subsequent findings and conclusion of IARC regarding the carcinogenicity of crystalline silica to humans, Defendant concealed the true risk of lung cancer from artificial stone fabricators who are regularly exposed to dangerous, indeed lethal concentrations of crystalline silica and therefore develop accelerated silicosis following just 5 to 10 years of exposure and have significantly increased risks of developing lung cancer years after they are diagnosed with silicosis, if they live long enough to manifest lung cancer 20 or 30 years thereafter.

550.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, concealed from Plaintiff the means by which he could prevent avoid getting silicosis, by providing meaningless instructions like "avoid inhalation of dust," without explaining how fabricators and installers could avoid inhaling dust from Defendant's stone products without wearing independent air supply respirators (which Defendant did not advise was necessary to protect Plaintiff from harm).

551.    Defendant, Paragon Industries, Inc. also concealed the hazard of silicosis that its artificial stone product presented to fabricators, by failing to identify silicosis as the most critical health hazard of its product in the Hazard(s) Identification section on the first page of its Safety Data Sheet, and only mentioning silicosis as a hazard of quartz in the last part of the "First Aid Measures" section on page 4 of its Safety Data Sheet, where readers would unlikely see this information, because first aid measures are not prescribed for chronic health conditions such as silicosis.

552.    Defendant, Paragon Industries, Inc. dba Bedrosians Tile and Stone, also provided false and misleading information in the "Regulatory Information" section of its Safety Data Sheet by warning that "[t]his product can expose you to chemicals including crystalline silica (airborne particles of respirable size) in dust created during fabrication/installation only if the product is dry cut/ground or pulverized," although artificial stone fabricators are exposed to respirable crystalline silica even when they use wet processing methods and wear air-purifying respirators, as shown by several studies, some of which were published before the date of Defendant's Safety Data Sheet.

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**Pental Granite and Marble**

553.    Defendant, Pental Granite and Marble, LLC, provided misleading information to Plaintiff and his employers by stating, in its Safety Data Sheet for Vicostone, also known as Pental Quartz, regarding respiratory protection that "respirators may protect workers from inhaling crystalline silica dust when carefully and properly selected, worn and used" and that one should "use only respiratory protection authorized in the U.S. Federal OSHA Standard (29 CRF 1910.134), applicable U.S. State regulations, or the Canadian CSA Standard Z94.4-93 and applicable standards of Canadian Provinces."   These statements are misleading because they suggest that wearing ordinary air-purifying respirators will prevent fabricators from getting silicosis, whereas such is not the case, because only a NIOSH-approved air supply respirator (along with other protections) can prevent fabricators of artificial stone from getting silicosis because of the extremely high (up to 95%) crystalline silica content of the products which create massive amounts of respirable crystalline silica dust when they are cut, ground, drilled, edged, and polished, all as designed, intended and expected.

554.    Defendant, Pental Granite and Marble, LLC, provided misleading information to Plaintiff and his employers by stating, in its Safety Data Sheet for Vicostone, also known as Pental Quartz, that "prolonged and/or massive inhalation of crystalline silica can cause pulmonary fibrosis and pneumoconiosis and silicosis," although fabricators exposed to artificial stone products at levels below occupational exposure limits are typically diagnosed with either acute silicosis or accelerated silicosis, even after just a few years of fabricating such products and even though they were only exposed to very small amounts of crystalline silica at levels below occupational exposure limits.

//
//
//
//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**Stylenquaza**

555.    Defendant, Stylenquaza LLC, provided misleading information to Plaintiff and his employers by stating, in its Safety Data Sheet for Vicostone regarding respiratory protection that "respirators may protect workers from inhaling crystalline silica dust when carefully and properly selected, worn and used" and that one should "use only respiratory protection authorized in the U.S. Federal OSHA Standard (29 CRF 1910.134), applicable U.S. State regulations, or the Canadian CSA Standard Z94.4-93 and applicable standards of Canadian Provinces."  These statements are misleading because they suggest that wearing ordinary air-purifying respirators will prevent fabricators from getting silicosis, whereas such is not the case, because only a NIOSH-approved air supply respirator (along with other protections) can prevent fabricators of artificial stone from getting silicosis because of the extremely high (up to 95%) crystalline silica content of the products which create massive amounts of respirable crystalline silica dust when they are cut, ground, drilled, edged, and polished, all as designed, intended and expected.

556.    Defendant, Stylenquaza LLC, provided misleading information to Plaintiff and his employers by stating, in its Safety Data Sheet for Vicostone, that "prolonged and/or massive inhalation of crystalline silica can cause pulmonary fibrosis and pneumoconiosis and silicosis," although fabricators exposed to artificial stone products at levels below occupational exposure limits are typically diagnosed with either acute silicosis or accelerated silicosis, even after just a few years of fabricating such products and even though they were only exposed to very small amounts of crystalline silica at levels below occupational exposure limits.

**Vadara Quartz Surfaces**

557.    Defendant, Vadara Quartz Surfaces, provided misleading information regarding the toxic hazards of its product to Plaintiff and his employers, by stating in the "Hazards Identification" section of its Material Safety Data Sheet that the product is "as shipped, non-hazardous quartz surfacing product," even though in its ordinary and intended use it causes silicosis.

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

558.    Defendant, Vadara Quartz Surfaces, also provided Plaintiff and his employers with false information, by stating that the "finished product does not contain hazard substances," even though the finished product contains > 85 % crystalline silica, crystalline silica is classified as a hazardous substance, crystalline silica causes silicosis, lung cancer, and other diseases, and crystalline silica has killed more workers than any other hazardous substance, including asbestos.

559.    Defendant, Vadara Quartz Surfaces, also provided Plaintiff and his employers with misleading information regarding the toxic hazards of its product by stating that "exposure limits may be applicable when cutting or grinding product creating dust, which can contain particles of crystalline silica (quartz)" and that "overexposure to airborne quartz particles can cause silicosis." These statements were misleading because occupational exposure limits always apply when cutting or grinding Vadara's product because of its very high (>85%) crystalline silica content, and because exposure to respirable crystalline silica causes silicosis even from extremely small amounts of crystalline silica to which fabricators are exposed below occupational exposure limits.

560.    Defendant, Vadara Quartz Surfaces, also provided Plaintiff and his employers with misleading information regarding engineering controls, by stating: "Provide appropriate exhaust ventilation at places where dust is formed" without specifying what type or degree of exhaust ventilation is necessary to prevent fabricators and installers from developing silicosis.

561.    Defendant, Vadara Quartz Surfaces, also provided Plaintiff and his employers with misleading information regarding personal protective equipment by stating that "when cutting or grinding . . . , workers should seek from their employer appropriate personnel protective equipment as required by the work environment conditions and equipment," although whenever cutting or grinding Defendant's product fabricators must wear full body protection and use a NIOSH-approved air supplied respirator to prevent being injuriously exposed to crystalline silica and getting silicosis.

562.    Defendant, Vadara Quartz Surfaces, also provided Plaintiff and his employers with misleading information regarding respiratory protection by stating: "In case of insufficient ventilation, wear suitable respiratory equipment" and that "dust masks do not provide suitable respiratory protection." These instructions are misleading, because they suggest that respiratory protection need only be worn where ventilation is "insufficient," whatever that may mean, although

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOXTORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

extremely powerful ventilation is necessary to prevent fabricators from getting silicosis, and, in addition to such ventilation systems, NIOSH-approved air supply respirators must always be worn by fabricators to prevent silicosis. The direction to wear "suitable respiratory equipment" is harmful, because it suggests that air-purifying respirators are adequate to protect fabricators from silicosis, although they are not; only a NIOSH-approved air supplied respirator can prevent silicosis.

**Wilsonart**

563.    Defendant, Wilsonart LLC, concealed from Plaintiff the true nature and severity of the hazards of its artificial products by concealing the hazard of silicosis from exposure to respirable crystalline silica from its artificial stone products. In June 2017 Defendant, Wilsonart LLC, issued an updated Safety Data Sheet for its artificial stone product Wilsonart Quartz, stating that the product contains 60-100% crystalline silica (quartz). Although this Safety Data Sheet stated that the crystalline silica content of the product was as much as 100%, Defendant totally concealed the hazard of silicosis from the use of this product. Indeed, the word "silicosis" is not found anywhere in the entire Safety Data Sheet.

564.    In the "Hazards identification" section of its 2017 Safety Data Sheet, Defendant, Wilsonart LLC, disclosed only two health hazards: "May cause cancer" and "Causes damage to organs through prolonged or repeated exposure," without explaining how many days, weeks, months, years or decades constitutes "prolonged" exposure that "causes damage to organs" and without quantifying the number of exposures that constitute "repeated exposure" that causes such damage.

565.    In the "Hazards identification" section of its 2017 Safety Data Sheet, Defendant, Wilsonart LLC, falsely stated that "No additional information [is] available regarding "Other hazards," although much additional information regarding the hazard of silicosis from exposure to respirable crystalline silica was known to Wilsonart LLC.

566.    Defendant, Wilsonart LLC, concealed from Plaintiff the need for fabricators and installers to wear air supply respirators to prevent them from getting silicosis, and provided 8 "Precautionary Statements" - none of which were to wear any respirators: (1) "Obtain special

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

instructions before use" (without stating what "special instructions" were to be obtained and from whom such special instructions could be obtained); (2) "Do not handle until all safety precautions have been read and understood," (as though Plaintiff, who neither speaks nor reads English could possibly read and understand the "safety precautions" in English), (3) "Do not breathe dust" (as though Plaintiff should hold his breath throughout the work day), (4) "Wash clothing, hands forearms and face thoroughly after handling" (although the products do not present appreciable health hazards by skin absorption); (5) "Do not eat, drink or smoke when using this product" (although the product does not present any significant health hazards by ingestion); (6) "Wear eye protection, face protection, protective clothing, protective gloes" (rather than the critical information that it is essential to wear an air supplied respirator when fabricating and/or installing artificial stone products); (7) "If exposed or concerned: Get medical advice/attention," (although fabricators are constantly exposed to the product when they cut, saw, grind, drill, edge, and polish the product); and (8) "Store locked up," (a meaningless instruction, because slabs of the product are too large to lock up and are so heavy they can only be stolen with great difficulty).

567.    In its 2017 Safety Data Sheet, Defendant, Wilsonart LLC, also concealed the identities of the ingredients of the product other than quartz, by stating that the product contains "binding resins" and "colorants" without identifying the ingredients of these components of the product, and without identifying any inorganic and/or metallic constituents of the product other than quartz.

568.    In the section of its 2017 Safety Data Sheet regarding Exposure controls, Defendant, Wilsonart LLC, provided the following "appropriate engineering controls" instruction: "Provide adequate general and local exhaust ventilation." This instruction not only failed to specify the type or degree of ventilation that is necessary to prevent silicosis, but constitutes a dangerous, lethal instruction, because general ventilation is never adequate when artificial stone containing 60-100% crystalline silica is sawed, cut, ground, routed, drilled, sanded or polished. Indeed, when fabricating artificial stone products, special ventilation is always required; using general ventilation for these tasks will cause silicosis, rather than prevent it.

569.    In the "Exposure controls" section of the Safety Data Sheet, Defendant, Wilsonart LLC, recommended the following "respiratory protection": "Use NIOSH (or other equivalent

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

national standard) -approved dust/articulate respirator." This instruction concealed critical information necessary to prevent silicosis, to wit, the specific type of respirator that is necessary to prevent silicosis (an air-supplied respirator), and instead provided misleading information – that a dust/particulate respirator would protect workers from harm, although air-purifying respirators do not protect artificial stone fabricators from silicosis and actually contribute to the development of silicosis, because they do not adequately filter our respirable crystalline silica.

**All Defendants**

570.    Prior to Plaintiff's exposure to Defendants' stone products, Defendants were aware that their artificial stone products contained extremely high concentrations of crystalline silica (approximately 95%), which produced extremely high levels of respirable crystalline silica in their ordinary and expected use, when fabricators and installers cut, grind, drill, edge, and polish the products, so their products presented extreme hazards and risks to the health of exposed workers, in comparison with natural stone products such as granite (which contains about 35% crystalline silica) and marble (which only contains about 5% crystalline silica).

571.    Prior to Plaintiff's exposure to Defendants' stone products, Defendants were aware that commonly used and recommended protective measures (e.g., use of wet processing methods and air purifying respirators) were inadequate to prevent fabricators and installers from getting silicosis.

572.    Prior to Plaintiff's exposure to Defendants' stone products, Defendants were aware that Plaintiff's employers lacked knowledge of the extreme toxic hazards of Defendants' stone products and were unaware of the extreme protective measures that are necessary to prevent fabricators and installers from getting silicosis from exposure to Defendants' stone products.

573.    At all times prior to Plaintiff's exposure to Defendants' stone products, Defendants nevertheless concealed from Plaintiff and from his employers the extreme protective measures that are necessary to prevent fabricators and installers from getting silicosis from exposure to Defendants' stone products.

//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

574.    At all times prior to Plaintiff's exposure to Defendants' stone products, Defendants failed to check and monitor the use of Defendants' stone products to determine whether Plaintiff's employers were using the products in such a manner so as not to endanger the health and safety of their employees, or whether Plaintiff's employers were endangering the health and safety of their employees by using Defendants' products in such a manner as would cause silicosis and death.

575.    At all times prior to Plaintiff's exposure to Defendants' stone products, Defendants failed to cease selling their toxic and lethal stone products to Plaintiff's employers who, despite their best efforts and intentions, were incapable of using Defendants' stone products safely, were incapable of protecting fabricators and installers from the respiratory and lethal hazards of Defendants' stone products, and, although they attempted to use Defendants' stone products as directed and intended, were nevertheless endangering the health and safety of their employees by exposing them to the toxic and lethal hazards of Defendants' stone products.

576.    Notwithstanding their knowledge of the toxic and fibrogenic hazards of their stone products, at all material times hereto, Defendants concealed said toxic hazards from Plaintiff, MARTIN MELENDEZ-MURILLO, so that he would use Defendants' stone products in his work.

577.    Plaintiff, MARTIN MELENDEZ-MURILLO, was unaware of the toxic and fibrogenic of Defendants' stone products and would not have acted as he did had he known of said concealed hazards.

578.    Defendants had a duty to disclose the toxic hazards of their products to plaintiff's employers; Defendants concealed significant health hazards from Plaintiff; Defendants intended that their products be used by Plaintiff; and therefore intended and had reason to expect that their concealment of toxic hazards and health risks would be acted upon by Plaintiff, MARTIN MELENDEZ-MURILLO, who otherwise would not have used Defendants' stone products. In using Defendants' stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, acted in justifiable reliance that Defendants had not concealed material facts of the toxic hazards of their stone products.

579.    As a direct and proximate result of Defendants' fraudulent concealment of the toxic and fibrogenic hazards of their stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to Defendants' stone products in the course of his work as a countertop fabricator and

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

Practice concentrated in toxic
tort & environmental litigation
occupational & environmental lung
disease, cancer, and toxic injuries

installer and he has sustained serious injuries and disease, including silicosis, and other conditions.

580.   Each of the toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed, was manufactured and/or supplied by Defendants, including the Doe Defendants.

581.   As a result of Plaintiff MARTIN MELENDEZ-MURILLO's exposure to Defendants' toxic stone products, toxins, including silica, metals and other toxic substances, within said stone products entered Plaintiff, MARTIN MELENDEZ-MURILLO's body.

582.   Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from specific illnesses, to wit, silicosis and other related and consequential medical conditions.

583.   Each of the foregoing toxic stone products caused Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis as well as his other related and consequential injuries.

584.   Each toxin, including silica and every metal, that entered Plaintiff, MARTIN MELENDEZ-MURILLO's body was a substantial factor in bringing about, prolonging, and aggravating Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis, and related and consequential injuries.

585.    As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from silicosisand other related and consequential medical conditions.

586.   As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their stone products, Plaintiff has been and will in the future be required to expend money and incur obligations for medical and related expenses in an amount not yet determined but which is well in excess of the jurisdictional minimum of the Court, and Plaintiff, MARTIN MELENDEZ-MURILLO, has been unable to attend to his usual work and activities.

587.   As a further direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

588.   As a further direct and proximate result of Defendants' fraudulent concealment of the

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

toxic hazards of their stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered and will continue to suffer general damages, according to proof at trial.

589.    In exposing Plaintiff to said toxic and fibrogenic stone products, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their products, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff.  Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff.  Defendants concealed known hazards of their stone products from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their stone products, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants.

590.    Defendants consciously decided to market their stone products with knowledge of their harmful effects and without remedying the toxic effects of their stone products, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants.  Defendants also misrepresented the nature of their stone products, by withholding information from Plaintiff regarding toxic and fibrogenic substances, including silica and metals, released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the Defendants.

591.    Defendants' conduct in exposing Plaintiff to said toxic and fibrogenic stone products without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use necessary to prevent disabling lung disease was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

//
//
//
//

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

## FIFTH CAUSE OF ACTION

## FOR BREACH OF IMPLIED WARRANTIES

(By Plaintiff MARTIN MELENDEZ-MURILLO

Against all Named Defendants and Does 1-100)

592.   Plaintiff refers to paragraphs 1 through 591 and, by this reference, incorporates said paragraphs herein as though set forth in full.

593.   At all times mentioned herein, Defendants were the importers, producers and distributors of inherently hazardous stone products which were purchased by Plaintiff's employers and delivered to Plaintiff's employers' facilities located in Los Angeles County, where Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to Defendants' toxic stone products.

594.   Defendants' stone products to which Plaintiff was exposed are toxic and fibrogenic.

595.   By placing their inherently hazardous stone products in the stream of commerce, Defendants impliedly warranted that their stone products were reasonably fit for their intended uses, that their stone products were of merchantable quality, that they were not defective, that they would function as safely as ordinary users would expect when used in an intended or reasonably foreseeable manner, and that they would not cause serious disease, harm, or death.

596.   Defendants, and each of them, breached said implied warranties, because their inherently hazardous stone products were not reasonably fit for their intended uses, were not of merchantable quality, were defective, and failed to function as safely as an ordinary user would expect when used in an intended or reasonably foreseeable manner, and caused serious injuries to Plaintiff, MARTIN MELENDEZ-MURILLO, to wit, silicosis and other injuries and disease.

597.   From his use of the foregoing inherently hazardous stone products, Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed to toxins, including silica, metals, and other toxins in Defendants' stone products.

598.   Each of the inherently toxic stone products to which Plaintiff, MARTIN MELENDEZ-MURILLO, was exposed, was manufactured and/or supplied by Defendants, including the Doe Defendants.

## COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

599.    As a result of Plaintiff MARTIN MELENDEZ-MURILLO's exposure to Defendants' stone products, toxins, including silica, metals and other toxic substances, within said stone products entered his body.

600.    Plaintiff, MARTIN MELENDEZ-MURILLO, suffers from specific illnesses, to wit, silicosis and other related and consequential medical conditions.

601.    Each of Defendants' inherently hazardous stone products caused Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis and other injuries.

602.    Each toxin, including silica and metals, that entered Plaintiff, MARTIN MELENDEZ-MURILLO's body was a substantial factor in bringing about, prolonging, and aggravating Plaintiff, MARTIN MELENDEZ-MURILLO's silicosis and other related and consequential injuries.

603.    As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered serious injuries and disease, including silicosis and other related and consequential medical conditions.

604.    As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, MARTIN MELENDEZ-MURILLO, has been requried and will in the future be required to expend money and incur obligations for medical and related expenses in an amount not yet determined but well in excess of the jurisdictional minimum of the Court, and Plaintiff, MARTIN MELENDEZ-MURILLO, has been unable to attend to his usual employment and activities.

605.    As a further direct and proximate result of Defendants' breaches of implied warranties resulting in his severe toxic injuries, Plaintiff, MARTIN MELENDEZ-MURILLO, has lost income from the date of the inception of his illness and thereafter through his worklife expectancy, all to Plaintiff's damage in a sum to be established according to proof.

606.    As a further direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, MARTIN MELENDEZ-MURILLO, has suffered great physical pain, mental anguish, emotional distress, fear of death, diminished quality/enjoyment of life, and damages to his psyche.

---

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

### SIXTH CAUSE OF ACTION

### FOR LOSS OF CONSORTIUM

(By Plaintiff RUFINA BARAJAS Against all Named Defendants and Does 1-100)

607.    Plaintiff refers to paragraphs 1 through 606 and, by this reference, incorporates said paragraphs herein as though set forth in full.

608.    At all material times hereto, Plaintiffs MARTIN MELENDEZ-MURILLO and RUFINA BARAJAS, have been living together as husband and wife.

609.    As a direct and proximate result of Defendants' above-described conduct and Defendants' defective chemical products, Plaintiff, RUFINA BARAJAS, has lost and been deprived of the services, love, companionship, comfort, affection, society, sexual relations, and solace of Plaintiff, MARTIN MELENDEZ-MURILLO, and anticipates further such losses in the future.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment, seeking damages as follows:

1.    For past, present and future general damages in excess of the jurisdictional minimum;

2.    For past, present and future medical expense according to proof;

3.    For past, present and future loss of earnings according to proof;

4.    For punitive damages according to proof;

5.    For loss of consortium according to proof;

6.    For Plaintiff's costs of suit incurred herein; and,

7.    For such other and further relief as the Court deems just and proper.

DATE:    April 17, 2023

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION

_____
RAPHAEL METZGER, ESQ.
Attorneys for Plaintiffs
MARTIN MELENDEZ-MURILLO
and RUFINA BARAJAS

### COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL

F:\WP\Cases\3205\PLEADDOC\COMPLAIN\2023-04-17 Complaint-rev2.wpd

**DEMAND FOR JURY TRIAL**

Pursuant to Cal. Code of Civil Procedure § 600 et seq. (and Rule 38 of the Federal Rules of Civil Procedure should this case ever be removed to federal court), Plaintiff hereby demands trial by jury of all issues which may be tried by a jury.

DATE:     April 17, 2023

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION

_____
RAPHAEL METZGER, ESQ.
Attorneys for Plaintiff
MARTIN MELENDEZ-MURILLO
and RUFINA BARAJAS

TELEPHONE (562) 437-4499
TOLL-FREE (877) TOX-TORT
TELECOPIER (562) 436-1561
WWW.TOXICTORTS.COM

METZGER LAW GROUP
A PROFESSIONAL LAW CORPORATION
555 EAST OCEAN BOULEVARD, SUITE 800
LONG BEACH, CALIFORNIA 90802

PRACTICE CONCENTRATED IN TOXIC
TORT & ENVIRONMENTAL LITIGATION
OCCUPATIONAL & ENVIRONMENTAL LUNG
DISEASE, CANCER, AND TOXIC INJURIES

**COMPLAINT FOR TOXIC INJURIES; DEMAND FOR JURY TRIAL**

262